1  DEBRA S. BELAGA (S.B. #83237) — dbelaga@omm.com
   RANDALL W. EDWARDS (S.B. #179053) — redwards@omm.com
2  ROBIN M. WALL (S.B. #235690) — rwall@omm.com
   FLORA F. VIGO (S.B. #239643) — fvigo@omm.com
3  O'MELVENY & MYERS LLP
   Embarcadero Center West
4  275 Battery Street
   San Francisco, CA  94111-3305
5  Telephone: (415) 984-8700
   Facsimile: (415) 984-8701
6
   Attorneys for Plaintiff
7  LENNAR-BVHP, LLC

**ORIGINAL FILED**

JUN 2 3 2008

E-filing

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8            **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10                **SAN FRANCISCO DIVISION**

11

12                                    CV 08    3058

13  LENNAR-BVHP, LLC, a California       Case No:
    limited liability company,
14                                       **COMPLAINT FOR:**      BZ
              Plaintiff,
15                                       (1) NEGLIGENCE;
         v.
16                                       (2) NEGLIGENT
    CH2M HILL, INC., a Florida               MISREPRESENTATION;
17  corporation, and CH2M HILL
    COMPANIES, LTD., an Oregon          (3) BREACH OF CONTRACT;
18  corporation,
                                         (4) EXPRESS INDEMNITY; and
19            Defendants.
                                         (5) UNFAIR BUSINESS PRACTICES
20
                                         **JURY TRIAL DEMANDED**
21

22

23

24

25

26

27

28

1    Plaintiff Lennar-BVHP, LLC ("Lennar") brings this action against defendants
2  CH2M Hill, Inc. and CH2M Hill Companies, Ltd. (collectively, ''CH2"). Lennar seeks to
3  recover for the significant economic harm it has suffered in addressing the ramifications
4  of CH2's gross and reckless misconduct in failing to provide competent asbestos air
5  monitoring services for Lennar's redevelopment of a portion of Hunters Point Shipyard in
6  San Francisco. Although ultimately government regulators and health experts concluded
7  that no significant risk to human health existed from the asbestos dust generated by the
8  redevelopment activities at issue, Lennar incurred substantial expense and other economic
9  harm as a result of responding to legal, regulatory, community, and other concerns upon
10  the revelation of CH2's failure to monitor those risks adequately. In support of its claims,
11  Lennar alleges as follows:

## PARTIES

13    1.    Lennar is a California limited liability company with its principal place of
14  business in California.

15    2.    Lennar is informed and believes, and on that basis alleges, that defendant
16  CH2M Hill, Inc. is, and at all relevant times was, a corporation organized under the laws
17  of Florida, with its principal place of business in Colorado.

18    3.    Lennar is informed and believes, and on that basis alleges, that defendant
19  CH2M Hill, Ltd. is, and at all relevant times was, a limited liability corporation organized
20  under the laws of Oregon, with its principal place of business in Colorado.

## JURISDICTION AND VENUE

22    4.    Jurisdiction of this Court exists under 28 U.S.C. § 1332, in that there is
23  complete diversity between the parties and the matter in controversy exceeds $75,000.

24    5.    Venue in this District is proper under 28 U.S.C. § 1391(c). Defendants
25  conduct business in the City and County of San Francisco, California, and the events
26  relevant to the subject dispute took place there.

27    6.    Pursuant to Local Rule 3-2(d), assignment to the San Francisco Division of the
28  U.S. District Court for the Northern District of California is appropriate because a

1

1  substantial part of the events and omissions which give rise to Lennar's claims in this
2  complaint occurred in the County of San Francisco.

3                              **FACTUAL BACKGROUND**

4      7.    In 1999, the City of San Francisco selected Lennar to be the master developer
5  to transform the Hunters Point Shipyard, a former Navy shipyard, into a clean, safe and
6  dynamic multi-use project that would bring much-needed housing, jobs and services to the
7  Bayview Hunters Point community.

8      8.    When the Navy ceased operations in 1974, the Shipyard had various
9  environmental issues and was designated as a Superfund site.  In 2004, the first parcel at
10 the Shipyard was deemed safe for residential development by numerous government
11 agencies.  The first phase of the project includes construction of approximately 1,600
12 housing units, commercial development, and creation of recreation and open space areas.
13 Redevelopment of the Shipyard continues to be subject to extensive regulation and
14 oversight by the Bay Area Air Quality Management District ("BAAQMD") and the San
15 Francisco Department of Public Health ("SFDPH"), among other agencies.

16     9.    Portions of the Shipyard sit on serpentine rock, a rock that is so common
17 throughout San Francisco and California that it is the official state rock.  Serpentine rock
18 can contain naturally occurring asbestos.  Among other regulatory requirements, Lennar
19 and its contractors were required to develop plans to monitor naturally occurring asbestos
20 to ensure that grading did not cause it to become airborne at levels that would pose a risk
21 to human health.

22     10.  Lennar arranged for CH2, an international environmental consulting firm with
23 purported expertise in air monitoring, to prepare and implement the necessary plans to
24 ensure compliance with this requirement.  CH2 holds itself out as having expertise and
25 adequately qualified personnel for this type of activity.  The Asbestos Dust Mitigation
26 Plan, developed by CH2 and approved by BAAQMD, required CH2 to collect and
27 analyze air samples on a periodic basis to measure ambient naturally occurring asbestos
28 levels.

11.  CH2 began collecting air samples in July 2005, before grading began, to obtain background readings.  In that timeframe, CH2 reported to BAAQMD that there were "non-detections," under the thresholds set by the plan, of naturally occurring asbestos.

12.  In or about January 2006, Lennar and CH2 formally entered into the Phase I Environmental Consulting Services Agreement for the asbestos air monitoring services CH2 was providing.  A copy of the Agreement is attached as Exhibit A.  As part of that Agreement, CH2 told Lennar that it would furnish adequately qualified personnel and would use the highest care in performing its services.

13.  After significant earth moving and major grading began in Spring 2006, CH2 reported to BAAQMD, Lennar and/or SFDPH on many occasions that the air monitoring continued to reflect "non-detections" of naturally occurring asbestos.  CH2 sent written communications to BAAQMD, sometimes but not always copying Lennar, SFDPH, and/or other entities, that naturally occurring asbestos levels were "non-detections" on at least the following dates in 2006:  April 25 and 27; May 2, 3, 4, 5, 9, 11, 19 and 26; and June 2, 14, and 23; and July 3, 7, 18, and 25.  On the basis of those communications – and the lack of any communications during this time that indicated detections of asbestos levels above the thresholds – Lennar understood that its grading activities were not causing asbestos to be airborne in a manner that required work stoppage or otherwise presented concerns under the approved plans.

14.  On August 22, 2006, CH2 disclosed to Lennar in writing that it could not verify any of the asbestos data (the non-detections) it had reported through July 2006.  These failures supposedly were due to the poor condition of CH2's air monitoring equipment and CH2's failure to establish or follow proper protocols, create and maintain documentation, and take other appropriate actions.

15.  Until CH2's disclosure, Lennar did not know and could not reasonably have known that CH2 failed to perform the asbestos air monitoring activities in an appropriate manner.

3

16.  Upon learning of CH2's asbestos air monitoring failures, Lennar reported the issue to the BAAQMD, the SFDPH and the community.  Lennar also terminated CH2 for cause from the portion of its contract relating to asbestos monitoring.

17.  As a result of the revelation of CH2's failures, Lennar has suffered significant economic harm and devoted significant resources to respond to community, regulatory and other concerns about CH2's air monitoring failures.  Lennar worked diligently to address these concerns.  Ultimately, numerous health experts and government regulators concluded that there was no significant long-term health risk due to naturally occurring asbestos disturbed during grading.  But before that conclusion was reached, and continuing thereafter, Lennar incurred substantial expense, liabilities, loss, and other economic harm.  Lennar's economic harm vastly exceeds $75,000.  CH2 has provided no compensation to Lennar and no other relief for its failures.  Indeed, CH2 has never publicly acknowledged its clear responsibility for its failures.

## FIRST CAUSE OF ACTION

### (Negligence/ Gross Negligence)

18.  Lennar re-alleges and incorporates by this reference paragraphs 1-17, above, as though set forth in full.

19.  CH2 owed a duty of care to Lennar in providing asbestos air monitoring services for Lennar's redevelopment project.  That duty was to use such skill, prudence, and diligence that asbestos air monitoring companies commonly possess and exercise and also to use ordinary reasonable care in performing the services pursuant to the Agreement.

20.  CH2 breached its duties to Lennar by failing to exercise ordinary or reasonable care in performing the asbestos air monitoring services.  To the contrary, as described above, CH2 acted negligently by, among other things, failing to ensure that its asbestos air monitoring equipment was in proper working condition, to ensure that its employees followed proper procedures, or to maintain adequate air monitoring protocols and documentation of air monitoring activities.  CH2's failure to exercise ordinary or

4

1    reasonable care in the performance of air monitoring services was so extreme that it

2    amounted to gross negligence.

3        21. CH2's negligence was the proximate and legal cause of significant economic

4    harm to Lennar, as described above.

5        22. As a result of CH2's failure to exercise the appropriate care, Lennar incurred

6    damages in an amount that vastly exceeds $75,000.

7                              **SECOND CAUSE OF ACTION**

8                              **(Negligent Misrepresentation)**

9        23. Lennar re-alleges and incorporates by this reference paragraphs 1-22, above, as

10   though set forth in full.

11       24. From April through July 2006, as detailed above, CH2 repeatedly sent written

12   reports to government regulators, often copying Lennar, indicating that CH2 had

13   monitored the asbestos levels on the site and that they were well below shutdown levels in

14   the plan. These representations were not correct when made.

15       25. CH2 owed a duty of care to make accurate representations to government

16   regulators and Lennar, both by virtue of CH2's contractual relationship with Lennar and

17   by virtue of the nature of the asbestos air monitoring services it sought to provide and

18   provided.

19       26. At the time CH2 misrepresented the accuracy and results of the air sampling

20   data, CH2 had no reasonable ground for believing its representations were correct. CH2's

21   air monitoring equipment and practices were deficient in multiple respects, and thus CH2

22   had no basis for reporting the non-detections. Although CH2 knew or should have known

23   of these deficiencies, it failed to disclose them to Lennar.

24       27. At the time CH2 made the above-mentioned misrepresentations, Lennar did not

25   know, and in the exercise of reasonable diligence had no reason to discover or suspect,

26   that CH2's representations were not correct.

27       28. In reasonable and justifiable reliance upon CH2's purported expertise and care,

28   and upon the numerous representations relating to the accuracy of the sampling data,

5

1  Lennar proceeded with the redevelopment activities based on its reasonable belief that

2  CH2 was providing the required and appropriate monitoring.

3      29. As a direct and proximate cause of Lennar's reliance on CH2's

4  misrepresentations, Lennar suffered damages in an amount that vastly exceeds $75,000.

5                              **THIRD CAUSE OF ACTION**

6                                 **(Breach of Contract)**

7      30. Lennar re-alleges and incorporates by this reference paragraphs 1-29, above, as

8  though set forth in full.

9      31. Under the Agreement, CH2 had contractual obligations to Lennar to provide

10  adequate asbestos air monitoring services, among other things. CH2 failed to provide the

11  required adequate services and to fulfill its contractual obligations, as described above.

12      32. As a result of its failures, CH2 materially breached the Agreement, including

13  but not limited to, sections 12.1, 12.9, 17, and 18. CH2's acts and omissions constituting

14  the breaches were so extreme that they amounted to gross negligence and/or fraud, as

15  those terms are used in section 15 of the Agreement.

16      33. CH2's failures to perform its duties were not excused.

17      34. At all relevant times, the Agreement was valid and in effect, and Lennar has

18  performed all of its duties to CH2 under the Agreement.

19      35. CH2's material breaches have directly and proximately caused damage to

20  Lennar.

21      36. Section 24 of the Agreement expressly provides that the prevailing party in any

22  action to enforce the provisions of the agreement is entitled to recover reasonable attorney

23  fees and costs. Accordingly, Lennar is entitled to recover its attorney fees and costs

24  incurred in pursuing this action against CH2.

25      37. As a result of CH2's breaches of its contractual obligations, Lennar has

26  incurred damages in an amount that vastly exceeds $75,000.

27

28

## FOURTH CAUSE OF ACTION

### (Express Indemnity)

38.  Lennar re-alleges and incorporates by this reference paragraphs 1-37, above, as though set forth in full.

39.  Lennar is informed and believes, and on that basis alleges, that the expense, liabilities, loss, and other economic harm incurred by Lennar described above fall within the express indemnity provision found in section 14 of the Agreement.

40.  Lennar incurred expense, liabilities, loss, and other economic harm as a direct and proximate result of CH2's failure to perform adequate air monitoring services under the Agreement.

41.  Lennar has fully performed all the conditions and obligations required by it under the Agreement.

42.  The expense, liabilities, loss, and other economic harm were reasonably and necessarily incurred.

43.  Lennar continues to incur necessary and reasonable attorney fees and other costs in pursuing the pending action.

44.  By the terms of the Agreement, Lennar is entitled to full express indemnification from CH2 for its expenses, liabilities, loss, and other economic harm, as well as for the reasonable attorney fees and costs in pursuing this action.

## FIFTH CAUSE OF ACTION

### (Unfair Competition Law)

45.  Lennar re-alleges and incorporates by this reference paragraphs 1-44, above, as though set forth in full.

46.  By reason of the acts and omissions described above, CH2 has engaged in unlawful, unfair and deceptive business practices within the meaning of California Business and Professions Code §§ 17200-09 (the Unfair Competition Law or "UCL").

47.  In addition, CH2 was legally obligated to implement and maintain all of the provisions of the ADMP pursuant to California Code of Regulation title 17, section

7

1    93105(e). CH2 violated this regulation and thereby engaged in unlawful business

2    practices under the UCL.

3        48.  Lennar suffered harm as a result of CH2's violation.  Lennar is entitled to,

4    among other things, equitable relief in the form of restitution, in an amount to be proven at

5    trial.

6                              **PRAYER FOR RELIEF**

7        Lennar prays for judgment as follows:

8        1.      For compensatory and consequential damages in an amount to be proven at

9    trial;

10       2.      For punitive damages;

11       3.      For restitution and indemnity;

12       4.      For attorney fees;

13       5.      For its costs of suit; and

14       6.      For such other and further relief as the Court deems just and proper.

15

16   DATED:  June 23, 2008              O'MELVENY & MYERS LLP

17

18                                     By: _Randall W. Edwards_____

19                                         Randall W. Edwards

20                                     Attorneys for Plaintiff
                                       LENNAR-BVHP, LLC

21

22

23

24

25

26

27

28

                                        8

1

## **DEMAND FOR JURY TRIAL**

2      Lennar demands a trial by jury on all issues triable by a jury.

3

4    DATED:  June 23, 2008              O'MELVENY & MYERS LLP

5

6                                      By: _Randall E Edwards_____
                                           Randall W. Edwards
7
                                       Attorneys for Plaintiff
8                                      LENNAR-BVHP, LLC

9

10

11   SF1:717962.2

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          9
─────────────────────────────────────────────
                        COMPLAINT

CONSULTING AGREEMENT


HUNTERS POINT SHIPYARD


NO. #3605461


Phase I Environmental Consulting Services for FY06


BETWEEN


"OWNER"


Lennar/BVHP, LLC
49 Stevenson, Suite 600
San Francisco, CA 94105
(415) 995-1770
(415) 995-1778 (fax)


License # N/A


AND


"CONSULTANT"


CH2M Hill
2485 Natomas Park Drive, Suite 600
Sacramento, CA 95833
Phone:  916-286-0423
Fax:  916-614-3410


License # N/A


EXHIBIT A

# CONSULTING AGREEMENT

Consultant: CH2M HILL

Contract No.: **3605461**

Amount: $392,600.00

Date:   January 20, 2006

This Consulting Agreement-Hunters Point Shipyard ("Agreement") is entered into by and between **Lennar/BVHP, LLC,** a California limited liability company doing business as Lennar/BVHP Partners located at **49 Stevenson Street, Suite 600, San Francisco CA  94105** ("Owner"), and **CH2M Hill,** located **at 2485 Natomas Park Drive, Suite 600, Sacramento, CA 95833** ("Consultant").  Owner and Consultant are individually or collectively referred to as a "Party" or the "Parties."   For valuable and sufficient consideration received, Owner and Consultant hereby agree as follows:

             1.     General Description of Services.   The services to be performed by Consultant ("Services") are described in the Summary Sheet attached as **Exhibit "A",** which specifies the development project with respect to which the Services are to be performed ("Project"), the exact nature and type of Services required; the compensation to be paid for such Services; the manner of payment of Consultant's Compensation; and the specific time periods or dates upon which Services must be completed, including without limitation, start up and completion dates, dates of inspections, conferences or meetings; and any other additional information deemed necessary by Owner.  Consultant acknowledges that this Agreement relates to Services to be performed with respect to Owner's Project located in the Bayview Hunters Point Area, on which certain Improvements (as defined below) shall be constructed, as more particularly described in the DDA (defined below) ("BVHP") of the City of San Francisco ("City") and is subject to that certain Disposition and Development Agreement-Hunters Point Shipyard Phase 1, between Owner and the Redevelopment Agency of the City and County of San Francisco ("Agency"), recorded April 5, 2005 in the Official Records of the County of San Francisco as Document No. 2005H932190 at Reel I861, Image 564, as amended from time to time ("DDA").  Consultant further acknowledges that the DDA requires that the development of the Project integrate and incorporate into all aspects of the Project environmentally sustainable, or "green", techniques, methods, and materials, and that responsible environmental stewardship is a material consideration for all aspects of Consultant's instruments of service or Work Product (defined below) resulting from Consultant's performance of the Services, and to comply with all of the relevant requirements of the Hunters Point Shipyard Phase 1 Horizontal Design Review and Document Approval Procedure for Infrastructure Development executed by Owner and Agency prior to or concurrently with Owner's acquisition of the Project.  Consultant agrees to provide all Services in a manner complying with these obligations.  As used herein and in the Riders attached hereto, "Improvements" shall mean any and all construction improvements to be constructed as a part of the Project, including but not limited to the Horizontal Improvements (as defined in the DDA), the Vertical Improvements (as defined in the DDA), and any other improvements to be constructed in or for the benefit of the Project.

2.    <u>Additions to or Modification of Services</u>.  The Services are not subject to modification or addition ("Change") unless Consultant obtains a written approval of the Change signed by Owner ("Change Order").  The contents of a written Change Order shall include at a minimum all of the following:  (a) a description of the particular Change to the Services; (b) the amount of any change in Consultant's Compensation (defined below) resulting from the Change; (c) any revisions in commencement, completion or delivery dates, if any, resulting from the Change; and (d) Owner's dated signature.  Consultant shall not commence or undertake any actions with respect to any Change or incur any "Reimbursable Expenses" (defined below) with respect to such Change until Consultant obtains a signed Change Order for such Change.

3.    <u>Term of Agreement</u>.  The term of this Agreement commenced on the date shown above in the preamble and on **Exhibit "A"** and shall continue in effect until the date ("Termination Date") which is the first to occur of the following:  (a) July 31, 2005, or (b) the date on which performance of the Services has been completed in accordance with this Agreement, or (c) the tenth (10th) calendar day, or such earlier date as may otherwise be provided in this Agreement, after Consultant receives a written notice from Owner ("Termination Notice") terminating this Agreement, which termination may be with or without cause.  If Owner terminates this Agreement without cause, Consultant shall be paid for all Services rendered in accordance with the terms of this Agreement up to the Termination Date.

4.    <u>Compensation</u>.  With the exception of the Reimbursable Expenses, and except as otherwise provided in any Change Order signed by Owner, Consultant shall be compensated ("Consultant's Compensation") on the basis specified in **Exhibit "A"**.  Except as otherwise provided in **Exhibit "A"** or any Change Order, Consultant's Compensation shall be paid monthly.  If Consultant's compensation is determined on an hourly basis, then monthly payments shall be based on the number of consulting hours provided by Consultant for that month, times the specified agreed hourly rate for each employee or agent of Consultant performing any portion of the Services.  Consultant shall provide Owner's accounting personnel with documentation, acceptable to Owner, reflecting the number of consulting hours or other relevant billing information for any month, which information shall be provided in a manner and at times specified by Owner from time to time.  Consultant acknowledges and agrees that Consultant's failure to provide time and billing information in a prompt manner and in the form required by Owner may result in a delay in the payment of Consultant's Compensation and Consultant agrees that Owner shall have no liability or responsibility to Consultant for such delays in payment of Consultant's Compensation as a result of such failure.

5.    <u>Reimbursable Costs</u>.  In addition to Consultant's Compensation, Owner shall reimburse Consultant, at cost with no further markup, for reasonable costs of food, travel, lodging, supplies, materials, publications, and other items incurred by Consultant, solely in connection with Consultant's performance of the Services, which expenses are expressly authorized by Owner in this Agreement or in any Change Order ("Reimbursable Expenses").  Consultant shall provide to Owner an itemization of all Reimbursable Expenses in the time and in the manner specified in **Exhibit "A"** or the applicable Change Order.  Such itemization shall include supporting receipts and invoices if requested by Owner.  Consultant shall advise Owner, in writing, prior to incurring any single expense or cost or any group of related expenses or costs

- 2 -

which exceed the amount specified in **Exhibit "A"** or the applicable Change Order ("Extraordinary Reimbursable Expenses"). Consultant shall only be reimbursed for Extraordinary Reimbursable Expenses if authorized in writing by Owner.

6. _INDEPENDENT CONTRACTOR STATUS. IN PROVIDING THE SERVICES, CONSULTANT IS ACTING AS AN INDEPENDENT CONTRACTOR AND THIS AGREEMENT IS NOT INTENDED TO, NOR DOES IT, CREATE ANY EMPLOYER-EMPLOYEE RELATIONSHIP, NOR SHALL IT BE CONSTRUED AS CREATING ANY JOINT VENTURE OR PARTNERSHIP BETWEEN OWNER AND CONSULTANT._

7. Tax Reporting. Consultant shall be responsible for all applicable federal, state and other taxes related to Consultant's Compensation and Owner shall not withhold or pay any such taxes on behalf of Consultant, including, without limitation, federal, state and other local income taxes and social security. Since Consultant is acting solely as an independent contractor under this Agreement, Consultant shall not be entitled to insurance, incentive pay, or other benefits normally provided by Owner to its employees.

8. Ownership of Work Product. All reports, studies, letters, maps, diagrams, investigations, permits, applications, materials, publications, supplies or other items of any kind prepared or obtained by Consultant in the course of performing the Services, whether or not the cost of same is reimbursed by Owner to Consultant ("Work Product") shall be the property of Owner and, upon termination of this Agreement, all of such Work Product (not previously delivered to Owner), shall be delivered to Owner.

9. Confidentiality. Consultant acknowledges and understands that all information, documents, and electronic media relating in any way to Owner or its business or affairs, whether written or oral, obtained by Consultant in connection with the Services and any information regarding the nature and extent of the Services or the Project ("Confidential Information"), shall, unless otherwise specified by Owner in writing, be held by Consultant in the strictest confidence. Consultant further acknowledges and understands that Consultant's unauthorized disclosure of any Confidential Information would be extremely prejudicial to Owner. Therefore, Consultant shall not disclose to any person or entity, any Confidential Information unless such disclosure is authorized in writing by Owner, which may be withheld in Owner's sole and absolute discretion. If Consultant discloses or threatens to disclose Confidential Information in violation of its obligations under this Section 9, Owner shall be entitled to temporary or permanent injunctive relief prohibiting the disclosure of such Confidential Information. Consultant may share Confidential Information with sub-consultants who are similarly bound by this confidentiality provision. If Consultant is served with any subpoena or other legal process seeking the compelled disclosure of Owner's Confidential Information, Consultant shall notify Owner within one (1) business day after Consultant's receipt of such legal process. Owner may, in its sole and absolute discretion and at Owner's sole expense, contest the disclosure of all or any portion of the Confidential Information sought under such legal process. Only after a final, non-appealable order of a court of competent jurisdiction requiring the disclosure of Confidential Information may Consultant disclose Confidential Information, and then such disclosure shall extend only to those portions of the Confidential

Information as may be required by such order of the court or courts. This prohibition of disclosure of Confidential Information shall survive the termination of this Agreement. Consultant hereby agrees to indemnify, defend and hold Owner and its affiliates, partners, employees and agents harmless from any and all loss, damage or liability which results from or arises in connection with Consultant's breach of its obligations under this Section 9. Consultant, at any time upon the request of Owner, shall immediately return and surrender to Owner all copies of any materials, records, notices, memoranda, recordings, drawings, and any other documents furnished to Consultant, and shall retrieve and return to Owner any copies of such Confidential Information as may have been transmitted to any person or entity by Consultant or its sub-consultants.

10.    Exclusive Services. During the term of this Agreement, Consultant agrees to act only as a consultant to Owner in connection with the subject matter of the Services, and Consultant shall not be engaged by or perform Services for any other individual, entity, or group in connection with the subject matter of the Services, without the written approval of Owner.

11.    Standards of Conduct.

11.1    Prohibited Activities. Neither Consultant nor any partner, director, employee, or agent of Consultant, as applicable, nor any subcontractor of Consultant or any partner, director, employee or agent of such subcontractor shall, without specific written authorization of Owner:

(a)    Commissions. Give or receive any commission, fee, rebate, gift or entertainment of significant cost or value to any person or entity in connection with or as a result of Consultant's Services provided hereunder;

(b)    Business Dealings with Affiliates. Enter into any business arrangement with any partner or employee of Owner, or any affiliate of same other than as a representative of Owner or such affiliate in accordance with this Agreement and with the prior written approval of Owner;

(c)    Gratuities. Make any payment or give anything else of value, to any government official, including any officer or employee of any government, department, agency or instrumentality, to influence any decision, or to gain any other advantage for Owner or Consultant; or

(d)    Conflict of Interest. Engage in any employment or enter into any contract or agreement which conflicts with Consultant's obligations under this Agreement, or, either individually or in association with any other individual or entity, acquire property or rights to acquire property; perform services or engage in any activities which will either directly or indirectly conflict or compete with Owner's business(es) or interests.

11.2    Notice. Consultant agrees to notify Owner immediately of any violation of this Section 11. In the event of a violation of Subsection 11.1(a) above, Consultant shall pay to Owner any and all amounts received by Consultant or any other individual or entity

- 4 -

described above in violation of Subsection 11.1(a), however, such payment shall not limit, or operate as a waiver of, any other legal or equitable rights which Owner may have against Consultant at law, in equity, or under this Agreement.

        11.3   <u>Remedies</u>. Due to the nature of this transaction and the potential exposure to various forms of fines, penalties, sanctions and other uncertain damages to Owner's business and reputation, all of which are, at the date of executing this Agreement, impractical and extremely difficult to ascertain in advance, Owner and Consultant agree that if Owner terminates this Agreement due to the breach of this Section 11, then, as the exclusive monetary remedy for such breach, as liquidated damages and not as a penalty, Consultant agrees that Consultant shall not be paid any amounts billed but unpaid for Consultant's Compensation for Services performed prior to the Termination Date, or receive reimbursement for any amounts billed but unpaid for any Reimbursable Expenses incurred prior to the Termination Date. This provision shall not be construed as a waiver of Owner's right to obtain temporary or permanent injunctive relief for any breach or threatened breach by Contractor of this Section 11.

        12.   <u>Consultant's General Obligations and Representations and Warranties</u>.

        12.1   <u>Standard of Care; Compliance with Laws</u>. Consultant accepts the relationship of trust and confidence established between it and Owner by this Agreement. Consultant covenants with Owner in the performance of the Services and Consultant's other obligations under this Agreement to furnish its best skill and judgment, to exercise the highest care as a professional in its field, and to cooperate with Owner in furthering the best interests of Owner. Consultant agrees to furnish efficient business administration and to furnish at all times an adequate supply of adequately qualified personnel to perform the Services in the best, most expeditious and economical manner consistent with Owner's best interests. Consultant covenants and agrees to abide by all federal, state, and local laws, ordinances, codes and regulations applicable to the Project and the Services under this Agreement. If Consultant observes or discovers that the Work Product or any portion thereof is in any way at variance with any such laws, ordinances, codes or regulations, Consultant shall promptly give Owner written notice thereof. Should Consultant perform any Services generating any Work Product that is contrary to any laws, ordinances, codes or regulations, Consultant shall bear all costs and expenses arising therefrom and associated therewith.

        12.2   <u>Responsibility for Consultant's Representatives</u>. Consultant shall be totally responsible and liable for all acts and omissions of its sub-consultants, of other parties directly or indirectly employed by such lower tier sub-consultant, and of all other parties for whose acts any such lower tier sub-consultant may be liable to the same extent Consultant is responsible and liable for the acts and omissions of parties directly employed by Consultant. Consultant shall also be solely responsible for the payment of its lower tier sub-consultants and all other persons and parties directly or indirectly employed by Consultant or by such lower tier sub-consultant. This Agreement shall not be construed to create any contractual relationship between Owner and any lower tier sub-consultant or other person or party having a direct contract with Consultant, nor shall it be construed to create any obligations of Owner to pay or to guarantee the payment of any monies due any such lower tier sub-consultant or other person or party, except as may otherwise be required by law.

- 5 -

12.3    Wage and Benefit Requirements.

12.3.1 Prevailing Wage Requirements.  Consultant shall comply with the terms, covenants, and conditions set forth in attached **Rider 1**, Prevailing Wage Requirements (Labor Standards).  Consultant shall include **Rider 1** in each lower tier sub-consultant agreement to be executed by Consultant with respect to any portion of the Services, substantially verbatim, and shall impose this obligation to include **Rider 1** in all lower tier sub-consultant agreements.

12.3.2 Minimum Compensation Requirements.  Consultant shall comply with the terms, covenants, and conditions set forth in attached **Rider 2**, Minimum Compensation Policy.  Consultant shall include **Rider 2** in each lower tier sub-consultant agreement to be executed by Consultant with respect to any portion of the Services, substantially verbatim, and shall impose this obligation to include **Rider 2** in all lower tier sub-consultant agreements.  Notwithstanding the foregoing, if this Agreement or any lower tier sub-consultant agreement meets the definition of "Excluded Subcontract" or is excluded from the definition of "Contract" as more particularly set forth in **Rider 2**, then Consultant or any applicable lower tier sub-consultant shall be exempt from compliance with the terms of **Rider 2**.

12.3.3 Health Care Accountability Policy.  Consultant shall comply with the terms, covenants, and conditions set forth in attached **Rider 3**, Health Care Accountability Policy.  Consultant shall include **Rider 3** in each lower tier sub-consultant agreement to be executed by Consultant with respect to any portion of the Services, substantially verbatim, and shall impose this obligation to include **Rider 3** in all lower tier sub-consultant agreements.  Notwithstanding the foregoing, if this Agreement or any lower tier sub-consultant agreement is excluded from the definition of "Contract" as more particularly set forth in **Rider 3**, then Consultant or any applicable lower tier sub-consultant shall be exempt from compliance with the terms of **Rider 3**.

12.4    Nondiscrimination Policy.  Neither Consultant nor any lower tier sub-consultant performing any portion of the Services shall discriminate on the basis of the fact or perception of a person's race, color, creed, religion, ancestry, national origin, age, sex, Sexual Orientation, Gender Identity, Domestic Partner status, marital status, disability of AIDS/HIV status, against any employee of, any Agency employee working with, any member of the public having contact with, or any applicant for employment with, such Consultant or lower tier sub-consultant, and Consultant shall require such lower tier sub-consultant to incorporate this provision, substantially verbatim, in all sub-consulting agreements executed or amended thereunder.  As used in this Section, the term "Domestic Partner" shall mean any person who has a currently registered Domestic Partnership with a governmental body pursuant to state or local law authorizing such registration, and "Gender Identity" shall mean a person's various individual attributes as they are understood to be masculine and/or feminine, and "Sexual Orientation" shall mean the status of being lesbian, gay, bisexual or heterosexual.

12.5    Equal Opportunity Requirements.  Consultant shall comply with the terms, conditions, and covenants set forth in **Rider 4**, Equal Opportunity Program, and shall

incorporate **Rider 4** substantially verbatim, into all lower tier sub-consultant agreements, to the extent such agreements meet the standards for required application set forth in **Rider 4**.

      12.6   <u>Additional Community Benefits</u>. Consultant shall comply with the terms, conditions, and covenants set forth in **Rider 6**, Small Business Assistance Program, and shall incorporate **Rider 6** substantially verbatim, into all lower tier sub-consultant agreements. Consultant shall cooperate with Owner in meeting all of Owner's other obligations, if any, to comply with other terms, conditions, and covenants which may be imposed on Owner by the Agency pursuant to the applicable provisions of that certain Community Benefits Agreement, dated as of April 4, 2005, between Agency and Owner, as it may be amended from time to time ("CBA"), other than the Small Business Assistance Program, and shall incorporate such provisions as may be required by Owner with respect to such obligations into all lower tier sub-consultant agreements, to the extent such obligations are deemed by Owner to be applicable to such sub-consultant agreements. Without limiting the generality of the foregoing, Consultant and all Affected Consultants (as defined in **Rider 6**) shall: (a) provided that Consultant is required under this Agreement to provide services in connection with the Interim African Marketplace (as defined in the CBA), use best efforts to maximize the participation of members of the BVHP Area (as defined in the CBA) community in all aspects of the planning and operation of the Interim African Marketplace, (b) cooperate fully with Owner by participating actively, upon Owner's request, in Owner's outreach activities to the BVHP Area community as are required under the terms of the CBA, and (c) provide reports of Consultant's efforts relating to its activities required under clauses (a) and (b) to Owner at such frequency as Owner may reasonably request during the term of this Agreement.

      12.7   <u>Mentorship Program Requirements</u>. Consultant shall, to the extent deemed necessary, desirable, or applicable by Owner, and in accordance with the respective provisions with respect to acting as a Mentor (as defined in **Rider 5**) or qualifying as a Protégé (as defined in **Rider 5**), comply with the terms, conditions, and covenants set forth in **Rider 5**, Mentorship Program, and shall incorporate **Rider 5**, substantially verbatim, into all lower tier sub-consultant agreements, to the extent such agreements are deemed by Owner to apply to any such lower tier sub-consultant agreements.

      12.8   <u>Required Meetings</u>. To facilitate the progress of the Services in a manner so as to assure Owner that the Services will be completed in accordance with this Agreement, and to ensure that any design, development, and construction of the Project is completed in a manner which integrates the Work Product of Consultant in the most expeditious manner with the work product of all other Project consultants, Consultant shall meet and confer with Owner (and other authorized representatives of Owner), those contractors and other Project consultants necessary to assist in scheduling and coordinating the Services, the services of any other Project consultant, or the construction Work undertaken on the Project pursuant to the Consultant's Work Product or the work product of any other consultant from time to time and as often as may reasonably be required to accomplish this purpose, but no less frequently than once each month. Owner shall prepare and maintain meeting minutes in such form Owner deems necessary or desirable and deliver the minutes to Consultant within two (2) business days after each meeting. Within two (2) business days after Consultant's receipt of such meeting minutes, Consultant shall deliver to Owner a signed acknowledgment of Consultant's receipt of such

- 7 -

meeting minutes and a written clarification of or objection to any matter set forth in the meeting minutes to which Consultant disagrees. If Consultant fails to deliver such acknowledgment or written statement to Owner within such two (2) business day period, then Consultant shall be deemed conclusively to have accepted such meeting minutes in their entirety and it shall be conclusively established that such meeting minutes accurately set forth the matters discussed at such meeting.

       12.9     <u>Consultant's Representations and Warranties</u>.     The following representations of Consultant are material to Owner's selection of Consultant (in addition to any other representations and warranties contained in this Agreement) which representations and warranties shall survive the execution and delivery of this Agreement, any termination of this Agreement, and the final completion of the Services.  Consultant shall provide such reasonable evidence necessary to support any of the following representations upon written request therefor by Owner.

       12.9.1     <u>Solvency</u>.     Consultant and, to Consultant's knowledge, its lower tier sub-consultants, are financially solvent, able to pay all debts as they mature, and possessed of sufficient working capital to complete the Services and perform all obligations hereunder for the Consultant's Compensation.

       12.9.2     <u>Ability to Perform Work</u>.     Consultant is able to furnish the materials, supplies, and equipment, and adequately trained and experienced management, supervision, and professional staff required to complete the Services and perform its obligations hereunder, and the key personnel assigned to the Project have the experience and competence to do so.

       12.9.3     <u>Authorization and Licensure</u>.     Consultant is authorized to do business in the City and State in which the Project is located, is properly licensed by, and currently in good standing with, and all professional staff are properly licensed and currently in good standing with all necessary governmental, public and quasi-public authorities having jurisdiction over Consultant and over the performance of the Services.

       12.9.4     <u>Due Execution and Authority</u>.     Consultant's execution of this Agreement and performance thereof is within Consultant's duly authorized powers, the individuals executing this Agreement on Consultant's behalf have been duly authorized by all requisite corporate or entity action to sign and bind Consultant to the terms of this Agreement, and this Agreement is a valid, binding, and enforceable obligation of Consultant.

       12.9.5     <u>Expertise</u>.     Consultant possesses a high level of experience and expertise in the field in which the Services are to be performed with respect to projects of the size, complexity, and nature of the Project, and will perform the Services with the care, skill and diligence of such a consultant.

       12.9.6     <u>Familiarity With Project</u>.     Consultant, through such knowledgeable and qualified personnel as Consultant deems necessary or appropriate based upon the nature and scope of the Project, has undertaken all actions deemed necessary to acquaint itself

with the requirements of the Project and this Agreement, and has evaluated, and is entering into this Agreement on the basis of, Consultant's own examination, inspection, review and investigation of the Project, this Agreement, all documents related to the performance of the Services with respect to the Project, and to the extent applicable to or impacting upon the performance of the Services, the visible portions of the Project Site, and is not relying on the opinion or representations of Owner to determine the nature of the Project Site, the conditions and limitations under which the Work Product is to be prepared, the character and quantity of the labor, materials, equipment, and facilities necessary to timely complete the Services in accordance with the scheduling requirements and the cost commitments of this Agreement in accordance with Consultant's standard of care, the general and local conditions relating to the Project, and such other matters that may affect Consultant's performance of the Services within the time provided.

13.    Insurance.  Consultant or any of its sub-consultants shall not commence any Services until such time as Owner has received, reviewed and approved evidence satisfactory to Owner that all insurance as required in **Exhibit "C"** has been obtained by such parties and that such insurance is in form and substance satisfactory to Owner. Without in any way limiting Consultant's obligations under Section 14, Consultant shall, during the term of this Agreement, maintain the policies of insurance required and <u>all insurance certificates and endorsements must be in compliance prior to payment of invoices.</u>  Consultant shall also obtain from any such sub-consultant an indemnification in form and substance identical to the indemnity set forth in Section 14, below, with the modification that such indemnity be from the sub-consultant for the benefit of the Indemnified Parties designated in Section 14.

14.    Indemnification.

14.1    Consultant's Indemnification Obligations.  To the fullest extent permitted by law, Consultant for itself and for its agents, employees and sub-consultants (including those employed directly or indirectly by such agents, employees and sub-consultants) for whom Consultant is legally liable (collectively, the "Consultant Parties"), shall indemnify, defend (with counsel reasonably satisfactory to Owner), protect and hold harmless Owner, all parent, subsidiary or affiliated companies of Owner and all of such parties' representatives, members, partners, stockholders, officers, directors, agents, and employees and their respective heirs, executors, administrators, successors, and assigns, Owner's Lenders, and the Agency and all other governmental entities and parties entitled to be indemnified by Owner pursuant to the DDA (collectively, the "Indemnified Parties") from any and all liabilities, losses, costs, expenses, obligations, liabilities, court costs, demands, damages, debts, causes, covenants, rights, controversies, causes of action, fines, judgments, and penalties, and reasonable actual attorneys' and professional parties' fees, court costs and other costs of defense incurred in enforcing this indemnity and in defending against any claims or defenses (collectively, "Liability") which may arise from or relate to:

(a) death or injury to people or damage or injury to property resulting from an error or omission or willful misconduct in the performance of the professional portion of the Services;

(b) any acts, errors, or omissions in connection with the performance of the nonprofessional portion of the Services;

- 9 -

(c) any and all liens, stop notices and charges of any type, nature, kind or description which may at any time be filed or claimed by Consultant or its sub-consultants against the site of the Project or any portion thereof, or the Owner or the Owner's Lender (except when such liens or stop notices are caused by Owner's default in its obligation to pay Consultant pursuant to the provisions of this Agreement) in connection with the performance of the Services;

(d) any claims by employees of Consultant or the Consultant Parties under worker's compensation acts, disability benefits acts, and other employee benefit acts (provided however, the indemnity and defense obligation hereunder shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable under such act(s));

(e) violation of any local, state or federal law, regulation or code, except with respect to violations which result from the act or failure to act of Owner; or

(f) infringement of any patent, trademark or copyright, or violation of trade secret or other proprietary right.

Notwithstanding the foregoing, Consultant shall not be obligated to indemnify, defend, protect or hold harmless the Indemnified Parties to the extent such Liability is determined by a court or arbitral panel of competent jurisdiction to have been caused by the negligence or willful misconduct of the party or parties to be indemnified, and Owner will promptly refund the portion of any defense costs which may be expended by Consultant which are attributable to the portion of fault ascribed to any such Indemnified Party as determined in accordance with this Section 14. If an Indemnified Party incurs Liability by reason of strict liability or a similar legal theory, Consultant shall, nonetheless, indemnify, defend, protect and hold each Indemnified Party harmless from such portion of such Liability that, directly or indirectly, relates to the negligent or willful acts or omissions of Consultant or any Consultant Party. Payment of any indemnified sum by any Indemnified Party shall not be a condition precedent to enforcing such party's rights to indemnification. Except as specifically limited herein and below, the indemnification by Consultant of the Indemnified Parties under this Section 14 shall apply regardless of any concurrent or contributory active and/or passive negligent act or omission of the party to be indemnified. The indemnity and defense obligation set forth in this section shall survive the expiration or termination of this Agreement until time barred by the applicable statute of limitation or repose. Nothing in this Section 14 shall be construed to negate, abridge or otherwise reduce any other right or obligation of indemnity (including without limitation equitable indemnity) which would otherwise exist as to the Indemnified Parties. Notwithstanding the foregoing, Consultant's defense obligation set forth in this Section 14 shall be an obligation of reimbursement to Owner or Owner's insurer only, and only for that portion of Owner's total defense costs equal to Consultant's proportionate share of fault determined in accordance with this provision.

14.2    Intentionally Deleted.

15.    Limitation on Liability.    Consultant shall not be liable pursuant to this Agreement to Owner, cumulatively and in the aggregate, for more than $2,000,000 for any Liability, including, without limitation, consequential damages, resulting from any professional

error or omission of Consultant or any Consultant Party. The foregoing limitation of liability shall not apply to any Liability of any nature, whether direct or consequential, arising from any acts or omissions by Consultant constituting gross negligence, an intentional tort, fraud, or criminal conduct.

16.    Personal Obligations. Consultant agrees that the nature of the Services and Consultant's obligations hereunder are personal, and that Consultant may, therefore, not assign or delegate its obligations hereunder without the written approval of Owner, which approval Owner may withhold for any reason, whether or not reasonable. Owner shall be entitled to delegate its obligations hereunder and assign the benefit of this Agreement.

17.    Maintenance of Records. Consultant agrees that, as a material consideration for Owner entering into this Agreement, Consultant shall (i) maintain adequate accounting and financial records related to Consultant's Compensation and the Reimbursable Expenses with respect to Consultant's providing the Services, and shall retain those financial records for a period of at least five (5) years from the date of completion of the Services or other termination of this Agreement, and (ii) maintain adequate records relating to Consultant's performance of the Services, including copies of all Work Product, and shall retain those professional service records until the later of the expiration of the longest period of limitations for latent construction defects affecting the Project in any manner or one (1) year after the entry of any final, non-appealable judgment of a court of competent jurisdiction, including appellate level courts, with respect to the latest concluded litigation relating to latent construction defects affecting the Project. Owner may audit any and all such records of Consultant and its sub-consultants after reasonable written notice.

18.    Compliance with Law. Consultant agrees to comply with all applicable federal, state and local laws, rules, regulations or orders, including, without limitation, (i) regulations or laws regarding nondiscrimination and equal employment opportunity, affirmative action for handicapped workers, veterans and disabled veterans; (ii) laws, negotiations and standards concerning occupational health and safety, accident prevention, safety equipment and OSHA regulations, and shall provide to Owner an Acknowledgment in the form of attached **Exhibit "D"** concurrently with the execution of this Agreement; (iii) laws, ordinances, codes, regulations, licensing requirements, and best management practices with respect to any hazardous material discovered, located, used, deposited or brought on the Project, or released, disposed of, or transported on, to, under, from or about the Project, and shall provide Owner, all applicable government entities and the public with any notices or disclosures concerning Hazardous Material associated with the Project required under any applicable laws, in accordance with attached **Exhibit "E"**.

19.    Surety Bonds. Owner has agreed with the Agency that no surety bonds will be required of any consultant or contractor performing services on the Project. Neither Consultant nor any sub-consultant shall be required to post any surety bonds for any Services to be performed on the Project. Any request by Owner or any affiliate of Owner to Consultant or any sub-consultant shall be an event of default by Owner and shall entitle Consultant and any sub-consultant affected by any such request to exercise all remedies available at law or in equity. Consultant and each sub-consultant which will enter into further contracts with consultants of

- 11 -

lower tiers shall include this provision in each such contract substantially verbatim.

20. Storm Water Compliance. Consultant shall comply with Owner's Storm Water Pollution Prevention Plan ("SWPPP"), applicable storm water permit ("Permit"), and Owner's Storm Water Compliance Guidelines ("Guidelines"). Consultant shall implement the Best Management Practices ("BMPs"), set forth in the SWPPP, for any Services that it performs on the Project. A copy of the SWPPP, Guidelines and Permit are available at the construction office. Owner shall be entitled to recover from Consultant all fines, fees, expenses and other penalties assessed by any governmental body due to Consultant's violation of the Permit or its obligations herein. CONSULTANT HEREBY AGREES TO INDEMNIFY, DEFEND AND HOLD HARMLESS OWNER FROM AND AGAINST ANY AND ALL CLAIMS, DAMAGES, ATTORNEYS' FEES, EXPENSES, OR LIABILITIES OF ANY TYPE OR NATURE, INCLUDING WITHOUT LIMITATION, ANY AND ALL FINES OR OTHER PENALTIES, CIVIL OR CRIMINAL, ARISING OUT OF ANY VIOLATION OF THE PERMIT OR ANY OF CONSULTANT'S OBLIGATIONS HEREIN, CAUSED IN WHOLE OR IN PART, BY THE WRONGFUL ACTS OR OMISSIONS OF CONSULTANT, OR OTHERWISE CAUSED IN WHOLE OR IN PART BY CONSULTANT'S FAILURE TO COMPLY WITH THE OBLIGATIONS IN THIS SECTION. Consultant acknowledges that failure to adhere to the requirements of the SWPPP, Guidelines or Permit constitutes a material default of its contractual obligations herein, and Owner may, without prejudice to any other right or remedy, remove Consultant from the Project, terminate this Agreement, and retain a separate consultant to complete Consultant's obligations arising under this Agreement (the "Completion Consultant"). In the event of termination, Consultant shall not be entitled to receive any further Consultant's Compensation unless and until the Consultant's Services is completed by the Completion Consultant.

21. Notices. Any notice, demand or statement required or permitted under this Agreement shall be given either by personal delivery, by telephone facsimile, or by depositing such notice in the United States mail, certified, with return receipt requested, postage prepaid and addressed as follows:

- 12 -

CONSULTANT:    CH2M Hill
2485 Natomas Park Drive
Sacramento, CA 95833
Phone: 916-286-0423
Fax: 916-614-3410

OWNER:    Lennar-BVHP, LLC
c/o Lennar Homes of California, Inc.
49 Stevenson, Suite 600
San Francisco, CA 94105
Telephone: (415) 995-1770
Facsimile: (415) 995-1778

    Either Party may, by written notice to the other, designate a different address which shall be substituted for the one specified above. Each notice, document or other communication required or permitted under this Agreement shall be deemed delivered (a) on the date delivered if by personal delivery, (b) on the date of transmission with confirmed answer back if by facsimile telecommunication, and (c) if sent by certified mail, two (2) business days following the deposit of such notice in the United States mail in the manner specified above.

    22.   Severability. If any provision of this Agreement is determined to be invalid or otherwise ineffective, the remaining provisions of this Agreement shall remain in full force and effect.

    23.   ARBITRATION. IF A DISPUTE ARISES BETWEEN OWNER AND CONSULTANT UNDER THIS AGREEMENT, OTHER THAN UNDER THE PROVISIONS OF ANY RIDER ATTACHED TO THIS AGREEMENT WHICH PROVIDES ANY OTHER DISPUTE RESOLUTION PROCEDURES WHICH SHALL APPLY TO SUCH DISPUTE, THEN EITHER PARTY MAY ELECT, BY WRITTEN NOTICE TO THE OTHER PARTY, TO HAVE THE DISPUTE RESOLVED BY ARBITRATION CONDUCTED IN ACCORDANCE WITH THE CONSTRUCTION INDUSTRY ARBITRATION RULES INCLUDING, WHERE APPLICABLE, THE FAST TRACK PROCEDURES, OF THE AMERICAN ARBITRATION ASSOCIATION, EXCEPT THAT THE ARBITRATION SHALL BE CONDUCTED BY A SINGLE ARBITRATOR. THE JUDGMENT UPON THE AWARD RENDERED IN ANY SUCH ARBITRATION SHALL BE FINAL AND BINDING UPON THE PARTIES AND MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. IF OWNER AND CONSULTANT DO NOT AGREE UPON A SINGLE ARBITRATOR WITHIN FIVE (5) BUSINESS DAYS AFTER DELIVERY OF WRITTEN DEMAND FOR ARBITRATION, THEN THE ARBITRATOR SHALL BE CHOSEN BY THE AMERICAN ARBITRATION ASSOCIATION WITHIN FIVE (5) BUSINESS DAYS THEREAFTER. THE PROPOSED ARBITRATOR SHALL MAKE ALL DISCLOSURES TO THE PARTIES AS ARE REQUIRED BY CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1281.9 WITHIN THE TIME PERIODS REQUIRED BY LAW. A HEARING BY THE ARBITRATOR APPOINTED SHALL BE HELD WITHIN THIRTY (30) DAYS AFTER THE EXPIRATION OF ALL STATUTORY NOTICE AND RESPONSE PERIODS. NOT LESS THAN FIVE (5) DAYS PRIOR TO THE HEARING OR

- 13 -

AT SUCH TIME AS THE PARTIES MAY MUTUALLY AGREE OR AS THE ARBITRATOR MAY REQUIRE, BOTH PARTIES SHALL SUBMIT TO THE ARBITRATOR AND TO THE OTHER PARTY A WRITTEN STATEMENT OF ITS POSITION.  THE ARBITRATOR MAY ALLOCATE THE FEES AND COSTS OF ARBITRATION BETWEEN OWNER AND CONSULTANT AND MAY AWARD COSTS, INCLUDING REASONABLE ATTORNEYS' FEES, TO THE PARTY DETERMINED BY THE ARBITRATOR TO BE THE "PREVAILING PARTY," AS THAT TERM IS DEFINED UNDER CALIFORNIA LAW, WHICH MAY BE EITHER OWNER OR CONSULTANT.  IN THE ABSENCE OF A DETERMINATION BY THE ARBITRATOR, OWNER AND CONSULTANT SHALL EACH BEAR ONE-HALF OF THE COSTS OF THE ARBITRATION AND THE ARBITRATOR, AND ALL OF ITS OWN COSTS.

NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL.  BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE.  YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL BINDING ARBITRATION.

OWNER'S
INITIALS

CONSULTANT'S
INITIALS

24.    Attorneys' Fees.   The prevailing party in any action or arbitration proceeding to enforce the provisions of this Agreement shall be entitled to an additional reasonable amount as attorneys' fees, including, without limitation, attorneys' fees on appeal, whether or not the action proceeds to judgment, and whether or not the successful party is designated plaintiff or defendant in the action, together with all court, arbitration, deposition and transcript costs.  Nothing in this Section 20 shall be construed to supersede Section 19 above or to authorize the commencement or maintenance of legal proceedings in lieu of arbitration proceedings in connection with an arbitrable dispute.

25.    Waiver of Breach.   Waiver by either Party of any breach or default by the other Party of any provision of this Agreement shall not be deemed a waiver of any other or subsequent breach or default, nor excuse any other breach or default of this Agreement by either Party.

26.    Time References.   Any reference in this Agreement to time for the

- 14 -

performance of obligations or to elapsed time shall mean consecutive calendar days, months or years, as applicable, unless otherwise expressly indicated herein. Any reference to "business day" shall mean Monday through Friday of each week, except that a legal holiday recognized as such by the Government of the United States shall not be regarded as a business day. Time is of the essence of this Agreement.

27. <u>Entire Agreement; Miscellaneous</u>. This Agreement (including each Change Order executed by the Parties) constitutes the entire Agreement between the Parties and shall supersede all other oral or written agreements between the Parties, respecting the subject matter of this Agreement. This Agreement may only be modified or amended by written instrument executed by both Parties. This Agreement shall be governed by the laws of the State of California and shall be construed as if it were prepared jointly by the Parties.

28. <u>Customer Appreciation Gifts or Events</u>. Because Lennar Because Lennar appreciates the efforts of its consultants and their employees, Lennar periodically gives its consultants and consultants' employees customary and nominal tokens of its appreciation, such as, without limitation, logo and non-logo apparel, rounds of golf, spa days, meals, materials and other "customer appreciation" gifts or outings. Consultant acknowledges and agrees that Lennar's giving such tokens of appreciation to Consultant or Consultant's employees is customary in the industry and does not constitute an attempt to improperly influence Consultant or Consultant's employees and does not and will not give rise to any claims for civil or criminal misconduct. Consultant fully understands that as a consequence of accepting any tokens of appreciation from Lennar, Consultant or Consultant's employees will be under no obligation to Lennar other than those contained in this Consultant Agreement. In order to ensure that Consultant is aware of this practice, Consultant expressly agrees that Lennar may, *at Lennar's sole discretion, without any obligation on the part of Lennar and without further notice to Consultant*, provide similar tokens of appreciation to Consultant or Consultant's employees without the need to obtain additional written or verbal consent from Consultant.

- 15 -

Dated: _____ 1/30 _____, 20 06

OWNER:

LENNAR-BVHP, LLC,
a California limited liability company

By:Lennar Southla     nd I, Inc.,
    a California corporation

By: _____

Name: PAUL J MENAKER

Title: SR VICE PRESIDENT

Dated: _____ 1 - 27 _____, 20 06

CH2M Hill

By: _____

Name: UDAI P. SINGH

Title: VICE PRESIDENT

- 16 -

LIST OF EXHIBITS AND RIDERS

AGREEMENT EXHIBITS:

| | |
|---|---|
| Exhibit "A" | Summary Sheet |
| Exhibit "B" | Consultant's Proposal |
| Exhibit "C" | Insurance Requirements |
| Exhibit "D" | OSHA Addendum |
| Exhibit "E" | MSDS Addendum |
| Exhibit "F" | Billing Sheets |
| Exhibit "G" | Waiver and Release Forms |

AGREEMENT RIDERS:

Rider 1 - Prevailing Wage Requirements (Labor Standards)
Rider 2 - Minimum Compensation Policy
Rider 3 - Health Care Accountability Policy
Rider 4 - Equal Opportunity Requirements
Rider 5 - Mentorship Program Requirements
Rider 6 - Small Business Assistance Program

PROJECT PERSONNEL:

| | |
|---|---|
| Kofi Bonner, Division President | (415) 995-4802 |
| Paul Menaker, Senior Vice President | (415) 995-1770 |

EXHIBIT "A"
SUMMARY SHEET
CONSULTING AGREEMENT SERVICES

Consultant:    CH2M Hill
Contract No.:  #3605461
Date of Consulting Agreement: January 20, 2006
Project:       Hunters Point Shipyard Redevelopment,
               City and County of San Francisco
               (referred to as "Project," "Shipyard," or "HPS")

Re:    Phase I Environmental Consulting Services for FY06 on a task order only, time and materials basis, with a not to exceed ceiling for each of the following tasks: Asbestos Air Monitoring during Grading; Environmental Support during Parcel A' Construction; Parcel A' 31 Reporting; Miscellaneous Support (attached hereto as Exhibit "A-1")

**Compensation for services is as follows:**
              Professional Services:

**Total Compensation for Services:**     $ 392,600.00

**FEE SUMMARY:**
Compensation for Services:              [  ] Hourly @ $_____ per hour

                                        [X] Other: Total compensation for this project shall not exceed a maximum of $392,600.00 for Professional Services, including reimbursable expenses without the express written consent of Owner.

Manner of Payment of
Compensation:                           [ X ] Monthly

                                        [  ] Other:

Time Periods: Date for Commencement of Services: December 1, 2004

        Date for Completion of Services: November 30, 2006

        Other (Dates of meetings, inspections, deadlines, etc.): N/A

Submission of Invoices for Time & Reimbursable Expenses:  Paid within 30 days of date of receipt of complete invoicing package.

EXHIBIT "A"
A-1

Lennar - BVHP, LLC
Submit to: Accounting Dept.
6121 Bollinger Canyon Road, Suite 500
San Ramon, CA  94583

Extraordinary                          $_____for any single expense or
Reimbursable Expenses:                              group of related expenses

                                       [ ] Other: _____

Insurance Policy Limits:     [ X ] As specified in Agreement


Miscellaneous:  Please reference contract number #3605461 and include professional services, and
reimbursable expenses, with backup on all invoices when submitting for payment.

EXHIBIT "A"
A-2

EXHIBIT "A-1"

SUMMARY SHEET
CONSULTING AGREEMENT SERVICES

| Phase 1 Environmental Consulting Services for FY06 on task order only, time and materials basis with a **not to exceed** ceiling for each of the following tasks: | UNIT | QTY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| Task 1. Asbestos Air Monitoring During Grading | ls | 1 | $251,000 | $ 251,000.00 |
| Task 2. Environmental Support During Parcel a' Construction | ls | 1 | $ 43,800 | $43,800.00 |
| Task 3. Parcel A' Article 31 Reporting | ls | 1 | $47,000 | $47,000.00 |
| Task 4. Miscellaneous Support | ls | 1 | $50,000 | $50,000.00 |
| | | | | -------------- |
| | | | Total : | $ 392,600.00 |

EXHIBIT "A"
A-3

EXHIBIT "B"

CONSULTANT'S PROPOSAL
**(NOT USED)**

EXHIBIT "B"
B-1

EXHIBIT "C"

INSURANCE REQUIREMENTS

**Consultants/Professionals**

**Consultant shall procure and maintain, at its sole cost and expense, the following insurance coverages:**

1.  **Workers' Compensation:**
    Coverage A.   Statutory Benefits
    Coverage B.   Employers' Liability of not less than:

    | | |
    |---|---|
    | Bodily Injury by accident | $2,000,000 each accident |
    | Bodily Injury by disease | $2,000,000 policy limit |
    | Bodily Injury by disease | $2,000,000 each employee |

    Coverage must include a waiver of subrogation endorsement in favor of, and naming, Lennar Corporation, including its subsidiaries, partners, partnerships, affiliated companies, successors and assigns.

2.  **Commercial Auto Coverage:**
    Automobile Liability coverage (equivalent in coverage to ISO form CA 00 01) of not less than $1,000,000 combined single limit, each accident, covering all owned, hired and non-owned autos.

3.  **Commercial General Liability:**
    Commercial General Liability coverage (equivalent in coverage to ISO form CG 00 01) of not less than:

    | | |
    |---|---|
    | Each Occurrence Limit | $2,000,000 |
    | Personal Advertising Injury Limit | $2,000,000 |
    | Products/Completed Operations Aggregate Limit | $2,000,000 |
    | General Aggregate Limit | $2,000,000 |
    | (other than Products/Completed Operations) | |

    The policy must include:
    a) Premises and Operations coverage with no explosions, collapse, or underground damage exclusion (XCU).
    b) Products and Completed Operations coverage.
    c) Standard ISO CG0001 0196 Contractual Liability coverage, or its equivalent, and a Separation of Insureds clause.
    d) Broad Form Property Damage coverage.
    e) An Additional Insured Endorsement (equivalent to ISO form CG 20 10) naming as additional insured:
       "Lennar Corporation, including its subsidiaries, partners, partnerships, affiliated

EXHIBIT "C"
C-1

companies, and successors and assigns."

f) Coverage must be on an "occurrence" form. "Claims Made" and "Modified Occurrence" forms are not acceptable.

4. <u>Professional Liability or Errors and Omissions Insurance:</u>

Professional Liability or Errors and Omissions coverage of not less than $2,000,000, or limit carried, whichever is higher, with a deductible or self-insured retention amount not greater than $50,000. Such insurance shall include prior acts coverage sufficient to cover the services under this Agreement and Contractual Liability to cover liability assumed under this Agreement, to the extent insurable under such Professional Liability Insurance. Such insurance is to be maintained during the term of this Agreement and for a period of ten years after final payment. If the Work to be performed is on an attached community, there shall be no exclusion for attached or condominium projects.

5. <u>Other Requirements:</u>

a) All policies must afford an unqualified thirty (30) days notice of cancellation to the additional insured(s) in the event of cancellation or non-renewal, and ten (10) days notice of cancellation for non-payment of premium.

b) All policies must be written by insurance companies whose rating in the most recent Best's Rating Guide, is not less than A (-):VII. All coverage forms must be acceptable to Company. Consultant agrees to provide a full certified copy of any policy maintained by Consultant to Company upon Company's request therefor.

c) Certificates of Insurance with the required <u>endorsements</u> evidencing the required coverages must be delivered to the Company prior to commencement of any work under this Subcontract. Such certificates of insurance shall state "All Operations" of Consultant performed on behalf of Company shall be covered by such insurance. The wording "Endeavor" and ... "but failure to mail such notice shall impose no obligation or liability of any kind upon the company" must be deleted from the certificate. If your carrier or broker will not remove such language from the certificate, a separate endorsement requiring 30-day notice of cancellation will be required.

d) If the Consultant fails to secure and maintain the required insurance, Company shall have the right (without any obligation to do so, however) to secure same in the name and for the account of Consultant in which event the Consultant shall pay the costs thereof and furnish upon demand all information that may be required in connection therewith.

e) Company reserves the right, but shall have no obligation, to procure the insurance, or any portion thereof, for which Consultant is herein responsible and which is described in this section. Company shall notify Consultant if Company exercises its right, whereupon Consultant's responsibility to carry such insurance shall cease and all the premiums and other charges associated with such insurance shall be refunded to the Company. Company further reserves the right at any time, with thirty (30) days written notice to Consultant, to require that Consultant resume the procurement and maintenance of any insurance for which Company has elected to procure pursuant to this subsection; in such event, the sums paid to Consultant by Company shall increase to the extent of any previously agreed and implemented reduction (as noted above) attributable to Company's prior assumption of the particular insurance coverages.

<u>EXHIBIT "C"</u>
C-2

LENNAR 024928
CONFIDENTIAL

Such refund shall be equitably pro-rated based upon Consultant's completed work at the time of such adjustment.

f) Company reserves the right, in its sole discretion, to require higher limits of liability coverage if, in Company's opinion, operations by or on behalf of Consultant create higher than normal hazards, and, to require Consultant to name additional parties in interest to be Additional Insureds, and included in any required Waiver of Subrogation, Notice of Cancellation, or other endorsement.

g) In the event that rental of equipment is undertaken to complete and/or perform the work, Consultant agrees that it shall be solely responsible for such rental equipment. Such responsibility shall include, but not be limited to, theft, fire, vandalism and use, including use by unauthorized persons.

h) Nothing in this Exhibit shall reduce Consultant's obligations under this Contract. Consultant's procurement and/or maintenance of insurance shall not be construed as a limitation of liability or as full performance of the indemnification and hold harmless provisions of this Agreement.

i) In the event that materials or any other type of personal property ("personal property") is acquired for the Project or delivered to the Project site, Consultant agrees that it shall be solely responsible for such property until it becomes a fixture on the Project, or otherwise is installed and incorporated as a final part of the Project. Such responsibility shall include, but not be limited to, theft, fire, vandalism, and use, including use by unauthorized persons.

j) Property Waiver of Subrogation.  Consultant hereby waives all rights of recovery against Lennar Corporation, including its subsidiaries, partners, partnerships, affiliated companies, and successors and assigns, with respect to any loss or damage, including consequential loss or damage, to the Consultant's property caused or occasioned by any peril or perils covered under any policy or policies of property insurance carried by the Consultant.  Consultant shall cause its insurance carriers to consent to such waiver of subrogation.

6.      **Changes and Modifications:**

Any modification or waiver of the insurance requirements to this Agreement, or in any addendum hereto, may only be made with the prior written consent of Company.

7.      **Notices:**

All Certificates of Insurance and required endorsements must be addressed and forwarded to:

Lennar Corporation
Insurance Compliance
PO Box 12010-LC
Hemet, CA 92546-8010
Phone: (909) 766-2274
Fax: (909) 766-2299

EXHIBIT "C"
C-3

EXHIBIT "D"

OSHA ADDENDUM

To: Owner

This Addendum will confirm that Consultant is fully cognizant of all relevant occupational safety and health statutes, regulations, and orders applicable to Consultant's performance of the Work, including, without limitation, the following provisions of the California Administrative Code, Title 8 (Industrial Relations), Division 1: (i) Chapter 3.2, Subchapter 2 (Regulations of the Division of Occupational Safety and Health); and (ii) the Regulations of the California Division of Occupational Safety and Health, Orders of the Division of Industrial Safety as set forth in Chapter 4, Subchapter 4 (Construction Safety Orders), and Cal/OSHA's SB 198 Injury and Illness Prevention Program requirements as set forth in Chapter 4, Subchapter 7 (General Industry Safety Orders). Consultant hereby acknowledges compliance with all of the same.

Consultant agrees to abide by the all of the above-referenced statutes, rules, regulations, and orders, and to take all steps to ensure that all employees on the jobsite covered by the Agreement will be fully knowledgeable of the rules as well. To facilitate Consultant's compliance with these obligations, a copy of any relevant regulations or orders will be provided to Consultant within ten (10) business days after Consultant's written request to Owner for such regulations or orders.

Acknowledgment:

CONSULTANT

By: _____    Date: _____1-27-06_____

Title: ___VICE PRESIDENT___

EXHIBIT "D"
D-1

EXHIBIT "E"

MSDS ADDENDUM

Consultant Name: _____

Subject: **"HAZARDOUS MATERIALS DISCLOSURE STATEMENT"**

Please be informed that you are obligated by "Proposition 65", the OSHA Hazard Communications Standards, and all other local governing agencies to disclose in writing to Owner any Hazardous Materials being used or stored on any of Owner's projects along with all applicable "Material Safety Data Sheets".

To comply with the "Hazardous Materials Compliance Program" being implemented by Owner, Hazardous Materials information will be on file in each construction site office for your employees' review.

If you are providing Services on more than one project, each project shall be disclosed to Owner separately.

If you will use no Hazardous Materials at the Project in the performance of your Services, please sign the Acknowledgment below and indicate "Not Applicable" and return to Owner with your executed Agreement. Your signature below constitutes a representation and warranty that no Hazardous Materials will be used on the Project unless and until Consultant complies with all obligations arising under the Agreement.

If you will be using any Hazardous Materials at the Project in performing the Services which is known as of the date of this Agreement, Consultant shall attach to this Addendum as Schedule "1" the required listing of all such Hazardous Materials, and shall deliver this executed Addendum, including Schedule "1", and all applicable MSDS forms with your executed Agreement. Your signature below constitutes a representation and warranty that only those Hazardous Materials reflected on Schedule "1" for which MSDS forms are provided to Owner will be used on the Project, and that Consultant will comply with all obligations arising under the Agreement to provide additional information with respect to any additional Hazardous Materials which are later required to be utilized in the performance of the Services during the term of the Agreement.

EXHIBIT "E"
E-1

Compliance with this procedure will be monitored by Owner in the same way as compliance with our insurance requirements is monitored. Failure to comply can delay approval and payment of your invoices.

If you have any questions, please contact our office.

Acknowledgment:

By: _____ Applicable ___    _ Not Applicable ____
Title VICE PRESIDENT _____
Date: 1-27-06 _____

EXHIBIT "E"
E-2

SCHEDULE 1 TO EXHIBIT "E"

LISTING OF HAZARDOUS MATERIALS

## EXHIBIT "F"

See attached Billing Sheets "F-1" and "F-2"

EXHIBIT "F-1"

BASIS OF CONTRACT AND PROGRESS BILLING SHEET

Lennar - BVHP, LLC - c/o Lennar Communities

6121 Bollinger Canyon Road, #500

San Ramon, CA 94503

Consultant: CH2M Hill

Address: 2485 Natomas Park Drive, Ste. 600

Sacramento, CA 95833

Phone No.: 916-286-0423

Date: January 20, 2006

Invoice No.:

Billing Period:

To:

Vendor No.: 296517

Job No.: 265170

Contract No.: 3605461

| JOB NUMBER | COST CODE | | CONTRACT SUBTOTAL | | CHANGE ORDERS | | REVISED SUBTOTAL | | PREVIOUS INVOICE | | CURRENT INVOICE | | BILLED TO DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 265170 | 1300-2217 | $ | 392,600.00 | $ | - | $ | 392,600.00 | $ | - | $ | - | $ | - |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

| | CONTRACT TOTAL | | CHANGE ORDER | | REVISED TOTAL | | PREVIOUS INVOICE | | CURRENT INVOICE | | BILLED TO DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | $ 392,600.00 | | $ - | | $ 392,600.00 | | $ - | | $ - | | $ - |

CONTRACT / CHANGE ORDER APPROVAL

_____
Lennar Authorized Representative          DATE: 1/30/06

_____
Consultant Representative                 DATE: 1-27-06

se Note: All Billing Sheets must be submitted on executed copies as noted by the above signatures.

INVOICE APPROVAL

_____
Field Verified by Lennar Area Manager     DATE:

_____
Consultant Representative                 DATE:

Please Note: All Billing Sheets must be approved by Area Manger prior to submitting to accounting for payment.

Page 1 of 1

Consultant: CH2M Hill
Address: 2485 Natomas Park Drive, Ste. 600
Sacramento, CA 95833
Phone No.: 916-286-0413
Date: 1/20/2006

Invoice No.:
Billing Period:
Vendor No.: 296617
Job No.: 265170
Contract No.: 3605461
To:

**EXHIBIT "F-2"**
**BASIS OF CONTRACT AND PROGRESS BILLING SHEET**
Lennar - BVHP, LLC - c/o Lennar Communities
6111 Bollinger Canyon Road, #500
San Ramon, CA 94583

| JOB No. | COST CODE | CO No. | ITEM No. | DESCRIPTION | UNIT | QTY | UNIT PRICE | CONTRACT TOTAL | PREVIOUS REQUEST QTY | PREVIOUS REQUEST AMOUNT | AMOUNT THIS REQUEST QTY | AMOUNT THIS REQUEST AMOUNT | TOTAL BILLED TO DATE QTY | TOTAL BILLED TO DATE AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Contract - $392,300.00 - January 20, 2006 | | | | | | | | | | |
| | | | | Phase I Environmental Consulting Services for FY06 on task order only, time and materials basis. Not to exceed ceiling for each of the following tasks: | | | | | | | | | | |
| 265170 | 1300-2217 | C | 1 | Task 1, Asbestos Air Monitoring During Grading | ls | 1.00 | $ 251,000.00 | $ 251,000.00 | | $ - | | $ - | | $ 0.00 |
| 265170 | 1300-2217 | C | 2 | Task 2, Environmental Support during Parcel 'A' Construction | ls | 1.00 | $ 43,800.00 | $ 43,800.00 | | $ - | | $ - | | $ 0.00 |
| 265170 | 1300-2217 | C | 3 | Task 3, Parcel 'A' Article 31 Reporting | ls | 1.00 | $ 47,800.00 | $ 47,800.00 | | $ - | | $ - | | $ 0.00 |
| 265170 | 1300-2217 | C | 4 | Task 4, Miscellaneous Support | ls | 1.00 | $ 50,000.00 | $ 50,000.00 | | $ - | | $ - | | $ 0.00 |
| | | | | | | | | | | $ - | | $ - | | $ 0.00 |
| | | | | | | | | | | $ - | | $ - | | $ 0.00 |
| | | | | --- INSERT OR DELETE ROWS ABOVE THIS LINE ONLY --- LEAVE THIS LINE HERE --- | | | | | | Subtotal $ - | | Subtotal $ - | | Subtotal $ 0.00 |
| | | | | | | | Contract $ 392,600.00 | | | Total $ - | | Total $ - | | Total $ 0.00 |

CONTRACT APPROVAL
DATE: 1-30-06
Lennar Authorized Representative

DATE: 1-27-06
Consultant Representative

Please Note: All Billing Sheets must be submitted on executed copies as noted by the above signatures.

INVOICE APPROVAL

Field Verified by Lennar Area Manger

Consultant Representative

Please Note: All Billing Sheets must be approved by Area Manger prior to submitting to accounting for payment.

Page 1 of 1

## EXHIBIT "G"



### CONDITIONAL WAIVER AND RELEASE
### UPON PROGRESS PAYMENT
### (Civil Code Section 3262)

**Reference: Agreement No. 3605461**

Upon receipt by the undersigned of a check from _____ in the sum of $_____ (amount of check) payable to _____ (payee or payees of check) and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's lien, stop notice, or bond right the undersigned has on the job of _____ located at _____ _____, in the city of San Francisco, California to the following extent. This release covers a progress payment for labor, services, equipment, or material furnished to _____ _____ (name of customer) through _____ (date) only and does not cover any retentions retained before or after the release date; extras furnished before the release date for which payment has not been received; extras or items furnished after the release date. Rights based upon work performed or items furnished under a written change order which has been fully executed by the parties prior to the release date are covered by this release unless specifically reserved by the claimant in the release. This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a rescission, abandonment, or breach of the contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment. Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

DATED:_____        _____
                                    (Company Name)

                                 By: _____

                                 Its _____

## EXHIBIT "G"



### UNCONDITIONAL WAIVER AND RELEASE
### UPON PROGRESS PAYMENT
### (Civil Code Section 3262)

**Reference: Contract No. 3605461**

NOTICE:  THIS DOCUMENT WAIVES RIGHTS UNCONDITIONALLY AND STATES

THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS.  THIS DOCUMENT IS

ENFORCEABLE AGAINST YOU IF YOU SIGN IT, EVEN IF YOU HAVE NOT BEEN

PAID.  IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL RELEASE FORM.

   The undersigned has been paid and has received a progress payment in the sum of $_____  for labor, services, equipment or material furnished to _____ on the job located at _____, in the city of San Francisco, California and does hereby release any mechanic's lien, stop notice, or bond right that the undersigned has on the above referenced job to the following extent. This release covers a progress payment for labor, services, equipment, or material furnished to _____ _____ [insert Owner's name] through _____ (date) only and does not cover any retention's retained before or after the release date; extras furnished before the release date for which payment has not been received; extras or items furnished after the release date.  Rights based upon work performed or items furnished under a written change order which has been fully executed by the parties prior to the release date are covered by this release unless specifically reserved by the claimant in the release.  This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a rescission, abandonment, or breach of the contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment.

DATED:_____

          _____
          (Company Name)

          By: _____

          Its _____

## EXHIBIT "G"



### CONDITIONAL WAIVER AND RELEASE UPON FINAL PAYMENT
### (Civil Code Section 3262)

**Reference: Contract No. 3605461**

      Upon receipt by the undersigned of a check from _____ in the sum of $_____(amount of check) payable to _____ (payee or payees of check) and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's lien, stop notice, or bond right the undersigned has on the job of _____ located at _____, in the city of San Francisco, California. This release covers the final payment to the undersigned for all labor services, equipment, or material furnished on the job, except for disputed claims in the amount of $_____. Before any recipient of this document relies on it, the party should verify evidence of payment to the undersigned.

DATED:_____

                               _____
                               (Company Name)

                               By: _____

                               Its _____

EXHIBIT "G"



## UNCONDITIONAL WAIVER AND RELEASE UPON FINAL PAYMENT
### (Civil Code Section 3262)

Reference: Contract No. 3605461

NOTICE:  THIS DOCUMENT WAIVES RIGHTS UNCONDITIONALLY AND STATES
THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS.  THIS DOCUMENT
IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT, EVEN IF YOU HAVE NOT BEEN
PAID. IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL RELEASE FORM.

     The undersigned has been paid in full for all labor, services, equipment or material furnished
to _____ on the job of _____
located at _____, in the city of San Francisco,
California and does hereby waive and release any rights to a mechanic's lien, stop notice, or any
right against labor and material bond on the job, except for disputed claims for extra work in the
amount of $_____.

DATED:_____          _____
                               (Company Name)

                               By: _____

                               Its _____

## RIDER 1

### PREVAILING WAGE REQUIREMENTS
### (LABOR STANDARDS)

These Prevailing Wage Requirements (hereinafter referred to as "Labor Standards") are attached to and made a part of the Consulting Agreement-Hunters Point Shipyard by and between Owner and Consultant ("Agreement"). Consultant is bound by this Rider as part of the obligations it assumes, and benefits it receives, under the Agreement. Capitalized terms not otherwise specifically defined in this Rider have the meanings given to them in the Agreement.

**Section 1.    Applicability.** These Labor Standards apply to any and all work affecting the Project, including the Services, to be performed pursuant to the Agreement (the "Work").

**Section 2.    Incorporation of the Labor Standards.** All contracts relating to the Work shall contain these Labor Standards and Consultant shall have the responsibility to assure that all contracts and subcontracts, regardless of tier, incorporate by reference the specifications containing these Labor Standards. If for any reason these Labor Standards are not included, the Labor Standards shall nevertheless apply. Consultant shall supply Owner with true copies of each lower tier subcontract relating to the Work showing the specifications that contain these Labor Standards within five (5) business days after due and complete execution thereof and before any Work under such subcontract commences. Failure to do so shall be a violation of the Labor Standards under the DDA and a material default of the Agreement.

**Section 3.    Definitions.**

**Affected Consultant** is the Consultant, and any other subconsultant of any tier having a contract or subcontract directly or indirectly with Consultant that exceeds $10,000.00, and who employs Persons to perform any of the Work.

**Agency's Optional Form** has the meaning set forth in Section 8.2(a).

**BAT** has the meaning set forth in Section 6.

**Bona Fide Prepayment of Wages** has the meaning set forth in Section 5.2.

**DAS** has the meaning set forth in Section 6.

**Laborers and Mechanics** are all persons providing labor to perform construction work, including Working Foremen and security guards.

**Non-Complying Consultant** has the meaning set forth in Section 13.2.

**Non-Conforming Contract** has the meaning set forth in Section 13.2.

**Notice of Dispute** has the meaning set forth in Section 13.3.

**Notice to Employees** has the meaning set forth in Section 12.

1

**Person** includes one or more individuals, partnerships, associations, organizations, corporations, cooperatives and legal representatives performing the Work, including Laborers and Mechanics.

**Statement of Compliance** has the meaning set forth in Section 8.2(b).

**Wage Determination** has the meaning set forth in Section 4.1.

**Working Foreman** is a person who, in addition to performing supervisory duties, performs the work of a Person during at least twenty percent (20%) of the work week.

Section 4.     **Prevailing Wage.**

4.1     All Persons employed to perform any Work will be paid unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account (except such payroll deductions as are permitted by Section 5) the full amount of wages and bona fide fringe benefits (or cash equivalents thereof) due at the time of payment, computed at rates not less than those contained in the General Prevailing Wage Determination ("Wage Determination") made by the Director of Industrial Relations pursuant to California Labor Code Part 7, Chapter 1, Article 2, §§ 1770, 1773 and 1773.1, regardless of any contractual relationship which may be alleged to exist between the Affected Consultant and such Laborers and Mechanics. A copy of the applicable Wage Determination is on file in the offices of the Agency with the Development Services Manager. At the time of execution of the Agreement, Owner shall provide Consultant with a copy of the applicable Wage Determination. At the time that Consultant executes any contract with respect to any portion of the Work, Consultant shall provide such contracting party with a copy of the applicable Wage Determination, which may be obtained from Owner after request therefor.

All Persons shall be paid the appropriate wage rate and fringe benefits for the classification of work actually performed, without regard to skill. Persons performing work in more than one classification may be compensated at the rate specified for each classification for the time actually worked therein, provided that the Affected Consultant's payroll records accurately set forth the time spent in each classification in which work is performed.

4.2     Whenever the wage rate prescribed in the Wage Determination for a class of Persons includes a fringe benefit which is not expressed as an hourly rate, the Affected Consultant shall either pay the benefit in the manner as stated therein, *i.e.*, the vacation plan, the health benefit program, the pension plan and the apprenticeship program, or shall pay an hourly cash equivalent thereof.

4.3     If an Affected Consultant does not make payments to a trustee or other third person, the Affected Consultant may consider as part of the wages of any Person the amount of any costs reasonably anticipated in providing benefits under a plan or program of a type expressly listed in the Wage Determination, provided that the Executive Director of the Agency has found, upon the written request of the Affected Consultant, made through the Owner, that the intent of the Labor Standards has been met. Records of such costs shall be maintained in the manner set forth in Section 8.1. If the Executive Director of the Agency requires Owner to set aside in a separate interest-bearing account with a member of the Federal Deposit Insurance

2

Corporation, assets to meet obligations under the plan or program referred to above in Section 4.2 arising out of or in connection with any act, omission, or breach of any obligations of consultant under the Agreement, then Owner may require Consultant to reimburse Owner, within ten (10) days after demand, for any such sums deposited by Owner on account of such act, omission, or breach of Consultant. The interest shall accumulate and shall be paid as determined by the Agency acting at its sole discretion.

4.4    Regular contributions made or costs incurred by any Affected Consultant for more than a weekly period (but not less often than quarterly) under plans, funds, or programs, which cover the particular weekly period, are deemed to be constructively made or incurred during such weekly period.

**Section 5.    Permissible Payroll Deductions.** The following payroll deductions are permissible deductions. Any others require the express written approval of Owner and, if approved by Owner, the Agency's Executive Director.

5.1    Any withholding made in compliance with the requirements of federal, state or local income tax laws, and the federal social security tax.

5.2    Any repayment of sums previously advanced to the employee as a bona fide prepayment of wages when such prepayment is made without discount or interest ("Bona Fide Prepayment of Wages"). A Bona Fide Prepayment of Wages is considered to have been made only when cash or its equivalent has been advanced to the employee in such manner as to give him or her complete freedom of disposition of the advanced funds.

5.3    Any garnishment pursuant to a validly-issued writ of execution.

5.4    Any contribution on behalf of the employee, to funds established by the Affected Consultant, representatives of employees or both, for the purpose of providing from principal, income or both, medical or hospital care, pensions or annuities on retirement, death benefits, compensation for injuries, illness, accidents, sickness or disability, or for insurance to provide any of the foregoing, or unemployment benefits, vacation pay, savings accounts or similar payments for the benefit of employees, their families and dependents, provided, however, that the following standards are met:

(a)    The deduction is not otherwise prohibited by law; and

(b)    It is either:

(1)    Voluntarily consented to by the employee in writing and in advance of the period in which the work is to be done and such consent is not a condition either for obtaining or for the continuation of employment, or

(2)    Provided for in a bona fide collective bargaining agreement between the Affected Consultant and representatives of its employees; and

(c)    No profit or other benefit is otherwise obtained, directly or indirectly, by the Affected Consultant (or any affiliated person or entity) in the form of

3

commission, dividend or otherwise; and

(d)     The deduction shall serve the convenience and interest of the employee.

5.5     Any authorized purchase of United States Savings Bonds for the employee.

5.6     Any voluntarily authorized repayment of loans from or the purchase of shares in credit unions organized and operated in accordance with federal and state credit union statutes.

5.7     Any contribution voluntarily authorized by the employee for the American Red Cross, United Way and similar charitable organizations.

5.8     Any payment of regular union initiation fees and membership dues, but not including fines or special assessments, provided that a collective bargaining agreement between the Affected Consultant and representatives of its employees provides for such payment and the deductions are not otherwise prohibited by law.

**Section 6.     Apprentices and Trainees.** Apprentices and trainees will be permitted to work at less than the Mechanic's rate for the work they perform when they are employed pursuant to and are individually registered in an apprenticeship or trainee program approved by the U.S. Department of Labor, Employment and Training Administration, Bureau of Apprenticeship and Training ("BAT") or with the California Department of Industrial Relations, Division of Apprenticeship Standards ("DAS") or if a person is employed in his or her first ninety (90) days of probationary employment as an apprentice or trainee in such a program, who is not individually registered in the program, but who has been certified by BAT or DAS to be eligible for probationary employment. Any employee listed on a payroll at an apprentice or trainee wage rate, who is not registered or otherwise employed as stated above, shall be paid not less than the applicable wage rate for a Mechanic. Every apprentice or trainee must be paid at not less than the rate specified in the registered program for the employee's level of progress, expressed as a percentage of a Mechanic's hourly rate as specified in the Wage Determination. Apprentices or trainees shall be paid fringe benefits in accordance with the provisions of the respective program. If the program does not specify fringe benefits, employees must be paid the full amount of fringe benefits listed in the Wage Determination.

**Section 7.     Overtime.** No Affected Consultant contracting for any part of the Work which may require or involve the employment of Persons shall require or permit any such Person in any workweek in which he or she is employed to work in excess of eight (8) hours in any calendar day or in excess of forty (40) hours in such workweek unless such Laborer or Mechanic receives compensation at a rate not less than one and one-half (1.5) times the basic rate of pay for all hours worked in excess of eight (8) hours in any calendar day or in excess of forty (40) hours in such workweek, whichever is greater.

**Section 8.     Payrolls and Basic Records.**

8.1     Payrolls and basic records relating thereto for all Persons employed by each Affected Consultant to perform the Services or any portion thereof shall be maintained and preserved by the Affected Consultant until the later to occur of (a) a period of four (4) years after

4

the Services are completed by Consultant, or (b) one (1) year after completion of the Infrastructure or Horizontal Improvements subject to, and as defined in, the DDA.  The payroll records for any Person employed by any Affected Consultant as a trainee in fulfillment of such Affected Consultant's obligations arising under the Agreement or any Rider attached thereto, shall contain the name, address and social security number of each employee, his or her correct classification, hourly rates of wages paid (including rates of contributions or costs anticipated for fringe benefits or cash equivalents thereof), daily and weekly number of hours worked, deductions made and actual wages paid.  Whenever the wages of any such trainee include the amount of any costs reasonably anticipated in providing benefits under a plan or program, the Affected Consultant shall maintain records which show the costs anticipated or the actual costs incurred in providing such benefits and that the plan or program has been communicated in writing to the Person affected.  Affected Consultant employing apprentices or trainees under approved programs shall maintain written evidence of the registration of apprenticeship programs and certification of trainee programs, the registration of the apprentices and trainees, and the ratios and wage prescribed in the applicable programs or the Wage Determination.

8.2     **Weekly Submissions.**

(a)  Each Affected Consultant shall submit to Owner on each Tuesday no later than 4:00 p.m. a copy of the payrolls for the week preceding the previous week in which any Services were performed.  The payrolls submitted for each trainee shall set out accurately and completely all of the information required by the Agency's Optional Form, an initial supply of which may be obtained from the Agency ("Agency's Optional Form"), and shall be submitted by each Affected Consultant in electronic format compatible with the Agency's requirements, unless otherwise permitted in writing by Agency and Owner, after a reasonable period of notice and such coordination with the Agency as may be required to conform Consultant's and all Affected Consultants' inputs to Agency requirements.  Owner shall submit copies of certified payrolls by all Affected Consultants to the Agency to the extent required by with the DDA.

(b)  Each weekly payroll shall, to the extent required by Owner, be accompanied by the Statement of Compliance that accompanies the Agency's Optional Form ("Statement of Compliance") and properly executed by the Affected Consultant or his or her agent who pays or supervises the payment of the employees.

8.3     The Affected Consultant shall make all records required to be maintained and preserved under the DDA, if any, available for inspection or copying by authorized representatives of the Agency, and shall permit such representatives to interview employees during working hours on the job.  On request, the Executive Director of the Agency shall advise the Affected Consultant of the identity of such authorized representatives.

**Section 9.     Occupational Safety and Health.**   No Person shall be required to work in surroundings or under working conditions which are unsanitary, hazardous or dangerous to his or her safety and health as determined under safety and health standards promulgated by Cal-OSHA or if Cal-OSHA is terminated, then by the federal OSHA.

**Section 10.     Equal Opportunity Program.** The utilization of apprentices, trainees, and Persons under these Labor Standards shall be in conformity with the Equal Opportunity Program

5

set forth in Rider 4 to the Agreement, including all Exhibits thereto. Any conflicts between the language contained in these Labor Standards and Rider 4 shall be resolved in favor of the language set forth in Rider 4, except that in no event shall less than the prevailing wage be paid.

**Section 11.    Nondiscrimination Against Employees for Complaints.** No Person to whom the wage, salary or other Labor Standards of this Rider are applicable shall be discharged or in any other manner discriminated against by any Affected Consultant because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or relating to these Labor Standards.

**Section 12.    Posting of Notice to Employees.** A copy of a "Notice to Employees," in the form appearing on the last page of these Labor Standards, shall be given to each Affected Consultant at the execution of each contract or subcontract with each such Affected Consultant. The Notice to Employees and the Wage Determination shall both be posted and maintained by each Affected Consultant in a prominent place readily accessible to all applicants and employees performing construction of the Improvements before construction commences. If such Notice and Wage Determination is not so posted or maintained, Owner or the Agency may do so.

**Section 13.    Violation and Remedies.**

13.1    Each Affected Consultant shall be liable to the employee for unpaid wages, overtime wages or benefits withheld in violation of these Labor Standards.

13.2    If there is a violation of these Labor Standards by reason of the failure of any contract or subcontract for the performance of any portion of the Work to contain the Labor Standards as required by Section 2 ("Non-Conforming Contract"), or by reason of any failure to submit the payrolls or make records available as required by Section 8 ("Non-Complying Consultant"), the Executive Director of the Agency may, after written notice ("Agency Notice") to Owner with a copy to the Affected Consultant involved and failure to cure the violation within five (5) business days after the date of such notice, stop the Services under the Non-Conforming Contract or of the Non-Complying Consultant until the Non-Conforming Contract or the Non-Complying Consultant comes into compliance.

13.3    For any violation of these Labor Standards the Executive Director of the Agency may give written notice to Owner, with a copy to the Affected Consultant involved, which notice shall state the claimed violation and the amount of money, if any, involved in the violation. Within two (2) business days after the date of said notice, Consultant shall advise Owner in writing whether or not the violation is disputed by the Affected Consultant and a statement of reasons in support of such dispute (the "Notice of Dispute"). Owner shall transmit the Notice of Dispute to the Agency in accordance with the provisions of the DDA. In addition to the foregoing, Owner, upon receipt of the notice of claimed violation from the Agency, shall, with respect to any amount stated in the Agency notice, withhold payment with respect to any sums payable to the Affected Consultant of the amount stated multiplied by forty-five (45) working days, and shall, with the Notice of Dispute, also advise the Agency that the monies are being or will be withheld. If Consultant or any other Affected Consultant fails to timely give a Notice of Dispute to Owner, then Owner may exercise any remedy provided Owner under Section 13.7.

6

13.4    Upon receipt of the Notice of Dispute and withhold advice, any stop work which the Executive Director has ordered shall be lifted, but Owner shall continue to withhold the monies until the dispute has been resolved either by agreement, or failing agreement, by arbitration as is provided in Section 14.

13.5    The Agency may withhold any or all Certificates of Completion, as provided for in the DDA, related to the Work for any violations of these Labor Standards until such violation has been cured.  If the actions of Consultant or any lower tier subconsultant performing any portion of the Work have caused the Agency to withhold any such Certificates of Completion, Owner may exercise any remedy provided Owner under Section 13.7 or under the Agreement.

13.6    In addition to all of the rights and remedies herein contained, but subject to arbitration, except as hereinafter provided, the Agency and Owner shall have all rights in law or equity to enforce these Labor Standards including, but not limited to, a prohibitory or mandatory injunction.  *Provided, however,* the stop work remedy of the Agency provided above in Sections 13.2 and 13.3 is not subject to arbitration.

13.7    Consultant agrees, and shall include in each lower tier subconsultant agreement specific provisions which require each lower tier subconsultant who will perform any portion of the Work with Persons, to agree: (i) that if Owner receives an Agency Notice provided for in Section 13.2 with respect to Consultant or any lower tier subconsultant, then Owner may, in Owner's sole discretion but without obligation to do so, take any and all actions necessary to cure the violation identified in the Agency Notice; (ii) that Owner's receipt of any such Agency Notice shall constitute a material default under both the Agreement and the affected lower tier subcontract agreement entitling Owner to terminate the Agreement and, based on the assignment provisions set forth in Section 2.9 of the Agreement, thereafter to terminate such non-conforming or non-compliant lower tier subcontract if such violation is not cured to the Agency's satisfaction within five (5) business days after delivery of the Agency Notice; and (iii) that Consultant and each such lower tier subconsultant shall defend (with legal counsel reasonably satisfactory to Owner), indemnify, and hold Owner and all Indemnitees harmless from any Claims arising as a result of Owner's receipt of any Agency Notice with respect to any Affected Consultant associated with the performance of the Work.

Section 14.    **Arbitration of Disputes.**

14.1    Any dispute regarding these Labor Standards shall be determined by arbitration through the American Arbitration Association, San Francisco, California office ("AAA") in accordance with the Commercial Rules of the AAA then applicable, but subject to the further revisions thereof.

14.2    The Agency and all persons or entities who have a contractual relationship affected by the dispute shall be made a party to the arbitration.  Any such person or entity not made a party in the demand for arbitration may intervene as a party and in turn may name any other such person or entity as a party.

14.3    The arbitration shall take place in the City and County of San Francisco.

14.4    Arbitration may be demanded by the Agency, Owner, or any Affected Consultant.

7

14.5    With the demand for arbitration, there must be enclosed a copy of these Labor Standards, and a copy of the demand must be mailed to the Agency and Owner, or as appropriate to one or the other if Owner or the Agency is demanding arbitration. If the demand does not include the Labor Standards, they are nevertheless deemed a part of the demand. With the demand, if made by the Agency, or within a reasonable time thereafter if not made by the Agency, the Agency shall transmit to the AAA a copy of the Wage Determination referred to in Section 4 and copies of all notices sent or received by the Agency pursuant to Section 13. Such material shall be made part of the arbitration record.

14.6    One arbitrator shall arbitrate the dispute. The arbitrator shall be selected from the panel of arbitrators of the AAA by the parties to the arbitration in accordance with the AAA rules. The parties shall act diligently in this regard. If the parties fail to select an arbitrator within seven (7) days from the receipt of the panel, the AAA shall appoint the arbitrator. A condition to the selection of any arbitrator shall be that person's agreement to render a decision within thirty (30) days after service of all disclosures required under the California Code of Civil Procedure Section 1281.9.

14.7    The decision of the arbitrator shall be final and binding on all of the parties, whether a party participates in the arbitration or not. Any and all rights of appeal from the decision are waived except a claim that the arbitrator's decision violates an applicable statute or regulation. The decision of the arbitrator shall be rendered on or before thirty (30) days after service of all disclosures required under the California Code of Civil Procedure Section 1281.9. The arbitrator shall schedule hearings as necessary to meet this thirty (30) day decision requirement and the parties to the arbitration, whether they appear or not, shall be bound by such scheduling.

14.8    Any party to the arbitration may take any and all steps permitted by law to enforce the arbitrator's decision. If the arbitrator's decision requires the payment of money, the Affected Consultant shall make the required payments to the affected Persons.

14.9    Each party shall bear its own costs and expenses of the arbitration and the costs of the arbitration shall be shared equally among the parties.

**Section 15.    Non-liability of the Agency.** Owner and each Affected Consultant acknowledge and agree that the procedures set forth herein for dealing with violations of these Labor Standards are reasonable and have been anticipated by the parties in securing financing, in inviting, submitting and receiving bids for the Work, in determining the time for commencement and completion of and in proceeding with the Work. Accordingly, Owner and any Affected Consultant, by proceeding with the Work, expressly waive and are deemed to have waived any and all claims against the Agency for damages, direct or indirect, arising out of these Labor Standards and their enforcement and including without limitation claims relative to stop work orders, and the commencement, continuance or completion of construction.

# SAN FRANCISCO REDEVELOPMENT AGENCY

## N O T I C E   T O   E M P L O Y E E S

*EQUAL OPPORTUNITY NON-DISCRIMI-NATION*

The contractor must take equal opportunity to provide employment opportunities to minority group persons and women and shall not discriminate on the basis of age, ancestry, color, creed, disability, gender, national origin, race, religion or sexual orientation.

*PREVAILING WAGE*

You shall not be paid less than the wage rate attached to this Notice for the kind of work you perform.

*OVERTIME*

You must be paid not less than one and one-half times your basic rate of pay for all hours worked over 8 a day or 40 a week, whichever is greater.

*APPRENTICES*

Apprentice rates apply only to employees registered under an apprenticeship or trainee program approved by the Bureau of Apprenticeship and Training or the California Division of Apprenticeship Standards.

*PROPER PAY*

If you do not receive proper pay, write:

San Francisco Redevelopment Agency
770 Golden Gate Avenue
San Francisco, CA 94102-3120
or call **749-2427** and ask for
**Mr. Sylvester McGuire**
Senior Contract Compliance Specialist

9

RIDER 2

## MINIMUM COMPENSATION POLICY

This Minimum Compensation Policy (the "Policy") is attached to and made a part of the Consulting Agreement-Hunters Point Shipyard ("Agreement") entered into by Owner and Consultant, pursuant to the terms and provisions of that certain Disposition and Development Agreement-Hunters Point Shipyard Phase 1 (the "DDA"). Consultant is bound by this Rider as part of the obligations it assumes and benefits it receives under the Agreement. Capitalized terms not otherwise specifically defined in this Rider have the meanings given to them in the Agreement.

Section 1.    **Findings and Declarations.**

1.1    The Redevelopment Agency of the City and County of San Francisco (the "Agency") enters into many contracts, including, but not limited to, service contracts, loan and grant agreements, and property agreements, in furtherance of the objectives of the California Community Redevelopment Law (Health and Safety Code §§ 33000 *et seq.*) in the interest of the health, safety and general welfare of the City of San Francisco's (the "City") residents.

1.2    These contracts and agreements have at times involved compensation to the contracting parties' or their subcontractors' employees that is at or only slightly above the minimum wage levels required by federal and state laws. The compensation paid by some Agency contractors and their subcontractors fails to provide employees with sufficient resources to afford life in the City. Requiring these contracting parties and their subcontractors to provide a minimum level of compensation to their employees will improve the health, safety and general welfare of San Francisco's residents, by, among other things, decreasing poverty and invigorating neighborhood businesses through increased consumer income.

Section 2.    **Definitions.**

**Affected Consultant** means either: (a) the person or entity that enters into a Contract with the Owner; or (b) in the case of an Included Subcontract, the subconsultant who enters into the Included Subcontract with the Affected Consultant or any lower tier subconsultant.

**Affected Subconsultant** means any subconsultant of any tier who enters into an Included Subcontract under the Agreement.

**Agency** means the Redevelopment Agency of the City and County of San Francisco.

**Agency Property** means real property that is owned by the Agency or over which the Agency has exclusive use. "Exclusive use" means the right to use or occupy real property to the exclusion of all others, subject to the rights reserved by the party granting such exclusive use.

**Business Day** means a day other than Saturday, Sunday or a state or federal holiday.

**City** means the City and County of San Francisco, California, a municipal corporation.

1

Contract means any agreement between Owner, Consultant, or any Affected Consultant and a Person to provide or procure professional services with respect to the design, analysis, or construction of any portion of the Improvements. A "contract" does not include a loan transaction. Notwithstanding the foregoing, the term Contract excludes:

(a) Excluded Subcontracts;

(b) any agreement with an Affected Consultant that, together with the Employees of any Affected Subconsultant and of any entity that is owned or controlled by the Affected Consultant or which owns or controls the Affected Consultant, would have twenty (20) or fewer Employees;

(c) agreements for the purchase or lease of goods or for guarantees, warranties, shipping, delivery or initial installation of such goods;

(d) agreements entered into pursuant to settlement of legal proceedings;

(e) agreements for urgent or specialized litigation requirements where the Agency General Counsel finds that it would be in the best interests of the Agency not to include the requirements of this Policy;

(f) agreements with any person or entity in which the cumulative amount of compensation payable to such person or entity under all agreements with Owner for services to be performed pursuant to the DDA is less than Twenty-Five Thousand Dollars ($25,000.00), or Fifty Thousand Dollars ($50,000.00) in the case of Nonprofit Corporations, in any fiscal year, provided that the agreements in question shall be deemed a Contract on and after the effective date of any instrument which causes such cumulative compensation under all such agreements with Owner to exceed Twenty-Five Thousand Dollars ($25,000.00), or Fifty Thousand Dollars ($50,000.00) in the case of Nonprofit Corporations;

(g) agreements for the investment, management or use of trust assets where compliance with this Policy would violate the fiduciary duties of the trustee;

(h) agreements entered into prior to the Effective Date (unless and until a Contract Amendment is entered into);

(i) agreements entered into after the Effective Date (unless and until a Contract Amendment is entered into) pursuant to, and within the scope of, bid packages or requests for proposals advertised and made available to the public prior to the Effective Date, which bid packages or requests for proposals were not amended on or after the Effective Date;

(j) agreements involving the expenditure by the Agency of grant or special funds to the extent the application of this Policy would violate or be inconsistent with the terms or conditions of the applicable grant agreement, or with the rules, regulations or instructions of the public agency administering such grant agreement, which terms or conditions or rules, regulations or instructions provide for compensation lower than the Minimum Compensation and/or to the

2

extent that application of this Policy would require the Agency to use Agency monies to supplement the grants, special funds or other non-General Fund revenues to maintain the current level of services;

(k) agreements with an Affected Consultant that is a public entity;

(l) agreements for employee benefits to be provided to Agency employees, where the Executive Director finds that no entity is willing to comply with this Policy and is capable of providing the required employee benefits;

(m) agreements that require the Affected Consultant to pay no less than the "prevailing rate of wage" in accordance with state or federal law or Agency policy, but only to the extent (A) each Covered Employee is covered by such requirement, and (B) such prevailing rate of wage is not less than the gross hourly compensation required under Section 3 of this Policy;

(n) agreements for the investment of Agency monies where the Executive Director finds that requiring compliance with this Policy will violate the Agency's fiduciary duties and for the investment of retirement, health or other funds held in trust pursuant to federal, state or local law, or MOU where the official or officials responsible for investing or managing such funds finds that requiring compliance with this Policy will violate their fiduciary duties;

(o) agreements made in connection with loans or grants under which the Agency, as creditor or grantor, is providing funds to be used by the debtor or grantee to: (A) acquire an interest in real property on which residential improvements for low- or moderate-income households will be constructed; (B) construct improvements owned or leased by the debtor or grantee, on condition that residents of the improvements qualify as low- or moderate-income households; or (C) rehabilitate improvements owned or leased by the debtor or grantee;

(p) disposition and development or ground lease agreements of Agency Property on which residential improvements for low- or moderate-income households will be constructed or existing improvements will be operated for low- or moderate-income households; or;

(q) agreements with an owner (such as an owner participation agreements) where such agreement is granted from the exercise of the Agency's regulatory or police powers not requiring any discretionary approvals by the Agency.

**Contract Amendment** means an amendment to a Contract which modifies or supplements such Contract in order to:  (a) extend the term; (b) modify the total amount of payments due from the Agency under a Contract; or (c) modify the scope of services to be performed by an Affected Consultant.  The term does not include construction change orders.

**Covered Employee** means:

(a)     An Employee of an Affected Consultant who, during the applicable Pay Period, performs at least four (4) hours work per week during the Pay Period funded (in whole or in part) under the applicable Contract or to the project funded under the applicable Contract:

3

(i) within the geographic boundaries of the City;

(ii) on real property owned or controlled by the Agency, but outside the geographic boundaries of the Agency; or

(iii) elsewhere in the United States, but only if such related work performed elsewhere within the United States consists of at least ten (10) hours per each work week during the Pay Period in question.

(b)      Notwithstanding the foregoing, the term Covered Employee excludes the following Employees of an Affected Consultant that is a Nonprofit Corporation:

(i) Any Employee who is:

(A) under the age of eighteen (18) and is claimed as a dependent for federal income tax purposes and is employed as an after-school or summer Employee; or

(B) employed as a trainee in a bona fide training program consistent with federal law, which training program enables the Employee to advance into a permanent position; provided, however, these exemptions only apply when the Employee does not replace, displace or lower the wage or benefits of any existing position or Employee; and

(ii) Any disabled Employee of an Affected Consultant, which disabled Employee:

(A) is covered by a current sub-minimum wage certificate issued to the Affected Consultant by the U.S. Department of Labor; or

(B) would be covered by such a certificate but for the fact that the Affected Consultant is paying a wage equal to or higher than the minimum wage.

**DDA** has the meaning set forth in the Preamble.

**Effective Date** means the date on which the Agreement, or any Included Subcontract with an Affected Subconsultant, is executed.

**Employee** means any person who is employed by an Affected Consultant, including part-time and temporary employees.

**Excluded Subcontract** means any agreement or portion of an agreement between an Affected Consultant and a person or entity that is not an Employee of such Affected Consultant, which agreement or portion of an agreement relates to a Contract but is not an Included Subcontract. The term Excluded Contract includes, without limitation, an agreement pursuant to which an Affected Consultant obtains from such a person or entity goods to be used in the fulfillment of the Affected Consultant's duties under the applicable Contract.

4

**Included Subcontract** means an agreement or portion of an agreement between an Affected Consultant and a person or entity who is not an Employee of such Affected Consultant, pursuant to which such person or entity:

(a)    agrees to assist an Affected Consultant in performing a Contract; or

(b)    agrees to assist an Affected Consultant with a project funded by grant monies conveyed to the Affected Consultant under the applicable Contract. An agreement to assist an Affected Consultant means an agreement to perform all or a portion of a component of the services covered by the applicable Contract.

**Minimum Compensation** means each of the components required under Section 3 of this Policy.

**Nonprofit Corporation** means a nonprofit corporation, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and (if a foreign corporation) in good standing under the laws of the State of California, which corporation has established and maintains valid nonprofit status under Section 501(c)(3) of the United States Internal Revenue Code of 1986, as amended, and all rules and regulations promulgated under such Section.

**Pay Period** means the Affected Consultant's regular pay period.

**Policy** has the meaning set forth in the Preamble.

**Property Agreements** means Disposition and Development Agreements (DDAs), ground leases, and any other agreements with the Agency (other than Excluded Subcontracts) in which the Agency has a Proprietary Interest.

**Proprietary Interest** means any nonregulatory arrangement or circumstance in which the financial or other nonregulatory interests of the Agency in a Contract could be adversely affected, in the following circumstances:

(a)    The Agency receives significant ongoing revenue (such as rent payments) under a lease or ground lease of real property owned by the Agency for the development of a project pursuant to a contract with Owner, excluding government fees or tax or assessment revenues, or the like (except for tax revenues under the circumstances specified in (b) below); or

(b)    The Agency receives ongoing revenue from a project pursuant to a contract with Owner to pay debt service on bonds or loans provided by the Agency to assist the development of such project (including incremental tax revenues generated by the project or the development project in which it is located and used, directly or indirectly, to pay debt service on bonds or to repay a loan by the Agency where the proceeds are used for development of that project or the development project in which it is located);

(c)    The Agency has agreed in a contract with Owner to underwrite or guarantee the development or operation of a development project, or loans related thereto;

5

(d)     The Agency pursuant to a contract with Owner receives a continuing financial payment that is specific to that project, which is not a tax or other charge of general applicability or a one-time payment for the land;

(e)     The Agency receives a share in the profits of a project in a negotiated economic participation agreement pursuant to a contract with Owner;

(f)     In addition to the circumstances described above, the Agency shall be deemed to have a Proprietary Interest in a project if the Agency determines, or an interested party demonstrates, prior to the effective date of the Contract pursuant to which a project will be operated that there is a significant risk that the Agency's financial or other nonregulatory interest in the project could be adversely affected, except that no circumstance or arrangement shall be considered "financial or nonregulatory" under this definition if it arises from the exercise of regulatory or police powers such as taxation or the receipt of tax increment funds as provided in Article 16, Section 16 of the California Constitution (except as provided in (b) above), zoning or the issuance of regulatory permits.

**Section 3.     Minimum Compensation Components.**  Minimum Compensation shall consist of each of the following:

(a)     (i)     Hourly gross compensation in the amount of Ten and 77/100 Dollars ($10.77) per hour.

(ii)     For each succeeding annual period, the Agency shall make an additional adjustment of two and one-half percent (2.5%).

(b)     Compensated time off (at the compensation rates specified in Section 3(a)) in an hourly amount that, on an annualized basis for a full-time employee, equals twelve (12) days per year.  Such time off shall vest with the Covered Employee at the end of the applicable Pay Period and may be used, for sick leave, vacation or personal necessity.  Notwithstanding the foregoing, if an Affected Consultant reasonably determines, in good faith, that the Affected Consultant cannot comply with this requirement for compensated time off, the Affected Consultant shall provide the Covered Employee with a cash equivalent of such compensated time off.

(c)     Uncompensated time off in an hourly amount that, on an annualized basis for a full-time employee, equals ten (10) days per year.  Such time off shall vest with the Covered Employee at the end of the applicable Pay Period and may be used, at the option of the Covered Employee, for sick leave for the illness of the Covered Employee or such Covered Employee's spouse, domestic partner, child, parent, sibling, grandparent or grandchild.  This uncompensated time off is in addition to any time off an employee is eligible for under the Family and Medical Leave Act.  Nothing in this section should be construed as conflicting with the Family and Medical Leave Act.

**Section 4.     Contract Requirements.**  Every Contract or Contract Amendment entered into on or after the Effective Date shall provide as follows:

6

4.1    For each hour worked by a Covered Employee during each Pay Period during the term of the Contract (as such term may be extended from time to time), the Affected Consultant shall provide to such Covered Employee no less than the Minimum Compensation as required in this Policy.

4.2    Failure to comply with the foregoing requirement shall constitute a material breach by the Affected Consultant of the terms of the Contract. Such failure may be determined by the Agency in its sole discretion, or by Owner.

4.3    If, within ten (10) days after the Affected Consultant receives written notice of such a breach from Owner, the Affected Consultant fails to cure such breach or, if such breach cannot reasonably be cured within such period of ten (10) days, the Affected Consultant fails to commence efforts to cure within such period, or thereafter fails diligently to pursue such cure to completion, which shall be cured in all instances within twenty-five (25) days after the Affected Consultant receives such notice, Owner shall have the right to pursue any rights or remedies available under the terms of the Agreement or under applicable law.

4.4    The Affected Consultant shall not discharge, reduce in compensation, or otherwise discriminate against any Employee for complaining to the Agency with regard to the Affected Consultant's compliance or anticipated compliance with this Policy, for opposing any practice proscribed by this Policy, for participating in proceedings related to this Policy, or for seeking to assert or enforce any rights under this Policy by any lawful means.

4.5    The Affected Consultant represents and warrants that it is not an entity that was set up, or is being used, for the purpose of evading the intent of this Policy.

4.6    The Affected Consultant shall keep itself informed of the current Minimum Compensation, and shall provide prompt written notice to all Covered Employees of annual adjustments to the Minimum Compensation, as well as any written communications received by the Affected Consultant from the Agency, which communications are marked to indicate that they are to be distributed to Covered Employees.

4.7    The Affected Consultant shall timely provide reports to the Agency and Owner in accordance with any reporting standards promulgated by the Agency's Contract Compliance Division.

4.8    The Affected Consultant shall provide the Agency with access to pertinent records after receiving a written request to do so and being provided at least five (5) Business Days to respond.

4.9    The Contract Compliance Division may conduct random audits of Affected Consultants. Random audits shall be (i) noticed in advance in writing; (ii) limited to ascertaining whether Covered Employees are paid at least the minimum compensation required by this Policy; (iii) accomplished through an examination of pertinent records at a mutually agreed upon time and location within ten (10) Business Days of the written notice; and (iv) limited to one (1) audit per Affected Consultant every two (2) years for the duration of the Contract. Nothing in this Section shall be deemed to interfere with the authority of the Contract Compliance Division to investigate any report of an alleged breach of contract as provided in Section 6.2.

7

   **4.10**    Any Affected Consultant subject to the provisions of this Policy shall promptly notify the Contract Compliance Division of any Affected Subconsultants performing services covered by this Policy and shall certify to the Contract Compliance Division that it has notified the Affected Subconsultants of their obligations under this Policy.

**Section 5.    Administration and Enforcement.**

   **5.1**    The Contract Compliance Division shall adopt the guidelines or rules adopted by the City and County of San Francisco for implementation of the City's Minimum Compensation Ordinance. At the option of the Contract Compliance Division, additional or revised guidelines or rules for the administration of this Policy may be adopted to facilitate the Agency's implementation of this Policy. Such guidelines and rules shall not be adopted finally until the Contract Compliance Division has held at least one (1) public community meeting and a workshop at a regularly scheduled Agency Commission meeting on the proposed guidelines. The guidelines and rules shall establish procedures for providing administrative hearings requested by Covered Employees to determine whether an Affected Consultant has breached a Contract based on the Minimum Compensation requirements of this Policy. The guidelines and rules shall also establish procedures permitting Affected Consultants to provide payroll information in confidence to the Agency for purposes of monitoring compliance under this Policy and authorizing disclosure of the information by the Agency only when necessary for enforcement purposes. The Contract Compliance Division shall also issue a determination as to whether a particular instrument constitutes a Contract or agreement subject to the requirements of this Policy. The Contract Compliance Division shall report annually on compliance with this Policy to the Agency Commission. Such report shall include cumulative information regarding the number of waivers granted by the Executive Director or Agency Commission pursuant to Sections 6, 7, 8 and 9 of this Policy and statistical data regarding such waivers.

   **5.2**    A Covered Employee may report to the Contract Compliance Division in writing any alleged breach by an Affected Consultant of the terms required to be contained in the applicable Contract under this Policy. The Contract Compliance Division shall investigate any such report. If the Contract Compliance Division determines that an Affected Consultant is in breach of any such term, the Contract Compliance Division shall notify the Executive Director of its findings and of any action that the Contract Compliance Division requests that the Executive Director take with respect to such breach (collectively, "Agency Enforcement Action"). In order to ensure compliance with this Policy and to enhance the monitoring activities of the Contract Compliance Division, the Agency desires to encourage reporting by Covered Employees pursuant to this subsection. The Contract Compliance Division shall keep confidential, to the maximum extent permitted by applicable laws, the Covered Employee's name and other identifying information.

   **5.3**    In addition to any other rights or remedies available to the Agency under the terms of the Contract or under applicable law, the Agency shall have the following rights, in the event of such failure by an Affected Consultant:

   (a) the right to charge the Affected Consultant an amount equal to the difference between the Minimum Compensation levels required by this Policy and any compensation actually provided to each Covered Employee who was not paid in accordance with the terms of this

Policy, together with interest on such amount from the date payment was due at the maximum rate then permitted by law;

(b)  the right to set off all or any portion of the amount described in Section 5.3(a) against amounts due to the non-compliant Affected Consultant under the Contract;

(c)  the right, with Owner's concurrence, to terminate the Contract in whole or in part;

(d)  in the event of a breach by an Affected Consultant of the covenant referred to in Section 4.4, the right to seek reinstatement of the affected Covered Employee or to obtain other appropriate equitable relief; and

(e)  the right to bar an Affected Consultant from entering into future contracts with the Agency for three (3) years. Each of these rights shall be exercisable individually or in combination with any other rights or remedies available to the Agency.  Any amounts realized by the Agency pursuant to this subsection shall be paid to each applicable Covered Employee.

5.4     Each Covered Employee shall be a third-party beneficiary under the Contract as set forth in this Section 5.4 and in Section 5.5, and may pursue the following remedies in the event of a breach by the Affected Consultant of any contractual covenant described in Section 3 or Section 4, but only after the Covered Employee has provided the notice and participated in the administrative review hearing provided in this Section 5.4.  The Covered Employee shall give written notice of a breach to the Affected Consultant and to the Contract Compliance Division. If the Contract Compliance Division determines that no breach has occurred, or if the Agency fails to obtain the cure of a breach by the Affected Consultant within sixty (60) days after receipt of notice by the Covered Employee, the Covered Employee may request an administrative review hearing.  The Covered Employee must request such a hearing within ninety (90) days after giving written notice of the breach.  Unless the Covered Employee withdraws the request for a hearing, the Contract Compliance Division shall conduct, or arrange to have conducted, a hearing.  The Employee shall have the right to attend the hearing personally or through a designated representative. The Contract Compliance Division shall notify the Affected Consultant of the hearing so that the Affected Consultant may attend and present evidence. After the hearing is completed, the person conducting the hearing shall determine whether the Affected Consultant has breached the Contract.  Upon the issuance of a written decision finding a breach, and after a waiting period of twenty-one (21) days, the Covered Employee may bring an action against the Affected Consultant for such breach in the Superior Court of the State of California, as appropriate, unless the Agency has commenced an action against the Affected Consultant based on the breach, or obtained compliance, within the twenty-one (21)-day waiting period and provided notice to the Covered Employee of that action. If the Covered Employee prevails in such action, the Covered Employee may be awarded: (A) an amount equal to the difference between the Minimum Compensation and any compensation actually provided to the Covered Employee, together with interest on such amount from the date payment was due at the maximum rate then permitted by law; and (B) in the event of a breach by the Affected Consultant of the covenant referred to in Section 4.4, the right to seek reinstatement or to obtain other appropriate equitable relief.

5.5     In the event of any legal action or proceeding between an Affected Consultant and

9

a Covered Employee arising from this Rider 2, the unsuccessful party to such action or proceeding shall pay to the prevailing party all costs and expenses, including reasonable attorney's fees and disbursements, incurred by such prevailing party in such action or proceeding and in any appeal in connection with such action or proceeding; provided, however, that an Affected Consultant shall be entitled to such costs and expenses only if the court determines that the Covered Employee's action or proceeding was frivolous, vexatious or otherwise an act of bad faith. If such prevailing party recovers a judgment in any such action, proceeding or appeal, such costs, expenses and attorneys' fees and disbursements shall be included in and as a part of such judgment. This Rider 2 does not authorize any award of costs, expenses, or attorney's fees in favor of or against the Agency.

     **5.6**    The Agency shall maintain the confidentiality of payroll information obtained in the course of monitoring compliance with this Policy and shall disclose such information only as necessary for enforcement purposes.

     **5.7**    The Contract Compliance Division shall develop a procedure for obtaining an assurance from Affected Consultants when they sign an agreement subject to this Policy that they comply with the requirements of this Policy, such as the signing of an affidavit of compliance.

     **5.8**    Consultant agrees, and shall include in each lower tier Included Subcontract specific provisions which require each lower tier Affected Subconsultant who will perform any portion of the Work, to agree: (i) that if Owner receives a notice of an Agency Enforcement Action ("Agency Notice") with respect to Consultant or any lower tier Affected Subconsultant, then Owner may, in Owner's sole discretion but without obligation to do so, take any and all actions necessary to cure the violation identified in the Agency Notice; (ii) that Owner's receipt of any such Agency Notice shall constitute a material default under both the Agreement and the Included Subcontract entitling Owner to terminate the Agreement and thereafter to terminate such non-conforming or non-compliant Included Subcontract if such violation is not cured to the Agency's satisfaction within any cure periods provided under the DDA or other applicable agreement, or to exercise any other remedy available to Owner under the Agreement or any such Included Subcontract after assignment; and (iii) that Consultant and each Affected Subconsultant shall defend (with legal counsel reasonably satisfactory to Owner), indemnify, and hold Owner and all Indemnified Parties harmless from any liability arising as a result of Owner's receipt of any Agency Notice with respect to the Agreement or any Included Subcontract associated with the performance of the Services.

**Section 6.**    **Waivers.** The Executive Director shall waive the requirements of this Policy under the following circumstances:

     **6.1**    The Executive Director has determined that: (a) either (1) there is only one prospective consultant willing to enter into the applicable Contract on the terms and conditions established by the Agency (other than the requirements of this Policy), or (2) the needed services under the applicable Contract are available only from a sole source; and (b) the prospective consultant is not currently disqualified from doing business with the Agency or any other governmental agency.

10

6.2     The Executive Director has determined in writing that the Contract is necessary to respond to an emergency which endangers the public health or safety and no entity that complies with the requirements of this Policy and is capable of responding to the emergency is immediately available to perform the required services.

6.3     The Executive Director has determined in writing that: (a) there are no qualified responsive bidders or prospective vendors that comply with the requirements of this Policy; and (b) the Contract is for a service, project, or property that is essential to the Agency or the public.

6.4     The Executive Director has determined in writing that: (a) the services to be purchased are available under a bulk purchasing arrangement with a federal, state or local governmental entity; (b) purchase under such arrangement will substantially reduce the cost of purchasing such services; and (c) purchase under such an arrangement is in the best interest of the Owner, Agency, and the public.

**Section 7.     Additional Waivers by the Executive Director – Nonprofit Corporations.**  A Nonprofit Corporation may seek a waiver from the requirements of the adjustments provided in Section 3.1(b) and Section 3.1(c) if the highest paid managerial position in the organization earns a salary which, when calculated on an hourly basis, is not more than six (6) times the lowest wage paid by the organization to a Covered Employee. The Nonprofit Corporation shall provide to the Contracting Department a written statement, prepared and signed by the Nonprofit Corporation, setting forth an explanation of the economic hardship to the Nonprofit Corporation or the negative impact on services that would result from compliance with this Policy. The Executive Director may grant the requested waiver. Each waiver shall be effective for a period of up to one (1) year, and subsequent waivers may be requested and granted.

**Section 8.     Special Waiver By the Agency Commission.**  A special waiver may be granted if, upon receipt of an application from the Affected Consultant, stating fully the grounds of the request and the facts pertaining thereto, the Agency finds following its own further investigation that the application of the Policy would result in an adverse impact on services or an unreasonable financial impact on the Contract. In order to permit any such waiver, the Agency must determine that:

(a)     The application of the Policy would result in practical difficulties or unnecessary hardships inconsistent with the general purpose and intent of the applicable Redevelopment Plan;

(b)     There are exceptional circumstances or conditions applicable to the property, the intended development of the property, or the services proposed through a contract, which do not apply generally to other properties or contracts having the same standards, restrictions and controls;

(c)     Permitting a waiver, for a specified period of time, will not be materially detrimental to the public welfare or injurious to property or improvement in the area; and

(d)     Permitting a waiver, for a specified period of time, will not be contrary to the objectives of the applicable redevelopment plan.

Waivers shall only be granted for a limited time period as determined to be needed

11

to promote the general purpose and intent of the applicable redevelopment plan. Subsequent waivers may be requested and either granted or denied. The Agency anticipates that all covered Projects and Contracts will eventually transition to achieving a viability that will allow for covered Affected Consultants to comply with the Policy.

Section 9.     **Waiver Through Collective Bargaining.**  All or any portion of the applicable requirements of this Policy may be waived in a bona fide collective bargaining agreement, provided that such waiver is explicitly set forth in such agreement in clear and unambiguous terms.

Section 10.     **Relationship to Other Requirements.**  This Policy provides a minimum level of compensation and shall not be construed to preempt or otherwise affect any other law, regulation or requirement providing a higher level of compensation.

Section 11.     **Preemption.**  Nothing in this Policy shall be interpreted or applied so as to create any power or duty in conflict with any federal or state law.

Section 12.     **Effective Date.**  This Policy shall become effective the date of the Agency approval.

Section 13.     **Severability.**  If any part or provision of this Policy, or the application of this Policy to any person or circumstance, is held invalid, the remainder of this Policy, including the application of such part or provisions to other persons or circumstances, shall not be affected by such a holding and shall continue in full force and effect. To this end, the provisions of this Policy are severable.

RIDER 3

HEALTH CARE ACCOUNTABILITY POLICY

This Health Care Accountability Policy (the "Policy") is attached to and made a part of that certain Consulting Agreement-Hunters Point Shipyard by and between Owner and Consultant ("Agreement") which is subject to the covenants, agreements and obligations set forth in the DDA. Consultant is bound by this Rider as part of the obligations it assumes and benefits it receives under the Agreement. Capitalized terms not otherwise specifically defined in this Rider have the meanings given to them in the Agreement.

Section 1.    Findings and Declarations.

1.1    The San Francisco Redevelopment Agency of the City and County of San Francisco (the "Agency") enters into many contracts, including, without limitation, service contracts, loan and grant agreements and property agreements, in furtherance of the objectives of the California Community Redevelopment Law (Health and Safety Code §§ 33000 et seq.) in the interest of the health, safety and general welfare of the City of San Francisco's (the "City") residents.

1.2    These contracts and agreements have at times involved compensation to the contracting parties' or their subcontractors' employees that does not include health benefits or does not provide a high enough level of compensation that would allow an employee to acquire their own health insurance. Uninsured persons seeking medical assistance place an immediate burden on the City's limited public health resources and place the uninsured at a far greater level of health risk. Requiring these contracting parties and their subcontractors to offer health benefits to their employees, or to make payments to the City's Department of Public Health to provide for the care of such persons, or to participate in a health benefits program developed by the City's Director of Health, will improve the health, safety and general welfare of San Francisco's residents by ensuring health benefits for many more of the City's residents who are now uninsured.

Section 2.    Definitions.

**Affected Consultant** means the person or entity that enters into a Contract with Owner or any lower tier subconsultant.

**Affected Subconsultant** means any subconsultant of any tier who enters into a Contract with any Affected Consultant of a higher tier.

**Agency** means the Redevelopment Agency of the City and County of San Francisco.

**Agency Property** means real property that is owned by the Agency or over which the Agency has exclusive use. "Exclusive use" means the right to use or occupy real property to the exclusion of all others, subject to the rights reserved by the party granting such exclusive use.

1

**Business Day** means a day other than Saturday, Sunday or a bank, City, or Agency holiday.

**City** means the City and County of San Francisco.

**Contract** means any agreement between Owner, Consultant, or any Affected Consultant and a Person to provide or procure professional services with respect to the design, analysis, or construction of any portion of the Improvements. A "contract" does not include a loan transaction. Notwithstanding the foregoing, the term Contract excludes:

(a)    agreements for a duration of less than one (1) year. Affected Consultants are prohibited from entering into multiple contracts of short duration in order to evade the requirements of this Policy;

(b)    agreements for the purchase or lease of goods, or for guarantees, warranties, shipping, delivery, installation or maintenance of such goods. Where an agreement is for the purchase or lease of both goods and other services, the agreement shall not be deemed a Contract if a preponderance of the Contract amount is for goods;

(c)    agreements entered into pursuant to settlement of legal proceedings;

(d)    agreements for urgent or specialized advice, consultation or litigation services for the Agency where the General Counsel finds that it would be in the best interests of the Agency not to include the requirements of this Policy;

(e)    agreements with any person or entity if the amount of the agreement is less than Twenty-Five Thousand Dollars ($25,000.00) (in the case of a for-profit entity or person) or less than Fifty Thousand Dollars ($50,000.00) (in the case of a Nonprofit Corporation). However, if the Contracting Party has multiple agreements with Owner which are subject to the DDA in a given fiscal year (which agreements would be considered Contracts under this Policy except that the individual dollar amounts are below the thresholds set forth in the preceding sentence) and the cumulative amount of such agreements is Seventy-Five Thousand Dollars ($75,000.00) or more, the provisions of this Policy shall apply to each such agreement from the date on which the triggering Contract is executed;

(f)    agreements for the investment, management or use of trust assets where compliance would violate the fiduciary duties of the trustee;

(g)    intentionally deleted;

(h)    agreements executed after the Effective Date (unless and until a Contract Amendment is entered into) pursuant to, and within the scope of, bid packages or requests for proposals advertised and made available to the public prior to the Effective Date, unless the bid packages or requests for proposals are materially amended on or after the Effective Date;

2

(i)    agreements that require the expenditure of grant funds awarded to the Agency by another entity. If a Contract is funded both by grant funds and non-grant funds, the entire Contract is exempt; provided that, if the use of the grant funds is severable from the non-grant funds, the Contract is exempt only with respect to the use of the grant funds;

(j)    agreements pursuant to which the Agency awards a grant to a Nonprofit Corporation;

(k)    agreements with a public entity;

(l)    agreements for employee benefits to be provided to Agency employees, where the Agency Executive Director finds that no person or entity is willing to comply with this Policy and is capable of providing the required employee benefits;

(m)    agreements for the investment, management or use of Agency monies where the Agency Executive Director finds that requiring compliance with this Policy will violate the Agency's fiduciary duties and agreements for the investment of retirement, health or other funds held in trust pursuant to Charter, statute, ordinance or MOU where the official or officials responsible for investing or managing such funds find that requiring compliance with this Policy will violate their fiduciary duties;

(n)    loan agreements and agreements made in connection with loans or grants under which the Agency, as creditor or grantor, is providing funds to be used by the debtor or grantee to:

    (1)    acquire an interest in real property on which residential improvements for low- or moderate-income households will be constructed;

    (2)    construct improvements owned or leased by the debtor or grantee, on condition that residents of the improvements qualify as low-or-moderate-income households; or

    (3)    rehabilitate improvements owned or leased by the debtor or grantee;

(o)    disposition and development or ground lease agreements of Agency Property on which residential improvements for low- or moderate-income households will be constructed or existing improvements will be operated for low- or moderate-income households; or

(p)    agreements with an owner (such as owner participation agreements) where such agreement is granted in the exercise of the Agency's regulatory or police powers.

**Contract Amendment** means a modification to an agreement which extends the term, increases the total amount of payments due from Owner (except where such increase is due solely to cost of living adjustments), or modifies the scope of Services to be performed by the Affected Consultant; provided that the resulting agreement falls within the definition of Contract.

3

Notwithstanding the foregoing, the term Contract Amendment does not include a one-time extension of the term of a Contract for up to six (6) months, or a construction change order, modification or amendment to a Contract executed by the Agency for its benefit (as determined by the Agency Executive Director).

**Contracting Party** means an Affected Consultant who enters into a Contract.

**Covered Employee** means an Employee of an Affected Consultant who works on a Contract or Subcontract for fifteen (15) hours or more per Week, (1) within the geographic boundaries of the City of San Francisco, or (2) elsewhere in the United States.

Notwithstanding the foregoing, the term Covered Employee does not include the following:

(1)     any Employee under the age of eighteen (18) who is a student, provided that the Employee does not replace, displace or lower the wage or benefits of any existing position or Employee; or

(2)     any Employee employed as a trainee in a bona fide training program consistent with federal law, which training program enables the Employee to advance into a permanent position, provided that the Employee does not replace, displace or lower the wage or benefits of any existing position or Employee; or

(3)     any Employee that the Contracting Party is required to pay no less than the "prevailing rate of wage" in accordance with the Agency's Prevailing Wage Policy; or

(4)     any disabled Employee who:

(A)     is covered by a current sub-minimum wage certificate issued to the employer by the U.S. Department of Labor; or

(B)     would be covered by such a certificate but for the fact that the employer is paying a wage equal to or higher than the minimum wage.

**DDA** has the meaning set forth in the Agreement.

**Effective Date** means the date on which the Agreement, or any Subcontract with an Affected Consultant, is executed.

**Employee** means any person who is employed by an Affected Consultant, including part-time and temporary employees.

**Nonprofit Corporation** means a nonprofit corporation, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and (if a foreign corporation) in good standing under the laws of the State of California, which corporation has

4

established and maintains valid nonprofit status under Section 501(c)(3) of the United States Internal Revenue Code of 1986, as amended, and all rules and regulations promulgated under such Section.

Policy has the meaning set forth in the Preamble.

Property Agreements means Disposition and Development Agreements (DDAs), ground leases, and any other agreements with the Agency (other than subcontracts not qualifying as Contracts under this Rider 3) in which the Agency has a Proprietary Interest.

Proprietary Interest means any nonregulatory arrangement or circumstance in which the financial or other nonregulatory interests of the Agency in a Contract could be adversely affected, in the following circumstances:

(a)     the Agency receives significant ongoing revenue (such as rent payments) under a lease or ground lease of real property owned by the Agency for the development of a project pursuant to a contract with Owner, excluding government fees or tax or assessment revenues, or the like (except for tax revenues under the circumstances specified in (b) below);

(b)     the Agency receives ongoing revenue from a project pursuant to a contract with Owner to pay debt service on bonds or loans provided by the Agency to assist the development of such project (including incremental tax revenues generated by the project or the development project in which it is located and used), directly or indirectly, to pay debt service on bonds or to repay a loan by the Agency where the proceeds are used for development of that project or the development project in which it is located;

(c)     the Agency has agreed in a contract with Owner to underwrite or guarantee the development or operation of a development project, or loans related thereto;

(d)     the Agency pursuant to a contract with Owner receives a continuing financial payment that is specific to that project, which is not a tax or other charge of general applicability or a one-time payment for the land;

(e)     the Agency receives a share in the profits of a project in a negotiated economic participation agreement pursuant to a contract with Owner; or

(f)     in addition to the circumstances described above, the Agency shall be deemed to have a Proprietary Interest in a project if the Agency determines or an interested party demonstrates, prior to the effective date of the Contract pursuant to which a project will be operated, that there is a significant risk that the Agency's financial or other nonregulatory interest in the project could be adversely affected, except that no circumstance or arrangement shall be considered "financial or non-regulatory" under this definition if it arises from the exercise of regulatory or police powers such as taxation or the receipt of tax increment funds as provided in Article 16, section 16 of the California Constitution (except as provided in (b) above), zoning or the issuance of regulatory permits.

5

**Subcontract** means an agreement between an Affected Consultant and a person or entity pursuant to which the person or entity agrees to perform all or a portion of the Services covered by a Contract. Notwithstanding the foregoing, the term Subcontract does not include:

(a) agreements for the purchase or lease of goods, or for guarantees, warranties, shipping, delivery, installation or maintenance of such goods. When an agreement is for the purchase or lease of both goods and other services, the agreement shall not be deemed a Subcontract if a preponderance of the Contract amount is for goods; or

(b) agreements with a public entity.

**Week** shall mean a consecutive seven (7)-day period. If the Affected Consultant's regular pay period is other than a seven (7)-day period, the number of hours worked by a Covered Employee during a seven (7)-day Week, for purposes of this Policy, shall be calculated by adjusting the number of hours actually worked during the Affected Consultant's regular pay period to determine the average over a seven (7)-day Week. However, such period of averaging shall not exceed a duration of one (1) month.

**Section 3.**    **Health Care Accountability Components.**

3.1    With respect to each Covered Employee who either resides in San Francisco (regardless of where the Covered Employee provides services) or provides services covered by this Policy in San Francisco, each Affected Consultant shall do one of the following, at the Affected Consultant's option:

(a) offer to the Covered Employee health plan benefits that meet minimum standards prepared by the City's Health Director and approved by the City's Health Commission. The minimum standards shall provide for a maximum period for each Covered Employee's health benefits to become effective, not to exceed thirty (30) days from the start of employment on a covered Contract or Subcontract. The Health Commission shall review such standards every two (2) years to ensure that the standards stay current with State and Federal regulations and existing health benefits practices;

(b) for each Week in which the Covered Employee works the applicable minimum number of hours set forth in the definition of Covered Employee), pay to the City One Dollar and Fifty Cents ($1.50) per hour for each hour the Covered Employee is employed by the Contracting Party on the Contract or Subcontract, but not to exceed Sixty Dollars ($60.00) in any Week. The City shall appropriate money received pursuant to this Section 3.1(b) for the use of the Department of Public Health. The Department of Public Health shall use the monies appropriated for staffing and other resources to provide medical care for the uninsured. The Health Commission may increase this hourly rate and Weekly maximum in accordance with the Bureau of Labor Statistics Consumer Price Index for Medical Care in the San Francisco Bay Area or such other factors as the Health Commission finds appropriate; provided, however, the Health Commission shall take this action no more than once a year and any adjustments in such hourly rate or Weekly maximum must be approved by the Board of Supervisors by resolution; or

(c) participate in a health benefits program developed by the Health Director in consultation with the City's Purchasing Department. The Health Director shall obtain Health Commission approval of the program before implementing it. The Health Director shall seek such approval within twelve (12) months after this Policy is finally approved. Prior to implementation of the health benefits program provided in this Section 3.1(c), each Affected Consultant shall comply with Section 3.1(a) or 3.1(b). After the Health Director implements the program, in addition to the options provided in Sections 3.1(a) and 3.1(b), Affected Consultants may satisfy their obligations under this Policy by complying with the requirements of the health benefits program. In developing the program, the Health Director shall (i) attempt to make health coverage available for uninsured Covered Employees and, if feasible, other uninsured City residents; (ii) use public health facilities to the maximum extent practicable; (iii) make the program economically viable; and (iv) provide a mechanism for funding which relies, as much as possible, on contributions by participating employers and employees.

3.2    With respect to each Covered Employee who does not reside in San Francisco, but who provides services covered by this Policy, each Affected Consultant shall do one of the options set forth in Section 3.1, at the Affected Consultant's option.

3.3    With respect to each Covered Employee who does not reside in San Francisco, and does not provide services covered by this Policy in San Francisco, each Affected Consultant shall do one of the following, at the Affected Consultant's option:

(a) offer to the Covered Employee health plan benefits that meet minimum standards prepared by the Health Director and approved by the Health Commission pursuant to Section 3.1(a) above; or

(b) for each Week in which the Covered Employee works the applicable minimum number of hours set forth in the definition of Covered Employee), pay to the Covered Employee an additional One Dollar and Fifty Cents ($1.50) per hour for each hour the Covered Employee is employed by the Contracting Party on the Contract, but not to exceed Sixty Dollars ($60.00) in any Week, to enable the employee to obtain health insurance coverage. This represents the City's current estimate of the average cost of obtaining individual health insurance benefits. The Health Commission may increase this hourly rate and Weekly maximum in accordance with the Bureau of Labor Statistics Consumer Price Index for Medical Care in the San Francisco Bay Area or such other factors as the Health Commission finds appropriate in order to track the cost of obtaining individual health insurance; provided, however, the Health Commission shall take this action no more than once a year and any adjustments in such hourly rate or Weekly maximum must be approved by the City's Board of Supervisors by resolution.

3.4    Notwithstanding the above, if, at the time a Contract or Subcontract is executed, an Affected Consultant has twenty (20) or fewer employees (or, in the case of a Nonprofit Corporation, fifty (50) or fewer employees), including any employees the Affected Consultant plans to hire to implement the Contract or Subcontract the Affected Consultant shall not be obligated to provide the Health Care Accountability Components set forth in this Section 3 to its Covered Employees. In determining the number of employees an Affected Consultant has, all employees of all entities that own or control the Affected Consultant and that the Affected Consultant owns or controls, shall be included.

7

Section 4.    **Contractual Obligations.**

4.1    Each Affected Consultant that enters into a Contract or Subcontract shall agree:

(a) to comply with the requirements of this Policy, including the requirement to choose and perform one of the Health Care Accountability Components set forth in Section 3;

(b) to comply with regulations adopted by the Agency pursuant to this Policy;

(c) to provide information and reports to the Agency in accordance with any reporting standards promulgated by the Agency in consultation with the City's Director of Health;

(d) to provide the Agency with access to pertinent records relating to the number of employees employed and terms of medical coverage as allowed by law after receiving a written request to do so and being provided at least five (5) Business Days to respond;

(e) to cooperate with the Agency when it conducts audits;

(f) to include in every Contract or Subcontract subject to this Policy provisions requiring compliance with this Policy, consistent with any directives or standards adopted by the Agency;

(g) to notify the Agency promptly of any Affected Subconsultants performing services covered by this Policy and certify to the Agency that it has notified the Affected Subconsultants of their obligations under this Policy; and

(h) to represent and warrant that it is not an entity that was set up, or is being used, for the purpose of evading the intent of this Policy.

4.2    An Affected Consultant shall not discharge, reduce in compensation, or otherwise discriminate against any Employee for notifying the City regarding the Affected Consultant's noncompliance or anticipated noncompliance with this Policy, for opposing any practice proscribed by this Policy, for participating in proceedings related to this Policy, or for seeking to assert or enforce any rights under this Policy by any lawful means.

Section 5.    **Administration and Enforcement.**

5.1    The Agency shall implement the City's Department of Public Health regulations for the interpretation and administration of this Policy, to the extent such regulations are consistent with adopted Agency Policy.

5.2    The Agency's General Counsel shall develop contractual provisions for use by Agency staff designed to enable the Agency to pursue the remedies set forth in this Section against every person or entity required to comply with this Policy.

5.3    The Agency, or at its request, the City's Department of Public Health, may conduct audits of Affected Consultants, although such audits shall be conducted only with at

8

least ten (10) Business Days' advance written notice to the Affected Consultant and after making good faith efforts for a mutually agreed upon time and location.

5.4     The Agency's Contract Compliance Division shall provide an annual joint report to the Agency Commission on compliance with this Policy. Such report shall include cumulative information regarding the number of waivers granted pursuant to this Policy.

5.5     A Covered Employee may report in writing to the Agency's Contract Compliance Division any alleged violation of this Policy by an Affected Consultant or other person or entity subject to this Policy. The Agency shall investigate any such report. If the Agency determines that any person or entity has violated this Policy, the Agency shall notify the Affected Consultant of its findings. In order to ensure compliance with this Policy and to enhance the monitoring activities of the Agency, the Agency encourages reporting by Covered Employees pursuant to this Section 5.5. The Agency shall keep confidential the Covered Employee's name and other identifying information, to the maximum extent permitted by applicable law.

5.6     The Agency has the right to assign the enforcement provisions of this Section 5 to the appropriate City department to act on behalf of the Agency;

5.7     In addition to any other rights or remedies available to the Agency under the terms of any agreement of an Affected Consultant or under applicable law, the Agency, or the City acting on behalf of the Agency, shall have the following rights:

        (a) the right to charge the Affected Consultant for any amounts that the Affected Consultant should have paid to the City for hours worked by Covered Employees pursuant to Sections 3.1(b) and 3.3(b), together with interest on such amount from the date payment was due at the maximum rate then permitted by law;

        (b) the right to assess liquidated damages of Fifty Dollars ($50.00) a day for each Covered Employee each day that the Affected Consultant fails to pay to the City the amounts required by Sections 3.1(b) and 3.3(b);

        (c) the right to set off all or any portion of the amount that an Affected Consultant is required to pay to the City pursuant to preceding Sections 5.7(a) and (b) against amounts due to an Affected Consultant;

        (d) the right, with the concurrence of Owner, to terminate the Contract in whole or in part; or

        (e) the right to bar an Affected Consultant from entering into future Contracts with the Agency for three (3) years.

5.8     Each Affected Consultant shall be responsible for its Affected Subconsultants with respect to compliance with this Policy. If an Affected Subconsultant fails to comply, the Agency, or the City acting on behalf of the Agency, may pursue the remedies set forth in this Section 5 against the Consultant based on the Affected Subconsultant's failure to comply, provided that the Agency has first provided the Affected Consultant with notice and an opportunity to obtain a cure of the violation.

9

5.9     Each of the rights set forth in this Section 5 shall be exercisable individually or in combination with any other rights or remedies available to the Agency. Any amounts realized by the Agency pursuant to this Section 5 shall be used first to cover the costs of enforcing this Policy and thereafter appropriated for the use of the Department of Public Health.

**Section 6.     Waivers by the Agency Executive Director.**

6.1     The Agency Executive Director or designee shall waive the requirements of this Policy when the relevant Agency staff has provided justification to the Agency Executive Director, and the Agency Executive Director has found that one of the following circumstances exists:

(a) there is only one prospective Affected Consultant willing to enter into the applicable Contract on the terms and conditions established by the Agency (other than the requirements of this Policy);

(b) the needed service, project or property arrangement under the Contract is available only from a sole source;

(c) the Contract is necessary to respond to an emergency that endangers the public health or safety;

(d) there are no qualified responsive bidders or prospective vendors that comply with the requirements of this Policy and the agreement is for a service or project that is essential to the Agency, City or the public;

(e) the public interest warrants the granting of a waiver because application of this Policy would constitute an adverse impact on services or an unreasonable adverse financial impact on the Agency or City; or

(f) the services to be purchased are available under a bulk purchasing arrangement with a federal, state or local governmental entity;

(g) purchase under such arrangement will substantially reduce the Agency's cost of purchasing such services; and

(h) purchase under such an arrangement is in the best interest of the Agency or the public.

6.2     Each waiver shall be effective for the duration of the Contract. Subsequent waivers may be requested and either granted or denied.

**Section 7.     Special Waiver by the Agency Commission.**

A special waiver is available if, upon receipt of an application from the Affected Consultant, stating fully the grounds of the request and the facts pertaining thereto, the Agency finds following its own further investigation that the application of the Policy would result in an

10

adverse impact on services or an unreasonable financial impact on the Contract. In order to permit any such waiver, the Agency must determine that:

7.1 the application of the Policy would result in practical difficulties or unnecessary hardships inconsistent with the general purpose and intent of the applicable Redevelopment Plan;

7.2 there are exceptional circumstances or conditions applicable to the property, the intended development of the property, or the services proposed through a contract, which do not apply generally to other properties or contracts having the same standards, restrictions and controls;

7.3 permitting a waiver, for a specified period of time, will not be materially detrimental to the public welfare or injurious to property or improvement in the area; and

7.4 permitting a waiver, for a specified period of time, will not be contrary to the objectives of the applicable redevelopment plan.

Waivers shall only be granted for a limited time period as determined to be needed to promote the general purpose and intent of the applicable redevelopment plan. Subsequent waivers may be requested and either granted or denied. The Agency anticipates the all covered Projects and Contracts will eventually transition to achieving a viability that will allow for covered Affected Contractors to comply with the Policy.

**Section 8.    Preemption.**

Nothing in this Policy shall be interpreted or applied so as to create any power or duty in conflict with any federal or state law.

**Section 9.    Effective Date.**

This Policy shall become effective on the date of Agency Commission approval.

**Section 10.    Period of Suspension.**

Affected Consultants shall not be required to provide any of the Health Care Accountability Components provided in Section 3 to their Covered Employees until such time as the City's Health Director has prepared, and the Health Commission has approved, minimum standards for health plan benefits pursuant to Section 3.1(a). The Health Director and Health Commission shall proceed promptly to take these actions. From the date upon which the Health Commission approves such minimum standards forward, Affected Consultants shall provide the Health Care Accountability Components set forth in Section 3 to their Covered Employees.

**Section 11.    Severability.**

If any part or provision of this Policy, or the application of this Policy to any person, location or circumstance, is enjoined or held invalid by a court of law, the remainder of this Policy, including the application of such part or provisions to other persons, locations or circumstances, shall not be affected by such action and shall continue in full force and effect. To

11

this end, the provisions of this Policy are severable. Further, to the extent Section 3.1(b) may be enjoined or held invalid by a court of law, the Contracting Party may alternatively comply in accordance with Section 3.3(b).

12

RIDER 4

EQUAL OPPORTUNITY PROGRAM

This Equal Opportunity Program (the "EOP") is attached to and made a part of the Consulting Agreement-Hunters Point Shipyard to which it is attached ("Agreement") and is subject to certain provisions of the Disposition and Development Agreement Between Lennar/BVHP, LLC ("Owner") and the Redevelopment Agency of the City and County of San Francisco, as amended from time to time (the "DDA") for Hunters Point Shipyard, Phase 1 ("Phase 1"). Consultant is bound by this Rider as part of the obligations it assumes, and benefits it receives, under the Agreement. Capitalized terms not otherwise specifically defined in this Rider have the meanings set forth in the Agreement.

Section 1.    Purposes.  Owner and Consultant agree that this EOP and its accompanying Exhibits and Attachments are designed to ensure that:

    1.1    Persons and businesses that plan, design or construct improvements on sites initially purchased and assembled with Agency funds provide equal opportunities to and do not discriminate against Minority Group Persons, women, or business enterprises owned by Minority Group Persons or women.

    1.2    Owner, Consultant, and all lower tier subconsultants recruit, employ and contract with all qualified individuals and businesses that are part of the work force and business community in San Francisco and the Bay Area.

Section 2.    Definitions.

    Affected Consultant means Consultant and each lower tier subconsultant having or who is a party to a professional service contract or subcontract with or through Consultant with respect to the Project in excess of Ten Thousand Dollars ($10,000.00) and who employ Persons with respect to any services affecting the Project Site or Agency Parcels.

    Affected Subconsultant means a Person that enters into a Subcontract of any tier.

    Agency means the Redevelopment Agency of the City and County of San Francisco and its staff responsible for ensuring that the EOP is implemented.

    Agency Parcels means, collectively, the Agency Housing Parcels, Community Facility Parcels and Open Space, all of which are shown on the map attached as Attachment 2 to the DDA.

    Agreement has the meaning set forth in the Preamble.

    Bayview Hunters Point Area or BVHP Area means that portion of the City and County of San Francisco located within the portions of the zip code areas 94124, 94134 and 94107 (or any successor zip codes) that are located in Supervisorial District 10, as shown on that certain Map of the City and County of San Francisco showing Precincts and Legislative Districts,

1

prepared by the Department of Elections and dated January 2004, which comprise the neighborhoods most affected by closure of the Shipyard. Unless otherwise expressly indicated, references to Bayview, Hunters Point, the community, neighborhoods and variants of those terms mean the BVHP Area.

**Business Day** means a day other than Saturday, Sunday or a state or federal holiday.

**Close of Escrow or Closing** means the recordation of the grant deed evidencing the conveyance of all or a portion of the Project Site. There may be a separate Closing for Parcel A-1 and for Parcel B-1.

**Commence Construction** means the commencement of substantial physical construction of the Horizontal Improvements as part of a sustained and continuous construction plan.

**Contract** means any agreement in excess of Ten Thousand Dollars ($10,000.00) between Owner, Consultant, or any Affected Consultant and a Person to provide or procure professional services with respect to the design, analysis, or construction of any portion of the Improvements. A "contract" does not include a loan transaction.

**Controlled**, for purposes of determining whether a business is an MBE or a WBE, means that the Minority Group Person(s), the woman or a combination of Minority Group Persons and women, as the context requires, shall (1) possess legal authority and power to manage business assets, good will and daily operations of the business; and (2) actively and continuously exercise such authority and power in determining the policies and in directing the operations of the business.

**DDA** has the meaning set forth in the Preamble.

**Developer** has the meaning set forth in the Preamble.

**Economically Disadvantaged** means a business that has not achieved the gross income threshold for the applicable industry specified below, calculated by averaging the gross income for the three most recent consecutive years. The gross income levels set forth below may be revised from time to time to reflect the Agency's then current policy regarding the criteria for determining Economically Disadvantaged businesses. Any such amendment shall be effective immediately upon written notification to Developer from the Agency. When a business is no longer Economically Disadvantaged, it is not an eligible M/WBE and it will not be counted toward meeting M/WBE goals.

| Industry | Gross Income |
|---|---|
| Construction | $14,000,000 |
| Professional or Personal Services | $ 2,000,000 |
| Suppliers | $ 2,000,000 |

2

**EOP** has the meaning set forth in the Preamble.

**First Consideration** means to make a genuine effort to consider local M/WBEs before looking elsewhere. Non-Local M/WBEs should be used to satisfy participation goals only if Local M/WBEs are not available or qualified, or if their bids or fees are significantly higher than those of the non-Local M/WBEs.

**First Consideration for Employment** means to offer a permanent position to individuals who are qualified for that position and who live in the BVHP Area (or in San Francisco as the case may be) prior to offering the position to a qualified individual who does not live in the BVHP Area (or in San Francisco as the case may be).

**Good Faith Efforts** or **GFE** has the meaning set forth in Section 3.2, of Exhibit 2 to this Rider.

**Horizontal Improvements** means those items identified in the Infrastructure Plan including street systems and street improvements, wet utilities, dry utilities, public Open Space including those items set forth in the Open Space Master Plan (defined in the DDA), and other improvements to be constructed in or for the benefit of the Redevelopment Area and any other matters described in the Infrastructure Plan.

**Infrastructure Plan** has the meaning set forth in Attachment 9 to the DDA.

**Job Category** means a group of similar jobs such as food and beverage supervisors, room cleaners and related workers, etc.

**Joint Venture** means two or more businesses acting as a general contractor or a subcontractor and performing or providing services on a contract, in which each joint venturer combines property, capital, skill and/or knowledge. In order for the M/WBE component of a joint venture to be recognized the ownership interest must meet a 35 percent threshold; provided, that if the joint venture subcontracts to non-M/WBEs a percent of the work in excess of the percentage interest that the M/WBE has in the joint venture, the joint venture shall not be recognized as an M/WBE.

**Local M/WBE** means an Economically Disadvantaged, independent and continuing M/WBE that: (a) has fixed offices located within the geographic boundaries of the City and County of San Francisco; (b) is listed in the Permits and License Tax Paid File with a San Francisco Business Street address; and (c) possesses a current Business Tax Registration Certificate. Post office box numbers or residential addresses alone shall not suffice to establish a firm's status as local. To qualify as a local firm, the firm must have been located and doing business in San Francisco for at least six (6) months prior to the date of the Agreement.

**Minority or Minority Group Person means:**

*American Indian or Alaska Native, which includes Alaska Indians, Inuits and Aleuts* (any person having origins in the indigenous peoples of North America and who is an enrolled member of a federally-recognized tribe);

3

*Asian* (any person of Chinese, Japanese, Korean, Pacific Islander, Samoan, Filipino, Asian-Indian or South East Asian origins);

*Black* (any person having origins in any of the black racial groups of Africa); or

*Latino* (any person of Spanish culture with origins in Mexico or other Spanish speaking countries in Central or South America or the Caribbean Islands).

**Minority-owned Business Enterprise (MBE)** means an Economically Disadvantaged, independent, continuing and for-profit business, which performs a commercially useful function, and is owned and controlled by one or more Minority Group Persons residing in the United States or its territories.

**Minority/Woman-owned Business Enterprise (M/WBE)** means an Economically Disadvantaged, independent, continuing and for-profit business, which performs a commercially useful function, and is owned and controlled by one or more Minority Group Persons or women residing in the United States or its territories.

**Notice of Non-Compliance** has the meaning set forth in Section 4.7 of Exhibit 2.

**Notice of Non-Qualification** has the meaning set forth in Section 4.6 of Exhibit 2.

**Open Space** has the meaning set forth in Attachment 2 to the DDA.

**Open Space Master Plan** has the meaning set forth in Section 1.1 of the DDA.

**Owned,** for purposes of determining if a business is an MBE or a WBE, means that the Minority Group Persons or women, as the context requires, possess an ownership interest of at least fifty-one percent (51%) of the business, possess incidents of ownership, such as an interest in profit and loss, equal at least to the required ownership interest percentage, and contribute capital, equipment and expertise to the business equal to at least the required ownership percentage.

**Participation Goals** has the meaning set forth in Section 5.1.

**Person** includes one or more individuals, partnerships, associations, organizations, corporations, cooperatives and legal representatives.

**Project Site** means that certain real property in the City more particularly described in Exhibit "A" to the Agreement. The Project Site does not include the Agency Parcels.

**Redevelopment Area** has the meaning set forth in Section 1.1 of the DDA.

**Request for Arbitration** has the meaning set forth in Section 6.2.

**San Francisco Resident** means an individual person who had lived in San Francisco for at least six (6) months prior to the date she or he applied for a transfer to a position at the Project Site or Agency Parcels or the date she or he was assigned to work at the Project Site or Agency

4

Parcels, whichever is earlier, or an individual person who establishes to the satisfaction of the Agency that she or he lived in San Francisco prior to applying for or being considered for a position with any Affected Consultant.

Subcontract means an agreement of any tier between Owner, Consultant, or any Affected Consultant and a Person pursuant to which the Person agrees to perform all or a portion of the services covered by a Contract.

Trade means all skilled construction trades, laborers and security guards.

Woman-owned Business Enterprise (WBE) means an Economically Disadvantaged, independent, continuing and for-profit business, which performs a commercially useful function, and is owned and controlled by one or more women residing in the United States or its territories.

Section 3.     Areas Covered. In addition to the matters directly addressed in this EOP, the equal opportunity obligations and requirements established herein cover:

3.1     The construction work force for the Horizontal Improvements upon the Project Site and Agency Parcels, and any additions or changes thereto.  Training and employment obligations and requirements are set forth in attached Exhibit 1.

3.2     Minority- and Woman-owned Business Enterprises.   These obligations and requirements are set forth in attached Exhibit 2.

Section 4.     Obligation to Incorporate in Other Contracts.

4.1     Each Contract to which an Affected Subconsultant is a party shall incorporate and make binding on the parties to each such Contract this Rider 4 and Exhibits 1 and 2 to this Rider 4 in their entirety.

4.2     There shall be no discrimination against or segregation of any person, or group of persons, on account of race, color, religion, creed, national origin or ancestry, sex, gender identity, age, marital or domestic partner status, sexual orientation or disability (including HIV or AIDS status) in the performance of this Agreement.  Each party to each such Contract will ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, creed, national origin or ancestry, sex, gender identity, age, marital or domestic partner status, sexual orientation or disability (including HIV or AIDS status).  Such action shall include, but not be limited to, the following:  employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; selection for training, including apprenticeship; and provision of any services or accommodations to clients or the general public.

Section 5.     Design and Other Professional Services Consulting Contracts.

5.1     Participation Goals.  The Agency has made a finding that discrimination has occurred against businesses owned by women and Minority Group Persons.  Accordingly, all

5

Affected Consultants with Contracts in excess of Ten Thousand Dollars ($10,000.00) shall make Good Faith Efforts to achieve the following goals, which have been designed to correct the effects of past discrimination:

| | |
|---|---|
| **MBE** | **twenty percent (20%)** |
| **WBE** | **eighteen percent (18%)** |

Only firms certified as MBEs, WBEs or W/MBEs (a combination of MBEs and WBEs) in accordance with Section 6 of Exhibit 2 to this Rider 4 will be counted toward meeting the above participation goals.

    5.2    All such Affected Consultants shall give First Consideration to local M/WBEs and comply with the Good Faith Efforts set forth in Section 4 of Exhibit 2 to this Rider 4 to ensure that M/WBEs have an equal opportunity to compete for and participate in contracts for the planning and design of the Horizontal Improvements on the Project Site and Agency Parcels. This obligation covers all Contracts related to the Horizontal Improvements, including professional service contracts, Consultant Contracts and Subcontracts. Consultant is responsible for ensuring that each of its Affected Subconsultants meets these requirements.

    5.3    The total Consultant Compensation payable to Consultant is as set forth in the Agreement. Consultant's obligations under this Rider 4 with respect to the hiring of MBEs, WBEs, or M/WBEs set forth above shall be based on such Consultant Compensation.

    5.4    Prior to the execution of the Agreement, Consultant has identified the following subconsultants which may be offered subconsultant agreements to perform portions of the Services:

| Firm & Address | Ethnicity & Gender of Owners | Telephone | Work Product | Contract Amount |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |

As of the date of the Agreement, _____% of Consultant's Affected Subconsultants are M/WBEs.

6

5.5    All Affected Consultants will employ Workforce Investment Act-eligible trainees through a program under which the employer may receive tax credits, in accordance with and to fulfill Owner's obligations arising under the DDA, with the specific requirements for Consultant's and each Affected Consultant's trainee hiring to be communicated to Consultant by Owner, in accordance with the following table:

| Trainees | Consultant Fees |
|----------|-----------------|
| 0 | $        0 - 249,999 |
| 1 | $    250,000 - 399,999 |
| 2 | $    400,000 - 599,999 |
| 3 | $    600,000 - 999,999 |
| 4 | $ 1,000,000 - 1,999,999 |
| 5 | $ 2,000,000 or more |

Section 6.    ARBITRATION OF DISPUTES.

6.1    **Agency's Right of Enforcement.** For purposes of enforcement, the Agency is and shall be an intended express third-party beneficiary of the obligations, requirements and agreements established by this Rider 4 and Exhibits 1 and 2, and any equal opportunity plan created or developed pursuant to these provisions. The Agency is the beneficiary for itself, in its own right, and also for purposes of protecting the interest of the community, and other parties, public or private, in whose favor and for whose benefit such obligations, requirements or agreements have been provided. Accordingly, the Agency shall have the right to enforce said obligations, requirements and agreements against any Affected Consultant, as well as any party who by contract also has the responsibility for enforcement of said obligations, requirements or agreements, *e.g.*, breaching lower tier subconsultant against any Affected Consultant.

6.2    **Initiating Arbitration; Request for Arbitration.** Arbitration, as provided for in this Rider 4 and its accompanying Exhibits, shall, subject to the provisions of Section 6.6 of this Rider 4, be the exclusive procedure for resolving any dispute concerning the interpretation, implementation or alleged breach of this Rider 4 or its Exhibits. Subject to the provisions of Section 6.6 of this Rider 4, the Agency, Owner, and all Affected Consultants may take any such dispute to arbitration by filing a Request for Arbitration ("Request") with any member of the panel of arbitrators attached hereto as Exhibit 4. Prior to filing the Request, the complaining party may determine by telephone if a particular arbitrator is available to hear the matter. Where the Agency is not the complaining party, the Request shall be served on the Agency. Where the Agency is the complaining party, the Request shall be served on Owner, the non-compliant party (if not Owner) and each Person identified in the Request as being involved in the dispute, at each such party's address last provided to the Agency, if any. The Request shall be filed and served either by hand delivery or by registered or certified mail. The Request shall identify the entities involved in the dispute (*e.g.*, Consultant or the specific Affected Subconsultant), and state the exact nature of the dispute and the relief sought. If the complaining party seeks a temporary restraining order and/or a preliminary injunction, the Request shall so state in the caption of the Request.

7

6.3    **Effect of Service on Owner.**  Service by Agency on Owner of the Request or any notice provided for by this Rider 4 or any accompanying schedule or Exhibit shall, if Agency is unable with reasonable diligence to serve any Person with the Request or notice, constitute service of the Request or notice on all Affected Consultants who are identified as being in alleged non-compliance in the Request.  Owner shall, without regard to any other service requirements set forth in Section 6.2, above, promptly serve the Request or notice, by hand delivery or registered or certified mail, on all Affected Consultants.

6.4    **Parties' Participation.**  Consultant shall require, by contract, that each Affected Subconsultant participate in any arbitration proceedings in which it is identified in the Request, and that each shall be bound by the outcome, including the decision of the arbitrator.

6.5    **Arbitrator's Ability to Act.**  Except where a temporary restraining order is sought, the arbitrator with whom the Request was filed shall notify the Agency, Owner, and the party initiating the Request by telephone within forty-eight (48) hours if she or he is **not** available to act as arbitrator.  Where a temporary restraining order is sought, such notice shall be provided within twenty-four (24) hours.  If the arbitrator is not available, she or he shall immediately designate one of the other available members of the panel appearing in Exhibit 4 hereto to be the arbitrator.

6.6    **Negotiations Prior to Arbitration.**  Prior to the filing and service of a Request, the parties to any arbitrable dispute shall meet and confer in an attempt to resolve the dispute. After the filing and the service of a Request, the parties shall negotiate in good faith for a period of ten (10) Business Days in an attempt to resolve the dispute; provided that the complaining party may proceed immediately to arbitration, without engaging in such a conference or negotiations, if the facts could reasonably be construed to support the issuance of a temporary restraining order or a preliminary injunction (temporary relief).  Whether the facts reasonably supported the issuance of temporary relief shall be determined by the arbitrator and shall not, under any circumstances, be determined by a court.

6.7    **Setting of Arbitration Hearing.**  If the dispute is not settled informally within such ten (10) Business Day period, a hearing shall be held within ninety (90) days of the date of the filing of the Request, unless otherwise agreed by the parties or ordered by the arbitrator upon a showing of good cause; provided that, if the complaining party seeks a temporary restraining order, the hearing on the motion for a temporary restraining order shall be heard not later than two (2) Business Days after the filing of the Request or after the arbitrator's fulfillment of the disclosure requirements set forth in California Code of Civil Procedure Section 1281.9, whichever is later, and provided further, if a party seeks a preliminary injunction, such motion shall be heard on fifteen (15) days' notice.  The arbitrator shall set the date, time and place for the arbitration hearing(s) within the prescribed time periods by giving notice by hand delivery to the Agency, Owner, the complaining party, and all other Persons identified in the Request as being involved in the matter; provided that, where a temporary restraining order is sought, the arbitrator may give notice of the hearing date, time and place to the Agency, Owner, the complaining party, and all other Persons identified in the Request as being involved in the matter by telephone.

8

**6.8    Discovery.** In arbitration proceedings hereunder, discovery shall be permitted in accordance with Code of Civil Procedure § 1283.05.

**6.9    Arbitration Remedies and Sanctions.** Except as may otherwise be expressly provided in the Exhibits incorporated herein, the arbitrator may impose only the remedies and sanctions set forth below and only against the non-compliant party(ies):

(a) Order specific, reasonable actions and procedures, in the form of a temporary restraining order, preliminary injunction or permanent injunction, to mitigate the effects of the non-compliance and/or to bring Owner and any non-compliant Affected Consultant into compliance.

(b) Require Developer or any Affected Consultants to refrain from entering into new contracts related to work covered by the DDA or the Agreement, or from granting extensions or other modifications to existing contracts related to Services covered by the DDA or the Agreement, other than those minor modifications or extensions necessary to enable completion of the Services covered by the existing Contract, with any non-compliant Affected Consultant until such non-compliant Affected Consultant provides assurances satisfactory to the Agency and Owner of future compliance with the applicable provisions of the Agreement.

(c) Direct Owner or Affected Consultants to cancel, terminate, suspend or cause to be cancelled, terminated or suspended, any Contract or portion(s) thereof for failure of any Affected Consultant to comply with any of the equal opportunity provisions of the DDA or the Agreement. Contracts may be continued upon the condition that a program for future compliance is approved by the Agency.

(d) Award back and front pay to those who were not hired or lost hours of work as a result of the failure of Owner or any Affected Consultant to make the required Good Faith Efforts to meet the employment goals established herein. No front pay award shall extend beyond the period that the non-compliant party performs Services at or with respect to the Project Site and Agency Parcels.

(e) If any Affected Consultant is found to be in willful breach of its obligations hereunder, impose financial penalties not to exceed Fifty Thousand Dollars ($50,000.00) or ten percent (10%) of the base amount of the Contract, whichever is less, for each such breach on the party responsible for the willful breach; provided that, in determining the amount of any financial penalty to be assessed, the arbitrator shall consider the financial capacity of the breaching party. No penalty shall be imposed pursuant to this paragraph for the first willful breach of this Rider 4 or its Exhibits unless the breaching party has failed to cure after being provided notice and a reasonable opportunity to cure. Penalties may be imposed for subsequent willful breaches by any Affected Consultant whether or not the breach is subsequently cured. For purposes of this paragraph, "willful breach" means a knowing and intentional breach.

(f) Direct any Affected Consultant to produce and provide to the Agency any records, data or reports which are necessary to determine if a violation has occurred

and/or to monitor the performance of any Affected Consultant.

**6.10   Arbitrator's Decision.**  The arbitrator shall make his or her award within twenty (20) days after the date that the hearing is completed; provided that where a temporary restraining order is sought, the arbitrator shall make his or her award not later than twenty-four (24) hours after the hearing on the motion. The arbitrator shall send the decision by certified or registered mail to the Agency, Owner and the non-compliant Affected Consultant, if any.

**6.11   Default Award; No Requirement to Seek an Order Compelling Arbitration.** The arbitrator may enter a default award against any party (*e.g.*, Owner or any Affected Consultant) who fails to appear at the hearing, provided that said party received actual notice of the hearing.  In a proceeding seeking a default award against a party other than Owner, Owner shall provide proof of service on the party as required by Section 6.7.  If Owner fails to provide proof of service, Owner shall pay Two Thousand Five Hundred Dollars ($2,500.00), as liquidated damages, to the Agency; provided that, no such damages shall be assessed if Owner demonstrates that it made good faith efforts to serve the party.  In order to obtain a default award, the complaining party need not first seek or obtain an order to arbitrate the controversy pursuant to Code of Civil Procedure § 1281.2.

**6.12   Arbitrator Lacks Power to Modify.**  Except as otherwise provided, the arbitrator shall have no power to add to, subtract from, disregard, modify or otherwise alter the terms of the DDA, the Agreement, this Rider 4, the Exhibits incorporated herein, or any other Rider to the Agreement, or any other agreement between the Agency, Owner or any Affected Consultant or to negotiate new agreements or provisions between the parties.

**6.13   Jurisdiction/Entry of Judgment.** The inquiry of the arbitrator shall be restricted to the particular controversy which gave rise to the Request.  A decision of the arbitrator issued hereunder shall be final and binding upon the Agency, Owner, and any non-compliant party, including Affected Consultants, and shall be sent by mail to the Agency, Owner and the non-compliant party or parties.  The losing party shall pay the arbitrator's fees and related costs of arbitration.  If any Affected Consultant is the losing party and fails to pay said fees within thirty (30) days after the decision, Owner shall pay the fees.  Each party shall pay its own attorneys' fees, provided, however, that attorneys' fees may be awarded to the prevailing party if the arbitrator finds that the Request was frivolous or that the arbitration action was otherwise instituted or litigated in bad faith.  Judgment upon the arbitrator's decision may be entered in any court of competent jurisdiction.

**6.14   Exculpatory Clause.**  Owner and all Affected Consultants (regardless of tier) expressly waive any and all claims against the Agency for damages, direct or indirect, including, without limitation, claims relative to the commencement, continuance and completion of construction.  Owner and all Affected Consultants (regardless of tier) acknowledge and agree that the procedures set forth herein for dealing with alleged breaches or failure to comply with the obligations and requirements of this Rider 4 and the equal opportunity obligations of the Agreement are reasonable and have been anticipated by the parties in securing financing, in inviting, submitting and receiving bids for the planning, design and construction of the Horizontal Improvements upon the Project Site and Agency Parcels, and in determining the

10

times for commencement and completion of the planning, design and construction or related work.

    **6.15    California Law Applies.** California law, including the California Arbitration Act, Code of Civil Procedure §§ 1280 through 1294.2, shall govern all arbitration proceedings.

    **6.16    Additional Arbitration Provisions in Exhibits.** The arbitration provisions contained in this Rider 4 are subject to the specific arbitration provisions, if any, set forth in attached Exhibits 1 and 2.

    **6.17    Designation of Agent for Service.** Not later than five (5) days after the execution of the Agreement, Consultant shall designate a person or business, residing or located in the City and County of San Francisco, as its agent for service of a Request and all notices provided for herein. If Consultant has an office located in San Francisco, it may designate itself as agent for service. The designation shall be served on Owner and shall include the address and telephone number of the agent. Consultant shall include this provision in each Contract it enters with respect to the Services, requiring each Affected Subconsultant to provide this notice to Owner.

    **6.18   NOTICE:  BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.**

        **WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.**

    _____      _____
                     Owner                                   Consultant

**Section 7.**    **Severability.** The provisions of this Rider 4 and each Exhibit incorporated herein are declared to be separate and severable. The invalidity of any clause, sentence, paragraph, subdivision, section or portion of this Rider 4 or any Exhibit, or the invalidity of the application thereof to any person or circumstance shall not affect the validity of the remainder of this Rider 4 and/or any Exhibits, or the validity of their application to other persons or circumstances.

11

## EXHIBIT 1

## PROFESSIONAL SERVICES EMPLOYMENTS

**Section 1.     Purpose.** The purpose of the Owner and Consultant, pursuant to relevant portions of and adopting the provisions of the DDA and the Attachments thereto executed by Agency and Owner, in entering into this Rider 1 is to ensure equal employment opportunities for Minority Group Persons and women in the construction work force and all planning, design, and analysis professional services providers involved in designing and building the Horizontal Improvements upon the Project Site and Agency Parcels covered by the Agreement.  To achieve this purpose, the Agency and Owner have adopted the standards and requirements set forth below, which are modeled on the standards and requirements of Executive Order 11246 and its implementing regulations including those contained in 41 Code of Federal Regulations ("CFR") 60-1.4, 60-4.2 and 60-4.3, which standards and requirements are adopted by Owner and Consultant and made a part of the Agreement.  Capitalized terms not otherwise specifically defined in this Exhibit have the meanings set forth in, in order of priority, Rider 4 or the Agreement.

**Section 2.     Work Force Goals.** Intentionally omitted.

**Section 3.     Incorporation.**  Whenever Consultant or any other Affected Subconsultant enters into subconsulting agreements for a portion of the Services it shall set forth substantially verbatim and make binding on each such Affected Subconsultant which has a Contract in excess of Ten Thousand Dollars ($10,000.00) the provisions of Rider 4 of the Agreement and this Exhibit 1.

**Section 4.     Equal Opportunity Requirements.**

    **4.1**     Each Affected Consultant shall take specific steps to ensure equal employment opportunity ("EEO").  The evaluation of the Affected Consultant's compliance with this Exhibit 1 shall be based upon its Good Faith Efforts to achieve maximum results from its actions.  Each Affected Consultant shall document these efforts fully, and shall implement equal opportunity steps at least as extensive as the following:

        (a) Ensure and maintain a working environment free of harassment, intimidation, and coercion at the Project Site and Agency Parcels.  The Affected Consultant shall specifically ensure that all foremen, superintendents, and other on-site supervisory personnel are aware of and carry out the Affected Consultant's obligation to maintain such a working environment with specific attention given to Minority Group Persons or women working at the Project Site and Agency Parcels.

        (b) Provide written notification to Young Community Developers, Inc. or any other organizations identified for the Affected Consultant by the Agency when the Affected Consultant or its unions have employment opportunities available, and maintain a record of the organizations' responses.

EXHIBIT "1"
1-1

(c) Maintain a current file of the names, addresses and telephone numbers of each off-the-street, Minority group, female or resident applicant and each Minority, female and resident referral from a union, a recruitment source or community organization and of what action was taken with respect to each such individual. If such individual was sent to the union hiring hall for referral and was not referred back to the Affected Consultant by the union, or if referred, not employed by the Affected Consultant, this shall be documented in the file with the reason therefor, along with whatever additional actions the Affected Consultant may have taken.

(d) Provide immediate written notification to the Agency when the union or unions with which the Affected Consultant has a collective bargaining agreement has not referred to the Affected Consultant a Minority Group Person, a woman or a resident sent or requested by the Affected Consultant, or when the Affected Consultant has other information that the union referral process has impeded the Affected Consultant's efforts to meet its obligations.

(e) Develop on-the-job training opportunities and/or participate in training programs which expressly include Minority Group Persons and women, including apprenticeship, trainee and upgrading programs relevant to the Affected Consultant's employment needs, especially those funded or approved by BAT or DAS. The Affected Consultant shall provide notice of these programs to the sources compiled under Section 4.1(b) above.

(f) Disseminate the Affected Consultant's EEO policy by providing notice of the policy to unions and training programs and requesting their cooperation in assisting the Affected Consultant in meeting its EEO obligations; by including it in any policy manual and collective bargaining agreement; by publicizing it in the company newspaper, annual report, etc.; by specific review of the policy with all management personnel and with all Minority group and female employees at least once a year; and by posting the company EEO policy on bulletin boards accessible to all employees at the Project Site and Agency Parcels.

(g) Review, prior to beginning the Services with respect to work at the Project Site and Agency Parcels and at least annually thereafter, the Affected Consultant's EEO policy and equal opportunity obligations under the Agreement and this Exhibit 1 with all employees having any responsibility for hiring, assignment, layoff, termination or other employment decisions including specific review of these items with supervisory personnel such as project managers, etc. A written record shall be made and maintained identifying the time and place of these meetings, persons attending, subject matter discussed and disposition of the subject matter. The Agency's contract compliance staff shall be invited to attend the meeting held prior to the beginning of the performance of the Services with respect to the Project.

(h) Disseminate the Affected Consultant's EEO policy externally by including it in any advertising in the news media, specifically including Minority and female news

<u>EXHIBIT "1"</u>

1-2

media, and providing written notification to and discussing the Affected Consultant's EEO policy with other consultants and subconsultants with whom the Affected Consultant does or anticipates doing business.

(i) Direct its recruitment efforts, both oral and written, to local Minority group, female and community organizations, to schools with Minority and female students and to Minority and female recruitment and training organizations serving the Affected Consultant's recruitment area and employment needs. Not later than one (1) month prior to the date for the acceptance of applications for apprenticeship or other training by any recruitment source, the Affected Consultant shall send written notification to organizations such as the above, describing the openings, screening procedures, and tests to be used in the selection process.

(j) Encourage present Minority and female employees to recruit other Minority Group Persons and women and, where reasonable, provide after school, summer and vacation employment to Minority and female youth both on the Project Site and Agency Parcels and in other areas of an Affected Consultant's work force.

(k) Validate all tests and other selection requirements where there is an obligation to do so under 41 C.F.R. Part 60-3.

(l) Conduct, at least annually, an inventory and evaluation of Minority and female personnel for promotional opportunities and encourage these employees to seek or to prepare for, through appropriate training etc., such opportunities.

(m) Ensure that seniority practices, job classifications, work assignments and other personnel practices do not have a discriminatory effect by continually monitoring all personnel and employment related activities to ensure that the EEO policy and the Affected Consultant's obligations hereunder are being carried out.

(n) Ensure that all facilities and company activities are nonsegregated except that separate or single-user toilet and necessary changing facilities shall be provided to assure privacy between the genders.

(o) Conduct a review, at least annually, of all supervisors' adherence to and performance under the Affected Consultant's EEO policies and equal opportunity obligations.

4.2    Affected Consultants are encouraged to participate in voluntary associations that assist in fulfilling one or more of their equal opportunity obligations under Section 4.1(a) through (o). The efforts of a contractor association, joint contractor-union, contractor-community, or other similar group of which the Affected Consultant is a member and participant, may be asserted as fulfilling any one or more of its obligations under Section 4.1(a) through (o) provided that the Affected Consultant actively participates in the group, makes every effort to assure that the group has a positive impact on the employment of Minority Group Persons and

EXHIBIT "1"
1-3

women in the industry, ensures that the concrete benefits of the program are reflected in the Affected Consultant's Minority and female work force composition, makes Good Faith Efforts to meet its individual goals, and can provide access to documentation which demonstrates the effectiveness of actions taken on behalf of the Owner. The obligation to comply, however, is the Affected Consultant's and failure of such a group to fulfill an obligation shall not be a defense for the Affected Consultant's non-compliance.

**Section 5.     Additional Provisions.**

5.1     The failure by a union with which the Affected Consultant has a collective bargaining agreement, if any, to refer either Minority Group Persons or women shall not excuse the Affected Consultant's obligations under this Exhibit 1.

5.2     An Affected Consultant shall not enter into any Contract with any person or firm that the Affected Consultant knows or should have known is debarred from government contracts pursuant to Executive Order 11246.

5.3     No employee to whom the equal opportunity provisions of this Exhibit 1 are applicable shall be discharged or in any other manner discriminated against by the Affected Consultant because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or relating to Rider 4 attached to the Agreement or this Exhibit 1.

5.4     Each Affected Consultant shall designate a responsible official to monitor all employment-related activity to ensure that the Affected Consultant's EEO policy is being carried out.

**Section 6.     Documentation and Records.**

6.1     **Submission of Certified Payrolls to the Agency.** Each Affected Consultant shall submit to the Owner no later than 4:00 p.m. on each Tuesday, for submission to the Agency, a report providing the information contained in the Agency's Optional Form of payroll report for the week preceding the previous week on each of its employees who is a trainee, in electronic format compatible with the Agency's requirements, unless otherwise permitted in writing by the Agency and Owner, after a reasonable period of notice and such coordination with the Agency as may be required to conform Consultant's and all Affected Consultants' inputs to Agency requirements.

6.2     **Instructions for Coding Certified Payrolls.** Intentionally deleted.

6.3     **Required Records.** For each employee who is a trainee, the Affected Consultant's payroll or similar record shall contain the name, address, whether an employee lives in the BVHP Area, telephone numbers, professional field, classification, union affiliation (if any), employee identification number, Social Security number, gender, race, status (*e.g.*, apprentice or trainee), dates of changes in status, hourly wage rates (including rates of contributions for costs anticipated for fringe benefits or cash equivalents thereof), daily and

<u>EXHIBIT "1"</u>
1-4

weekly number of hours worked, deductions made and actual wages paid. Records shall be maintained in an easily understandable and retrievable form; provided that, to the extent that existing records satisfy this requirement, the Affected Consultant shall not be required to maintain separate records.

     6.4    **Additional Information.** Intentionally deleted.

     6.5    **Inspection of Records.** The Affected Consultant shall make the records required under this Section 6 available for inspection or copying by authorized representatives of Owner, and shall permit such representatives to interview employees during working hours on the job. If required by the Agency, Owner and each Affected Consultant shall cooperate with the Agency with respect to any request for the Agency's review of such records.

     6.6    **Failure to Submit Reports.** If an Affected Consultant fails or refuses to provide the reports to Owner as required by Section 6.1, the Agency, upon notice from Owner, shall consider but not be required to institute arbitration proceedings against the non-compliant Affected Consultant.

     6.7    **Submission of Good Faith Effort Documentation.** If the Affected Consultant's Good Faith Efforts are at issue, the Affected Consultant shall provide Owner and the Agency with the documentation of its efforts as required by Section 4.1.

**Section 7.**    **Arbitration of Disputes.** The Agency, Owner, and any Affected Consultant may take any dispute concerning the interpretation, implementation or alleged breach of this Exhibit 1 to arbitration in accordance with the arbitration provisions of Rider 4 to the Agreement.

**Section 8.**    **Owner and Agency Required Meetings.**

     8.1    At such time or times prior to or after commencement of the Services, Consultant and all Affected Consultants (regardless of tier) shall attend all meetings convened by either the Owner or the Agency, including those to which outreach organizations are invited to review the reporting requirements, EEO guidelines, the prospective work force composition and any problems that may be anticipated in meeting the professional services employment goals. Owner shall provide all Affected Consultants verbal notice of all such meetings at least twenty-four (24) hours prior to any meeting.

     8.2    Any Affected Consultant (regardless of tier) who does not attend such a meeting shall not be permitted to undertake any portion of the Services. Owner has agreed with Agency to endeavor to include as many prospective consultants and professional services providers as possible at these meetings in order not to protract unduly the number of meetings.

     8.3    Consultant's or any Affected Consultant's failure to comply with this meeting provision may result in the Owner, at Owner's or the Agency's behest, ordering a suspension of Services by Consultant until the breach has been cured. Suspension of the Services under this provision is not subject to arbitration.

EXHIBIT "1"

1-5

**Section 9.     Term.**  The obligations of the Affected Consultants with respect to their work forces, as set forth in Rider 4 of the Agreement and this Exhibit 1, shall remain in effect until acceptance of all Services to be performed by each Affected Consultant in connection with the planning, design, or analysis of any aspect of the Project or the construction of Horizontal Improvements at the Project Site and Agency Parcels by Owner, Agency, and any Governmental Authority.

<u>EXHIBIT "1"</u>
1-6

## EXHIBIT 2

## EQUAL OPPORTUNITY FOR
## MINORITY AND WOMAN-OWNED BUSINESS ENTERPRISES

**Section 1.     Purpose.** The purpose of Owner and Consultant, pursuant to and adopting the relevant portions of the provisions of the DDA and the Attachments thereto executed by Agency and Owner, in entering into this Exhibit 2 is to establish a set of MBE and WBE participation goals and Good Faith Efforts designed to ensure that monies are spent in a manner which is nondiscriminatory and which provides MBEs and WBEs with an equal opportunity to compete for and participate in contracts for the planning, design and construction of the Horizontal Improvements upon the Project Site and Agency Parcels covered by the Agreement. Capitalized terms not otherwise specifically defined in this Exhibit have the meanings set forth in, in order of priority, Rider 4 or the Agreement.

**Section 2.     MBE and WBE Participation Goals.**

The Agency has made a finding that discrimination has occurred against businesses owned by women and Minority Group Persons. Accordingly, each Affected Consultant shall make Good Faith Efforts to achieve the goals which have been designed to correct the effects of past discrimination and are set forth in Rider 4 to the Agreement.

**Section 3.     Good Faith Efforts to Meet Goals With Local MBEs and WBEs.**

3.1     All Affected Consultants with Contracts in excess of Ten Thousand Dollars ($10,000.00) shall make Good Faith Efforts, described below in Section 3.2, to ensure that M/WBEs have an equal opportunity to compete for and participate in contracts for the planning, design and construction of the Horizontal Improvements upon the Project Site and Agency Parcels. A genuine effort will be made to consider local M/WBEs before looking outside of San Francisco. This obligation covers all contracts involved in the Horizontal Improvements upon the Project Site and Agency Parcels, including professional service contracts, consultant contracts and contracts and subcontracts for labor, materials, supplies and trucking. Consultant and each Affected Consultant is responsible for ensuring that each of their respective Affected Subconsultants meets these requirements.

3.2     Each Affected Consultant's compliance with the following steps will be the basis for determining if the Affected Consultant has made Good Faith Efforts to meet the goals for MBEs and WBEs:

(a) Not less than thirty (30) days prior to the opening of bids for any portion of the Work for which the Affected Consultant is responsible or the selection of any lower tier Subconsultants, the Affected Consultant shall:

(1) advertise for M/WBEs interested in competing for the Contract, in

## EXHIBIT "2"
### 2-1

general circulation media, trade association publications, including timely use of the *Bid and Contract Opportunities* newsletter published by the City and County of San Francisco Purchasing Department and media focused specifically on M/WBEs such as the *Small Business Exchange*, of the opportunity to submit bids or proposals and to attend a pre-bid meeting to learn about contracting opportunities.

(2) search through available published lists of M/WBEs in the Bay Area which provide the service being sought including such Agency directories as the Agency's MBE/WBE Directory, which is available from the Agency's Contract Compliance Department, in order to identify such M/WBEs and provide written notice to them, of the opportunity to bid for contracts and to attend a pre-bid or pre-solicitation meeting to learn about contracting opportunities.

(b) Hold a pre-bid meeting for all interested Persons not less than fifteen (15) days prior to the opening of bids or the selection of Affected Consultants. The Agency shall be invited to attend as an observer.

(c) The Affected Consultant shall follow up initial solicitations of interest by contacting the M/WBEs to determine with certainty whether the enterprises are interested in performing specific items involved in work on the Project Site and Agency Parcels.

(d) The Affected Consultant shall divide, to the greatest extent feasible and where permitted by Owner, the Services subject to the Contract into small units to facilitate M/WBE participation, including, where feasible, offering contracts for the performance of portions of the Services to Subconsultants which the Affected Consultant would normally perform itself.

(e) The Affected Consultant shall provide M/WBEs with complete, adequate and ongoing information about the plans, specifications and requirements of professional or other service work. This Section 3.2(e) does not require the Affected Consultant to give M/WBEs any information not provided to other Affected Subconsultants. This Section 3.2(e) does require the Affected Consultant to answer carefully and completely all reasonable questions asked by M/WBEs and to undertake every Good Faith Effort to ensure that M/WBEs understand the nature and the scope of the Services to be performed.

(f) The Affected Consultant, where feasible, shall negotiate with M/WBEs in good faith and demonstrate that M/WBEs were not rejected as unqualified without sound reasons based on a thorough investigation of their capacities.

(g) The Affected Consultant shall prohibit the shopping of the bids. Where the Affected Consultant learns that bid shopping has occurred, it shall treat such bid shopping as a material breach of contract or as an event disqualifying the Person engaging in bid

EXHIBIT "2"
2-2

shopping from consideration for the award of a Contract.

(h) The Affected Consultant shall assist M/WBEs in their efforts to obtain lines of credit and insurance, as applicable to the Project. The Affected Consultant shall require no more stringent bond or insurance standards of M/WBEs than those required of other business enterprises in accordance with Owner's standard guidelines relating to similarly situated consultants.

(i) The Affected Consultant shall establish delivery schedules, which encourage participation of M/WBEs.

(j) Each Affected Consultant shall encourage and assist any lower tier Affected Subconsultants which will further subcontract all or any portion of such Affected Subconsultant's portion of the Services in such Affected Subconsultant's undertaking Good Faith Efforts to utilize M/WBEs as lower tier Subconsultants.

(k) The Affected Consultant shall use the services of Minority and woman contractor associations, federal, state and local M/WBE assistance offices and other organizations that provide assistance in the recruitment and placement of M/WBEs, including the Small Business Administration and the Minority Business Development Agency of the Department of Commerce.

Section 4.    Procedures.

4.1    Notice to Owner.  Consultant shall provide Owner and, in the case of an Affected Subconsultant, any higher tier Affected Consultant, with the following information within five (5) days after the award of a Contract or selection of a Subconsultant:

(a)    the nature of the contract, e.g., type and scope of Services to be performed;

(b)    the dollar amount of the Contract; and

(c)    the name, address, license number, gender and ethnicity of the person to whom the Contract was awarded.

Owner shall, within the time period required under the DDA, provide all information required to be delivered to Owner by any Affected Consultant by this Section 4.1 to the Agency.

4.2    Affidavit.  If any Affected Consultant contends that it qualifies as an MBE or WBE, the Affected Consultant shall submit to Owner a fully-completed M/WBE Application for Certification and its accompanying Affidavit (Attachment A hereto) completed by the Minority or woman owner; provided that an M/WBE Affected Consultant that was previously recognized by the Agency as such may, instead, submit only the short M/WBE Eligibility Statement (Attachment B hereto).  Owner shall, within the time period required under the DDA or, if none,

EXHIBIT "2"
2-3

within ten (10) business days after receipt of any Affected Consultant's Application and Affidavit, submit all such documentation to the Agency for consideration and action.

    4.3    **Good Faith Documentation.**  If any subconsultant Contract to be let by an Affected Consultant is not awarded to an MBE or WBE, Owner and such Affected Consultant shall meet and confer with the Agency at a date and time set by the Agency. If the issue of the Affected Consultant's Good Faith Efforts is not resolved at this meeting, the Affected Consultant shall submit to the Agency and Owner within five (5) days, a declaration under penalty of perjury containing the following documentation with respect to the Good Faith Efforts:

    (a) A report showing the responses, rejections, proposals and bids (including the amount of the bid) received from M/WBEs, including the date each response, proposal or bid was received. This report shall indicate the action taken by the Affected Consultant in response to each proposal or bid received from M/WBEs, including the reasons(s) for any rejections.

    (b) A report showing the date that the bid was received, the amount bid by, and the amount to be paid (if different) to, the non-M/WBE Affected Consultant that was selected. If the non-M/WBE Affected Contractor who was selected submitted more than one bid, the amount of each bid and the date that each bid was received shall be shown in the report. If the bidder asserts that there were reasons other than the respective amounts bid for not awarding the contract to an M/WBE, the report shall also contain an explanation of these reasons.

    (c) Documentation of advertising for and contacts with M/WBEs, Minority or female contractor associations or development centers, or any other agency which disseminates bid and contract information to M/WBEs.

    (d) Copies of initial and follow-up correspondence with M/WBEs, Minority or female contractor associations and other agencies that assist M/WBEs.

    (e) A description of the assistance provided Minority and woman-owned firms relative to obtaining and explaining plans, specifications and contract requirements.

    (f) A description of the assistance provided to M/WBEs with respect to bonding generally, lines of credit, etc.

    (g) A description of efforts to negotiate or a statement of the reasons for not negotiating with M/WBEs.

    (h) A description of any divisions of the Services undertaken to facilitate M/WBE participation.

    (i) Documentation of efforts undertaken to encourage Affected Subconsultants to obtain M/WBE participation at a lower tier.

<u>EXHIBIT "2"</u>
2-4

(j) A report which shows for each private project and each public project (without an M/WBE program) undertaken by the bidder in the preceding twelve (12) months, the total dollar amount of the contract and the percentage of the contract dollars awarded to MBEs and the percentage of contract dollars awarded to WBEs.

(k) Documentation of any other efforts undertaken to encourage participation by M/WBEs.

4.4    **Waiver of Submissions.**    The Agency may waive any of the submission requirements set forth in Section 4.3(a) through (k) if the Agency determines that a specific requirement is not relevant to the particular situation at issue, that M/WBEs were not available, or that M/WBEs were attempting to exploit the program by charging an unreasonable price.

4.5    **Presumption of Good Faith Efforts.**    If the Affected Consultant achieves the Participation Goals, it will not be required to submit Good Faith Effort documentation.

4.6    **M/WBE Determination.**    Where an Affected Consultant makes a submission pursuant to Section 4.2, the Agency shall make a determination, pursuant to the criteria set forth below in Section 5.2 of this Exhibit 2 as to whether or not an enterprise which an Affected Consultant claims is Minority or woman-owned is in fact owned and controlled by Minority Group Persons or women. If the Agency determines that the enterprise is not an MBE or a WBE, the Agency shall give the Affected Consultant a "Notice of Non-Qualification" and provide the Affected Consultant with a reasonable period (not to exceed twenty (20) days) in which to meet with the Agency and if necessary make a submission, in accordance with Section 4.3, concerning its Good Faith Efforts. If the Affected Consultant disagrees with the Agency's Notice of Non-Qualification, the Affected Consultant may request arbitration pursuant to Section 6 of this Exhibit 2.

4.7    Where an Affected Consultant makes a submission pursuant to Section 4.3 and, as a result, the Agency has cause to believe that the Affected Consultant has failed to undertake Good Faith Efforts, the Agency shall conduct an investigation. After affording the Affected Consultant notice and an opportunity to be heard, the Agency shall recommend such remedies and sanctions as it deems necessary to correct any alleged violation(s). The Agency may recommend only the remedies and sanctions set forth in Section 6 of Rider 4 to the Agreement. The Agency shall give Owner and the Affected Consultant a written "Notice of Non-Compliance" setting forth its findings and recommendations. If the Affected Consultant disagree with the findings and recommendations of the Agency as set forth in the Notice of Non-Compliance, the Affected Consultant may request arbitration pursuant to Section 6 of this Exhibit 2.

Section 5.    **Criteria for Determining M/WBE Eligibility.**

5.1    **Agency's Role.**    The Agency shall exercise its reasonable judgment in determining whether a firm whose name is submitted by Owner or an Affected Consultant as an MBE or WBE is owned and controlled by Minority Group Persons and/or women. A firm's

EXHIBIT "2"
2-5

appearance in any of the Agency's current directories of Minority or Woman-Owned businesses, if any, will be considered by the Agency as prima facie evidence that the firm is an MBE or a WBE.

5.2    **M/WBE Certification Criteria.**

(a)    The Agency will accept the certifications or denials of the Human Rights Commission of the City and County of San Francisco unless the Agency has reasonable grounds to believe that the certification or denial is inappropriate or otherwise incorrect.

(b)    In order to be certified as an MBE, WBE or W/MBE the business must meet the definition of MBE, WBE or W/MBE set forth in Section 2 of Rider 4 to the Agreement.

(c)    In order for the M/WBE component of a joint venture to be recognized, the ownership interest must meet a thirty-five percent (35%) threshold; provided that, if the joint venture subcontracts to non-M/WBEs a percent of the Services in excess of the percentage interest that the M/WBE has in the joint venture, the joint venture shall not be recognized as an M/WBE.

(d)    The Agency will not recognize an Affected Subconsultant as an M/WBE if it subcontracts more than fifty percent (50%) of its subcontract amount to non-M/WBEs.

(e)    An eligible MBE or WBE shall be an independent business. In determining whether a business is independent, the Agency shall examine the adequacy of the business' resources for the scope of Work under a proposed contract, its financial independence, the extent of its equipment leasing and its relationships with non-Minority firms, and whether the firm:

(1)    is known in the industry or trade to be operated by a non-Minority male;

(2)    is operated in tandem with a non-M/WBE;

(3)    has multiple licenses, some of which belong to non-M/WBEs;

(4)    is listed in the telephone book, preferably in the Yellow Pages under the class for which it is seeking Agency recognition;

(5)    subcontracts back to, or is back-contracted by an Affected Consultant of a higher tier or joint venturer(s) in an amount unrelated to shared risks and profits. Back contracting includes any agreement or other arrangement between an Affected Consultant and any lower tier Affected Subconsultant where the higher tier Affected Consultant performs or secures the performance of the subconsulting Contract in such a fashion and/or under such terms and conditions that the higher tier Affected Consultant enjoys the

<u>EXHIBIT "2"</u>
2-6

financial benefit of the subcontract. Said agreement or other arrangement includes, but is not limited to, situations where either Owner or any Affected Subconsultant agrees that any term, condition or obligation imposed upon the Affected Subconsultant by the subconsultant Contract shall be performed by or be the responsibility of Owner or a higher tier Affected Consultant; and

(6) maintains a permanent office separate from that of Consultant or subconsultants, Owner, or any joint venturer(s).

(f) A Minority or woman-owned firm shall not have any formal or informal restrictions that limit the customary discretion of the Minority or woman owner. The owner should have the authority to perform all of the below functions:

(1) manage either the marketing or production aspects of the business;

(2) be authorized to sign on all bank accounts, to draw against letters of credit, and to secure insurance; and

(3) control the profit sharing, pensions or stock option plans.

(g) The Minority or woman owner must serve as the Chief Executive Officer of the firm, *i.e.*, be the boss. If there are part-owners of the firm who are not Minority Group Persons or women and who are disproportionately responsible (according to percent or degree of ownership) for the operation of the firm, then the firm shall be deemed not controlled by Minority Group Persons or women and shall not be considered an eligible MBE or WBE. Where the actual day-to-day management of the firm is handled by individuals other than the owner, those persons who have the ultimate power to hire and fire the managers shall be considered as controlling the business. Among the factors considered in making a determination are whether the owner herself or himself:

(1) possesses sufficient working experience and knowledge to perform the Contract; and

(2) controls at least fifty-one percent (51%) of the directors' votes if the firm is incorporated.

(h) All securities evidencing full or partial ownership and/or control of a business entity for purposes of establishing it as an MBE or WBE shall be held directly by Minority Group Persons or women.

(i) Minority and woman owners of firms shall make real and substantial contributions of capital and expertise to acquire their interests in the firm. Examples of insufficient contributions include a note payable to the firm or those of its part-owners who are neither Minority Group Persons nor women, or the participation as an employee without management authority.

EXHIBIT "2"
2-7

(j) **License Qualification Essential.** An unlicensed person, where licensure is required legally to perform the Services, who is used to qualify a professional business as an M/WBE does not meet the Agency's M/WBE requirements of having management and control of the business. Likewise, a person used to qualify a construction business who is not the Qualifying Partner, Responsible Managing Employee or Responsible Managing Officer as these terms are used by the Contractors' State License Board, cannot meet the Agency's M/WBE requirements of having management and control of the business. An owner who is certified by the Agency for one profession, *e.g.*, electrical engineering, cannot attribute that certification to another profession, *e.g.*, mechanical engineering, unless he or she is registered for more than one professional license. By extension a certified Minority-owned plumbing business must also be certified to perform electrical work to be an eligible Minority-owned electrical Contractor.

(k) A business requesting to be certified as an MBE or WBE shall supply the Agency with all such additional information as the Agency may deem relevant in order to make a determination of such status. If such information is not supplied within forty-five (45) days of it being requested, the Agency may consider the Application for certification withdrawn.

(l) A change in ownership of a firm from majority to Minority or woman ownership will be carefully scrutinized. The following factors shall be considered:

(1) The timing of the change in ownership of the business relative to the time that bids are opened or proposals are considered;

(2) Whether an employee-owner who had previous or continuing employee-employer relationship between or among present owners has management responsibilities and capabilities; and

(3) Whether the interest of the non-Minority or non-woman ownership conflicts with the ownership and control requirements of the Agreement.

**Section 6.    Arbitration of Disputes.**

6.1    Subject to Sections 6.2 through 6.4, the Agency, Owner, and any Affected Consultant may take any dispute concerning the interpretation, implementation or alleged breach of this Exhibit 2 to arbitration pursuant to the arbitration provisions of Rider 4 to the Agreement.

6.2    Where Owner or any Affected Consultant disagrees with the Agency's Notice of Non-Qualification or Notice of Non-Compliance, Owner or any Affected Consultant shall have seven (7) days, unless otherwise stipulated by the parties, in which to file a Request for Arbitration. If Owner or any Affected Consultant fails to file a timely Request for Arbitration, Owner or any Affected Consultant shall be deemed to have accepted and to be bound by the finding of Non-Qualification or the findings and recommendations contained in the Notice of

EXHIBIT "2"
2-8

Non-Compliance.

    6.3    The burden of proof with respect to MBE or WBE status and/or Good Faith Efforts shall be on Owner or the Affected Consultant.

    6.4    In the case of a dispute over MBE or WBE status, the arbitrator shall make a final decision on the enterprise's status. In all other cases, including disputes over an alleged failure to make Good Faith Efforts, the arbitrator shall have authority to issue relief authorized by Section 6 of Rider 4 to the Agreement.

Section 7.    **Term.** The obligations of all Affected Consultants with respect to M/WBEs, as set forth in Rider 4 to the Agreement and this Exhibit 2 shall remain in effect until acceptance of all Services to be performed by each Affected Consultant in connection with the planning, design, or analysis of any aspect of the Project or the original construction of the Horizontal Improvements at the Project Site and Agency Parcels by Owner, Agency, and any Governmental Authority.

<u>EXHIBIT "2"</u>

2-9

## ATTACHMENT A

### APPLICATION FOR CERTIFICATION
### (MINORITY OR WOMAN-OWNED BUSINESS ENTERPRISE AFFIDAVIT)
#### (To be completed by Minority or Woman Owner)

_____          _____
(Name of Project)                        (General Contractor if not the General itself)

1.  Name of Firm _____
    (Has business operated under another name? _____  If so, explain under item 22.)

2.  Contact Person _____

3.  Business Address _____
    (P. O. Box is unacceptable)

4.  Mailing Address _____
    (If different)

5.  Telephone Number(s) _____     FAX: _____

6.  Is business address or phone number also that of a residence? _____  If so, please explain under item 22.

7.  Indicate the type of industry or the business:

    ☐ Construction          ☐ Professional Consultant          ☐ Supplier
    ☐ Manufacturer          ☐ Manufacturer's Representative     ☐ Other _____

**Identify types of services or products offered.  (Equipment operator or trucker should identify the equipment it owns here or under item 22.)**

_____
_____
_____
_____
_____

8.  Type of ownership:   ☐ Corporation      ☐ Sole Proprietor      ☐ Partnership
    ☐ Joint Venture          Indicate if another entity_____

ATTACHMENT "A" TO EXHIBIT "2"
2-A-1

9.   With your application please submit true and correct copies of the following documents:

    a.   Proof of ethnic identification, such as birth certificate or tribal registration, if you are a Minority owner.

    b.   Contractors' State License No. _____
                                   (Name of person who qualified for license)

*NOTE:   If you have formed a partnership or incorporated since becoming a contractor, the partnership or corporation must have its own Contractors' State License.*

    c.   Registration and license issued by the State Board of Architectural Examiners, the Board of Registration for Professional Engineers and Land Surveyors, the State Board of Accountancy or the State Bar of California.

    d.   Local business license(s) and permits(s).

    e.   Fictitious name filing, if you are doing business as a fictitious entity.  The names on the Contractors' State License and the fictitious name filing must match.

    f.   Partnership Agreement, if the firm is a partnership.  The names of the partners must match those shown to be partners on the Contractors' State License.

    g.   If the firm is a corporation:

        i.    Articles of Incorporation,
        ii.   Corporate Bylaws and
        iii.  Minutes of the first meeting.

    h.   Joint Venture Agreement (including dollar amount of capital contribution), if a joint venture is the applicant.

    i.   Federal personal tax returns, Form 1040, in full with W-2 statements and all supporting schedules and statements for *all* shareholders for the past two (2) years.

    j.   Federal corporate tax returns, Form 1120 (including Exhibit E), in full with *all* supporting schedules and statements such as Form 4562 for the past two (2) years.

    k.   Resumes pointing out the years of specific experience to qualify for the responsibilities delegated to each *Management* person listed in item fifteen (15) of this Application.

    l.   Proof, if the firm is registered as a disadvantaged business under Section 8(a) of the

<u>ATTACHMENT "A" TO EXHIBIT "2"</u>
2-A-2

Small Business Act.

m.    Inventory (not to exceed a ten (10)-page extract), if the firm is a manufacturer or supplier.

10.    List the owners who have an interest of five percent (5%) or greater:

| Name | Ethni-city* | Gender M/F | Date of Ownership | Number of Shares | Vote % | U.S. Citizen (yes/no) |
|------|-------------|------------|-------------------|------------------|--------|------------------------|
| _____ | ___ | ___ | _____ | ____ | ____ | ____ |
| _____ | ___ | ___ | _____ | ____ | ____ | ____ |
| _____ | ___ | ___ | _____ | ____ | ____ | ____ |
| _____ | ___ | ___ | _____ | ____ | ____ | ____ |
| _____ | ___ | ___ | _____ | ____ | ____ | ____ |

If more Owners, check here ☐ and continue listing under item 22.

*American Indian or Alaska Native, which includes Alaska Indians, Inuits and Aleuts (any person having origins in the indigenous peoples of North America and who is an enrolled member of a federally-recognized tribe), Asian (any person of Chinese, Japanese, Korean, Pacific Islander, Samoan, Filipino, Asian-Indian or South East Asian), Black (any person having origins in any of the Black racial groups of Africa), Latino (any person of Spanish culture with origins in Mexico or other Spanish speaking countries in Central or South America, or the Caribbean Islands).

11.    List the contributions of money, equipment, real estate, or expertise of each of the owners for firms with less than one hundred percent (100%) disadvantaged ownership.

_____

_____

_____

_____

12.    Date firm was established _____.    The total number of years the firm has been in business is _____.  The number of years the firm has been in business under present ownership is _____.  The following is a brief explanation of the change in ownership of the firm (if applicable):

<u>ATTACHMENT "A" TO EXHIBIT "2"</u>
2-A-3

_____

_____

13.   Board of Directors:

| Name | Title | Ethni-city | Gender M/F | Date Elected/ Expiration/Term |
|------|-------|------------|------------|-------------------------------|
| _____ | _____ | ____ | ____ | _____ |
| _____ | _____ | ____ | ____ | _____ |
| _____ | _____ | ____ | ____ | _____ |
| _____ | _____ | ____ | ____ | _____ |

**If more Directors, check here** ☐ **and continue listing under item 22.**

14.   If the Board of Directors has changed within the last three years, list the names of the former Directors, their ethnicity, gender and date of resignation under item 22.

15.   **Management:** The following duties are actually performed by the persons indicated below:

    a.   Preparation of estimates and bids:

    by _____   who reports to _____
            name     name

    b.   Hiring, firing of management personnel:

    by _____   who reports to _____
            name     name

    c.   Purchasing of major equipment, material or supplies:

    by _____   who reports to _____
            name          name

    d.   Financial control:

    by _____   who reports to _____
            name          name

    e.   Negotiations and approval of contracts:

<u>ATTACHMENT "A" TO EXHIBIT "2"</u>
2-A-4

by _____    who reports to _____
       name       name

f.     Administration of contracts:

by _____    who reports to _____
       name       name

g.     Supervision of field operations:

by _____    who reports to _____
       name       name

h.     Marketing and sales activities:

by _____    who reports to _____
       name       name

i.     Warehouse inventory and control:

by _____    who reports to _____
       name       name

16.    Federal identification no. _____

17.    Indicate the firm's gross receipts and average number of employees for the last three tax years:

Year ending _____    Amount _____    Employees _____

Year ending _____    Amount _____    Employees _____

Year ending _____    Amount _____    Employees _____

18.    <u>MANUFACTURERS AND SUPPLIERS ONLY</u>: For last year:

a.     Lowest no. of employees _____

b.     Highest no. of employees _____

c.     No. of employees whose job lasted the entire year _____

d.     Were any of the employees on another firm's payroll? _____  If so, identify the firm: _____

<u>ATTACHMENT "A" TO EXHIBIT "2"</u>
2-A-5

    e.      Value of current inventory $_____

    f.      Location of inventory _____

19.  How were applications to other local agencies handled?

| | Name of local agency | L/M/WBE? | Approved Yes/No | Date |
|---|---|---|---|---|
| a. | _____ | _____ | | |
| b. | _____ | _____ | | |
| c. | _____ | _____ | | |
| d. | _____ | _____ | | |

20.  Name of Surety _____

       Name of Agent _____ Telephone No. _____

       Bonding Limit _____ Sources of letter of credit _____

21.  If the firm or other firms with any of the same officers has previously been denied recognition as an M/WBE, MBE or WBE please explain the circumstances.

      _____

      _____

      _____

22.  Identify any owner or management official of the named firm who is or has been an employee of another firm that has an ownership interest in or a present business relationship with the named firm. Describe present business relationships that include sharing space, equipment, financing or employees, as well as common owners. Please use this additional space to supplement the information provided above, especially under items 1, 6, 10, 11, 12 and 13. You may attach additional sheets.

      _____

      _____

## ATTACHMENT "A" TO EXHIBIT "2"
### 2-A-6

_____

_____

23.   The firm intends to subcontract _____ percent of the work to be performed under its
      contract with _____ to the following:

      M/WBE
                      Name            Amount of
                                      Yes/No   Subcontract      Scope of Work

      a.    _____    _____  _____  _____

      b.    _____    _____  _____  _____

      c.    _____    _____  _____  _____

      d.    _____    _____  _____  _____

G:\All Share\CONTRACTS-Bob,Caroline,Eric,Pauline,Victor\CONTRACTS - Bob,Eric and Victor\AAAA HPS TEMPLATES Contracts & Mtg
Forms\HPS PARCEL A CONSULTANT TEMPLATES\Consultant Agr Rider 4 (EOP) Hugh Oct 05-6.doc

## ATTACHMENT B

### M/WBE ELIGIBILITY STATEMENT
#### (To be completed by Minority or Woman Owner)

_____          _____
(Name of Project)                         (General Contractor if not the General itself)


I, _____, declare:


1.    I  have  carefully  reviewed  the  **Affidavit/Declaration**  executed  by  myself  on
_____  on behalf of _____
            Date                                Name of Firm

2.    The only changes to said document are:


I have personal knowledge of the foregoing facts and if called as a witness I could and would testify competently thereto.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____     in _____
              Date                                Place of Execution


_____          _____
Signature of Declarant                    Title


### ATTACHMENT "B" TO EXHIBIT "2"
#### 2-B-1

## EXHIBIT 3

## FIRST SOURCE REFERRAL HIRING AND JOB TRAINING

Consultant and all Affected Subconsultants shall comply with any applicable provision of the City's First Source Hiring Program pursuant to Ordinance No. 264-98, to the extent that, and so long as, such provisions remain in full force and effect on a city-wide basis to established and future development. Consultant acknowledges the application of the First Source Hiring Program, to the extent therein provided, to future transferees and lower tier Affected Subconsultants.

# EXHIBIT 4

## PANEL OF ARBITRATORS

Morris Davis, Esq.
64 Ironwood
Oakland, CA 94605
Phone: 510/635-4509
Fax:    510/635-4509

John Kagel, Esq.
P. O. Box 50787
Palo Alto, CA 94303
Phone: 650/325-0389
Fax:    650/325-4394

William Bennett Turner
Rogers Joseph O'Donnell Quinn
311 California Street
San Francisco, CA 94104
Phone: 415/956-2828

EXHIBIT "4"
4-1

# RIDER 5

## MENTORSHIP PROGRAM

This Mentorship Program (the "MP") is attached to and made party of the Consultant Agreement to which it is attached ("Agreement") and is subject to certain provisions of the Disposition and Development Agreement between Lennar-BVHP, LLC and the Redevelopment Agency of the City and County of San Francisco, as amended from time to time (the "DDA") for Hunters Point Shipyard, Phase I ("Phase I"). Consultant is bound by this Rider as part of the obligations it assumes, and benefits it receives, under the Agreement. Capitalized terms not otherwise specifically defined in this Rider have the meanings set forth in the Agreement.

**Section 1.    Purposes.**  Owner and Consultant agree that this MP is designed to ensure that:

(a)    Persons and businesses that plan, design or construct improvements on sites at Hunters Point Shipyard provide opportunities to eligible parties for the development of Mentor-Protégé relationships.

(b)    Consultant and all lower tier subconsultants coordinate with Owner's obligations to provide mentors and mentorship opportunities for all eligible parties performing Work on the Project.

**Section 2.    Mentors.**  The individual or entity contracted by Owner to administer the MP ("Mentorship Program Sponsor") shall select or accept for inclusion in the MP reputable and successful individuals and companies with at least seven (7) years experience in the construction industry to assist emerging MBE/WBE construction-related enterprises with a primary business address in the BVHP Area or with an owner who lives in the BVHP Area ("Protégés") in achieving goals identified in the MP ("Mentors"). Owner and Agency have agreed that the number and quality of the Mentors will be key to the success of the MP. Owner is obligated to display prominently information about the MP on its website and on the Shipyard website. To the extent Consultant qualifies as a Mentor, Consultant shall, if requested by Owner or the Mentorship Program Sponsor, participate as a Mentor in the MP. Mentors shall assist Protégés with setting targets for improvement, setting deadlines for reaching such targets and meeting the set deadlines. Minimum responsibilities of Mentors shall be to:

(a)    Make themselves available to their assigned Protégés by attending all required meetings including, without limitation, the regularly scheduled monthly meetings to be scheduled by the Mentorship Program Sponsor;

(b)    Make themselves available to their assigned Protégés at other times to help them address significant business issues that may arise;

(c)    Regularly review their assigned Protégés' business and action plans;

1

(d)    Monitor their assigned Protégés' key business indicators, including cash flow, work in progress and recent bids, as their Protégés grow and develop; and

(e)    Teach their Protégés how to market a construction company.

**Section 3.    Protégés.**  To the extent Consultant qualifies as a Protégé, Consultant shall comply with the obligations of Protégés set forth in this Rider 5 if Owner requires such participation or if the Consultant requests that it be included as a Protégé in the MP and is so enrolled by the Mentorship Program Sponsor.  Subject to excused absences based on rules developed by the Mentorship Program Sponsor, Protégés shall attend all regularly scheduled meetings and help determine the agenda for those meetings.  Between such meetings, Protégés shall make every effort to implement the business decisions that the meetings produce.  Additionally, Protégés shall perform the following activities:

(a)    Work with the party or parties selected by the Mentorship Program Sponsor to use its knowledge of construction business issues to educate Protégés and provide them with professional services, including, without limitation, financial administration, insurance and bonding, business management and other services that Protégés and Mentors may identify as beneficial to Protégés (collectively, "Professional Services Provider");

(b)    Attend seminars and/or other relevant educations programs;

(c)    Implement specific changes in the management or operation of their business, as necessary and appropriate;

(d)    Provide to the Mentorship Program Sponsor complete and up-to-date information on their businesses, including their business and action plans, cash flow information, latest bids, and work in progress; and

(e)    Take the initiative to request whatever additional assistance they may need to address significant business issues.

**Section 4.    Surety Companies.**  Consultants of any tier who are Protégés shall attend workshops and meetings with the surety companies and brokers arranged by the Mentorship Program Sponsor so that the surety companies and brokers can explain the purpose and function of surety bonds, and help the Protégés develop the underwriting files that will enable them to obtain bonds for other projects.

**Section 5.    Financial Institutions.**  Consultants of any tier who are Protégés shall attend workshops and meetings with banks and other lenders within and outside of the BVHP Area arranged by the Mentorship Program Sponsor to explain how to apply for, and assist Protégés in applying for credit or increasing credit limits.  These workshops may be coordinated with those conducted as part of the Financial Assistance Program.

2

**Section 6.    Performance Standards for Protégés.** Consultants of any tier who are Protégés shall coordinate and cooperate with the Mentorship Program Sponsor to set and monitor quarterly and annual performance standards for the Protégés in the following areas:

(a)    Capital base, including

- Working capital;
- Depreciated value of equipment owned or leased;
- Payroll;
- Material expensed;
- Overhead expensed;
- Net profit; and
- Available credit.

(b)    Bonding limits, per job and in the aggregate;

(c)    Value of current and future work;

(d)    Success in getting profitable work outside any government program for small, minority, women or disadvantaged business enterprises;

(e)    Retention of reliable and productive employees; and

(f)    Customer loyalty resulting in repeat business.

**Section 7.    Selection of Protégés.** If Consultant is invited to enroll in the MP as a Protégé, whether as a result of the Mentorship Program Sponsor's invitation or the Consultant's request, Consultant shall cooperate with Owner and the Mentorship Program Sponsor in pursuing such enrollment, including, without limitation, participating in interviews to identify and/or clarify the needs of each prospective Protégé. Applicants must complete and submit an MP application, a balance sheet and income statement. The Advisory Board and Mentorship Program Sponsor shall use the submitted balance sheet and income statement to conduct a limited financial review before interviewing the applicant. The limited financial review will include a comparison with standard industry ratios.

**Section 8.    Meetings.** Mentors, their Protégés, the Professional Services Provider, and the Mentorship Program Sponsor shall meet at least once each month, at a regularly scheduled time and place. The Mentorship Program Sponsor shall arrange these meetings and prepare a written agenda for each meeting. The participants shall review the items on the Protégé's business and action plans and shall make appropriate changes to such plans. The Professional Services Provider shall take notes at the meeting and within a reasonable time after each meeting, distribute a written report on the meeting to all of the participants. The report shall outline the applicable Protégé's most recent efforts to implement its business and action plan and the results of those efforts. The report shall also list the applicable Protégé's current needs. Mentors and Protégés shall use this report to guide their next steps, and the Mentorship Program Sponsor will use it to prepare the agenda for the next month's meeting.

3

**Section 9.      Progress Reports.**  For each month, quarter and year of enrollment, the Mentorship Program Sponsor will produce a progress report on each Protégé, based on the performance standards that the Mentorship Program Sponsor recommends.  Progress reports shall include information and be written in a manner that helps the MP participants assess the actual results of the MP.  The progress reports should be used as a tool to help improve the MP, clarify, if necessary, and strengthen the roles and effectiveness of the participants.  The Mentorship Program Sponsor shall deliver the progress reports to the applicable Protégés, their Mentors and the Agency within fifteen (15) days after the end of the each month, thirty (30) days after the end of each quarter, and sixty (60) days after the end of each year.

4

RIDER 6

SMALL BUSINESS ASSISTANCE PROGRAM

Section 1.     **Introduction.**  Pursuant to Section 5.6 of DDA Attachment 24B and Section 11 of the Community Benefits Agreement, Owner shall establish or fund an existing small business assistance program located in the BVHP Area (the "Small Business Assistance Program").  The Small Business Assistance Program shall identify opportunities to assist small businesses in the BVHP Area (defined below) to obtain contracts for and participate in other business opportunities at the Hunters Point Shipyard ("Shipyard").  The term "small business operating in the BVHP Area", or "BHVP Area Small Businesses", shall mean any business located in and with a principal business address in the BVHP Area and which has fewer than fifty (50) employees, based on information provided by such business.

Section 2.     **Program.**  Owner shall implement the following Small Business Assistance Program, which will have four (4) main components:

(a)     Database of BVHP Area Small Businesses.  Owner shall generate and maintain a database of BVHP Area Small Businesses, including for each such business, contact information, a description of the business and how that business can provide products and services needed by Shipyard contractors, consultants and other parties doing business at the Shipyard or associated with the Shipyard Project ("Directory").  Owner shall also include in the Directory similar information regarding BHVP Small Businesses from existing databases created by applicable entities such as applicable government agencies and community-based organizations.  The purposes of this Directory are to facilitate networking among businesses and to serve as "yellow pages" for prime construction contractors and other contractors and consultants to identify and market to BVHP Area Small Businesses.  Owner shall use reasonable efforts to cause the Directory to be comprehensive and to reflect a wide variety of anticipated business needs such as catering/restaurants, copying and reproduction, legal and accounting services, construction suppliers, office supplies, furniture suppliers, etc.  Owner shall develop and post the Directory on the Shipyard website, and make it available at the Project Office and other outreach venues described in the Outreach Program within sixty (60) days after the Close of Escrow.  Owner shall update the Directory periodically, but no less than biannually.  Upon the mutual agreement of the Agency and Owner, and with reasonable prior notice to the BVHP Area Small Businesses, the definition of "BVHP Area Small Businesses" may be revised to adjust the maximum number of employees, if based on information gathered during the implementation of this Small Business Assistance Program, the Agency and Owner determine that a different employee number would more accurately reflect the size of the majority of the businesses in the BVHP Area that can provide Shipyard Project-related products and services.  Consultant shall cooperate with all interested parties in updating and maintaining the Directory when requested by Owner, the City, or the Agency.

(b)     Contract Requirements.  Consultant shall use best efforts to purchase no less than twenty percent (20%) of the dollar value of all of Consultant's Shipyard Project-related purchases from BVHP Area Small Businesses.  Owner shall have supplied Consultant with the

1

current copy of the Directory prior to executing this Agreement.  Consultant shall provide monthly progress reports on the dollars Consultant spends with BVHP Area Small Businesses (A) compared with the dollars Consultant spent on its total Shipyard Project-related purchases; and (B) compared with the dollars Consultant spent on its Shipyard Project-related purchases with non-BVHP Area businesses with less than fifty (50) employees.  Failure to comply with the above requirements shall be a default under this Agreement.  If Consultant does not meet the 20% goal, Consultant shall provide Owner with evidence satisfactory to the Agency and Owner that it used best efforts to meet the 20% purchasing goal, including, without limitation:

        1.     A detailed, written description of its efforts to purchase Shipyard Project-related supplies and/or services from BVHP Area Small Businesses, including from those relevant sources listed in the Directory;

        2.     A detailed, written description of responses, if any, received from BVHP Area Small Businesses to its bid, pricing, solicitation or other requests to purchase supplies or services; and

        3.     A detailed, written description stating why responses from BVHP Area Small Businesses did not satisfy its selection requirements, including, without limitation, whether price quotes given by the responding BVHP Area Small Businesses were reasonably competitive considering the amounts that could reasonably be attributed to the increased costs generally faced by small businesses.

Notwithstanding the foregoing provisions, Owner and Consultant acknowledge that Owner has encouraged Consultant to exceed this 20% requirement and that Owner will evaluate Consultant's efforts to do so in determining future contract opportunities.  Owner is obligated to verify and report to the Agency the progress of, and any failure of, Consultant to meet the requirements of this paragraph (b).

        (c)     <u>Marketing and Networking Opportunities.</u>

        (i)     At least once each quarter during Phase 1, or less if such lesser number is determined by the Agency and Owner to be warranted, Owner shall host a small business networking workshop for BVHP Area Small Businesses.  The purpose of the workshop will be two-fold:

        (A)     To inform BVHP Area Small Businesses of the upcoming needs of contractors, consultants and Shipyard businesses; and

        (B)     To provide BVHP Area Small Businesses with an opportunity to market their goods and services to Owner and its contractors and consultants.

        Consultant shall attend each such networking workshop through authorized representatives and cooperate with Owner's other reasonable requests to meet these obligations.

2

(ii)    Owner shall hold the first BVHP Area Small Business networking workshop within ninety (90) days from Close of Escrow.

(iii)Owner shall also outr      each to the various merchants and business associations in the BVHP Area (such as the Rotary), utilize the media and coordinate with organizations such as the San Francisco Mayor's Office and the Small Business Administration to keep them informed of opportunities for small businesses and vendors at the Shipyard, encourage their members to submit information to Owner for distribution to contractors and consultants, and to participate in the networking workshops.  Consultant shall cooperate with Owner's reasonable requests to meet these obligations.

(iv)    Owner shall conduct a quarterly survey of Shipyard businesses, contractors, consultants and tenants via its website, at its Project Office, via mail, fax or through face-to-face meetings, in order to collect updated information about the Shipyard businesses, contractors, consultants and tenants, their contract needs, and supplies and services they use. This survey shall be used to assess the quality of the Small Business Assistance Program, to determine the extent of dollars getting into the BVHP Area community from the program and to focus on critical supplies and services needed for the networking workshops.  Consultant shall cooperate with Owner's reasonable requests to meet these obligations.

(v)    Owner shall feature a BVHP Area Small Business in each Shipyard newsletter and on the website to promote and advertise the utilization of these businesses by Owner, and contractors, consultants and other businesses at the Shipyard. Consultant shall cooperate with Owner's reasonable requests to meet these obligations.

(d)    <u>Community Benefits Manager</u>.  Consultant will cooperate fully with the Lennar/BVHP Community Benefits Manager assigned to be responsible for operating the Small Business Assistance Program and ensuring that all of the components of the program are implemented as described herein.

Section 3.    <u>Definition</u>.  The area of San Francisco, California located within the portions of the 94124, 94134 and 94107 zip code areas (or any successor zip codes) that are located in Supervisorial District 10, as shown on that certain Map of the City and County of San Francisco showing Precincts and Legislative Districts, prepared by the Department of Elections and dated January 2004, shall hereinafter be referred to as the "BVHP Area".

3